UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED

11 APR -7 PM 7: 37

U.S. DISTRICT COURT
S.D.N.Y.

---

BRICKLAYERS AND MASONS LOCAL :
UNION NO. 5 OHIO PENSION FUND :
and DEKALB COUNTY PENSION FUND on:
*behalf of themselves and all others* :
*similarly situated,* :

                  Plaintiffs,

     - against –

TRANSOCEAN LTD., ROBERT L. LONG, :
and JON A. MARSHALL, :

                  Defendants.

Civil Action No. 10-cv-7498

Judge: Laura Taylor Swain

---

## AMENDED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

Page

I.    NATURE AND SUMMARY OF THE ACTION ...............................................................1

II.   JURISDICTION AND VENUE .......................................................................................7

III.  PARTIES .........................................................................................................................7

IV.   GENERAL ALLEGATIONS ...........................................................................................9

    A.    BACKGROUND .................................................................................................9

    B.    TRANSOCEAN'S DEEPWATER DRILLING IN THE GULF WAS
          STRICTLY REGULATED BY FEDERAL REGULATIONS AND
          LAWS .................................................................................................................12

    C.    THE MERGER BETWEEN TRANSOCEAN AND GLOBALSANTAFE .........17

    D.    TRANSOCEAN SYSTEMATICALLY VIOLATED FEDERAL LAWS
          AND INDUSTRY STANDARDS DESIGNED TO REDUCE THE RISK
          OF CATASTROPHIC OIL SPILLS....................................................................19

          1.    Transocean Failed to Inspect and Maintain Its Blowout Preventers
                In Accordance With Law ..........................................................................19

                i.     The BOP is a Critical Piece of Equipment on a Deepwater
                      Drilling Rig ....................................................................................19

                ii.    Federal Regulations Required Transocean to Maintain its
                      BOPs to Ensure Well Control, Including Disassembly and
                      Inspection .......................................................................................22

                iii.   Transocean Ignored The BOP Manufacturer's
                      Recommendations For Inspection and Maintenance ....................24

                iv.    Transocean Refused to Adequately Inspect and Test its
                      BOPs in Order to Increase Revenues.............................................24

          2.    Transocean Otherwise Failed to Safely Maintain Its Equipment to
                Cut Costs..................................................................................................29

          3.    Transocean Refused to Staff Its Rigs With Licensed Engineers and
                 Other Qualified Personnel Needed to Safely Operate Its Rigs .................31

i

4. Transocean Systematically Flouted Laws Requiring It To Train Its Rig Crew On Critical Safety Tests and Well Control Procedures ............33

 i. Transocean Failed to Train Its Employees On How To Conduct a Negative Pressure Test and Correctly Interpret Its Results .....................................................................................34

 ii. Transocean Failed to Adequately Train Its Employees to Detect "Kicks" ..............................................................................35

 iii. Transocean Failed to Train Its Employees on How to Respond to Low Frequency, High Risk Events ............................36

E. TRANSOCEAN'S MANAGEMENT POLICIES CREATED UNSAFE OPERATING CONDITIONS THROUGH THE COMPANY ............................37

 1. Transocean Management Shifted Blame To Low-Level Employees Rather Than Developing Standards and Correcting Safety Hazards ........38

 2. Transocean Created Unsafe Conditions By Disregarding Industry Rig Inspection Standards In Favor of Less Costly Measures ...................39

F. TRANSOCEAN MANAGEMENT REPEATEDLY UNDER-REPORTED CRITICAL SAFETY INCIDENTS, IGNORED SAFETY HAZARDS AND SILENCED WHISTLEBLOWERS ........................................42

V. THE PROXY CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMITTED MATERIAL INFORMATION ..................................48

A. THE PROXY CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS WHICH DEPRIVED THE GLOBALSANTAFE SHAREHOLDERS OF THEIR RIGHT UNDER SECTION 14(A) TO A FULLY INFORMED VOTE ..........................................48

B. THE PROXY WAS FALSE AND MISLEADING BECAUSE IT OMITTED MATERIAL INFORMATION WHICH DEPRIVED GLOBALSANTAFE SHAREHOLDERS OF THEIR RIGHT UNDER SECTION 14(a) TO A FULLY INFORMED VOTE...........................................52

 1. The Proxy Failed To Disclose That Transocean Failed To Inspect And Maintain Its Drilling Rigs, Including Its BOPs, as Required............52

 2. The Proxy Failed To Disclose That Transocean's Training Practices Were Grossly Deficient ...............................................................54

3.     The Proxy Failed To Disclose That Transocean Misreported and
Failed To Report Safety Incidents And Punished Whistleblowers............54

4.     The Proxy Failed To Disclose A Culture That Routinely Sacrificed
Safety for Profits .........................................................................................54

VI.     THE TRUTH IS REVEALED/LOSS CAUSATION .........................................................55

VII.     CLASS ACTION ALLEGATIONS .................................................................................62

PRAYER FOR RELIEF ...........................................................................................................66

JURY TRIAL DEMANDED .....................................................................................................67

By and through their undersigned counsel, Lead Plaintiffs, Bricklayers and Masons Local Union No. 5 Ohio Pension Fund and DeKalb County Pension Fund (collectively, "Plaintiffs") allege the following against Defendants Transocean Ltd. ("Transocean") and Robert L. Long ("Long") and Jon A. Marshall ("Marshall") upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters upon information and belief and upon the investigation of counsel, which included, without limitation, the review, examination and analysis of the following: (a) public filings made by Transocean, GlobalSantaFe Corporation ("GlobalSantaFe") and other related parties and non-parties with the Securities Exchange Commission ("SEC"); (b) press releases and other publications disseminated by certain Defendants; (c) public information disseminated by  non-parties, including but not limited to news articles and analyst reports (d) shareholder communications and postings of information on Transocean's website; (e) governmental records, studies, reports, and other documents and information obtained through other civil actions against Transocean, independent reports, and other testimony, documents, and reports obtained in connection with hearings held by the U.S. House of Representatives, the U.S. Senate, the Joint Investigation of the U.S. Coast Guard, Bureau of Ocean Energy Management, Regulation and Enforcement, and the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling ("National Commission"); and (f) interviews with former Transocean employees. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity to engage in discovery.

## I.     NATURE AND SUMMARY OF THE ACTION

1.     This is a class action brought by Lead Plaintiffs on behalf of themselves and other persons or entities who exchanged their GlobalSantaFe stock for Transocean stock as part of a

merger transaction in the fall of 2007 with Transocean (the "Merger"), and who were damaged thereby, as further described below.  This case is brought against Transocean, and its former Chief Executive Officer ("CEO"), Long and former GlobalSantaFe CEO, Marshall (collectively, "Defendants") arising out of Defendants' dissemination of a false and misleading proxy statement ("the Proxy")[1] in connection with Transocean's merger with GlobalSantaFe in violation of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder.

2.      GlobalSantaFe was an offshore oil and gas drilling contractor and provided offshore drilling services to the world's leading oil and gas companies.  Transocean was at the time of the Merger, and continues to be, one of the largest international providers of offshore contract drilling services for oil and gas.  At the time of the Merger, Transocean owned numerous offshore mobile drilling rigs throughout the world, including the deepwater semi-submersible drilling rig, the *Deepwater Horizon*.

3.      On July 21, 2007, Defendants Long and Marshall on behalf of Transocean and GlobalSantaFe, respectively (the "Companies"), entered into a tentative merger agreement (the "Merger Agreement") in which GlobalSantaFe shareholders would surrender each of their shares in exchange for .4757 shares of Transocean stock plus a $22.46 cash payment (the "Exchange Price").  Consummation of the Merger was conditioned upon, *inter alia*, certain representations and warranties made by each Company, the receipt of "fairness opinions" regarding the adequacy of the Exchange Price, and the approval of the Merger by a vote of the shareholders in each Company.  By this Merger Agreement, Transocean represented and warranted:

---

[1] By the term Proxy, Plaintiffs refer to the SEC Form 14A Proxy Statement and its annexes attached at Exhibit A hereto, and incorporated herein by reference.  One of the annexes to the Proxy is the July 21, 2007 Merger Agreement.

*Environmental Matters.*

(a) ***Transocean and each Subsidiary of Transocean has been and is in compliance with all Environmental Laws*** except for such matters as do not and are not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect. ***There are no past or present facts, conditions or circumstances that interfere (or are reasonably likely to interfere in the future) with the conduct of any of their respective businesses in the manner now conducted or which interfere with continued compliance with any Environmental Law***, except for any non-compliance or interference that is not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect.

    A.   Except for such matters as do not and are not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect, no judicial or administrative proceedings or governmental investigations are pending or, to the knowledge of Transocean, threatened against Transocean or its Subsidiaries that allege the violation of or seek to impose liability pursuant to any Environmental Law, and ***there are no past or present facts, conditions or circumstances*** at, on or arising out of, or otherwise associated with, any current (or, to the knowledge of Transocean or its Subsidiaries, former) businesses, assets or properties of Transocean or any Subsidiary of Transocean, including but not limited to on-site or off-site disposal, release or spill of any Hazardous Materials ***which violate Environmental Law or are reasonably likely to give rise under any Environmental Law to (i) costs, expenses, liabilities or obligations related to any cleanup, remediation, investigation, disposal or corrective action, (ii) claims arising for personal injury, property damage or damage to natural resources, or (iii) fines, penalties or injunctive relief.***

(Emphasis added).

Based on Transocean's policies, practices and procedures as they existed at the time of the Proxy, these statements were false and misleading because Transocean was not in compliance with Environmental and other laws concerning its operations safety practices.

4.    In addition to misrepresenting that the Company was in compliance with Environmental Laws, the Proxy, which incorporated by reference the Company's 2006 Form 10-K, also misled Plaintiffs and the Class about the safety of Transocean's drilling operations by representing that Transocean conducted "extensive" training and safety programs without

3

disclosing that, in fact, Transocean's management routinely assumed excessive safety risks in its deepwater drilling operations and short-changed training to maintain production schedules and to cut short-term costs.

5.     The Proxy also misrepresented that the Exchange Price – 0.4757 Transocean shares and $22.46 cash for each GlobalSantaFe share – was "fair" when in fact it was not.

6.     It is now clear that GlobalSantaFe shareholders did not receive adequate compensation for their shares and were deprived of the opportunity to make an informed decision as to how to vote on the Proxy because of Defendants' false statements and omissions as further described below.

7.     On October 2, 2007, the Companies jointly disseminated the Proxy (including the Merger Agreement) in advance of GlobalSantaFe's November 9, 2007 shareholder meeting and vote on the proposed Merger.  The Proxy was signed by Defendants Long and Marshall.

8.     By virtue of the false and misleading statements in the Merger Agreement, and other material misrepresentations and omissions in the Proxy, the purported value of the Transocean stock was inflated, the fairness opinions (which were based, in part, on the Merger Agreement) were rendered false and misleading, and the integrity and efficacy of the GlobalSantaFe shareholders' vote approving the Merger was undermined, all in violation of Section 14(a) of the Exchange Act and Rule 14a-9.

9.     While misrepresenting Transocean's compliance with Environmental Laws, that the Company had "extensive training and safety programs," and that the Exchange Price was "fair", the Proxy also failed to disclose to the GlobalSantaFe shareholders that Transocean, through systemic and company-wide policies and practices, had reduced its equipment

maintenance and safety compliance for its deepwater drilling rigs and equipment utilized on the

rigs, which had the effect of increasing the risks of explosions, fire and major oil spills by:

- Failing to adequately inspect and maintain its Blowout Preventers ("BOP"), including by ignoring manufacturer recommendations regarding maintenance and making after-market modifications to BOPs that affected their performance; [2]

- Failing to adequately staff, train and supervise maritime and drilling rig personnel, particularly with respect to emergency conditions and drilling incidents on its rigs;

- Failing to perform required inspections and repairs for its deepwater drilling rigs, such as the *Deepwater Horizon*;

- Discouraging staff reports, or misreporting and destroying records for safety incidents on its rigs;

- Failing to implement safety systems which were adequate to protect the environment from deep water blowouts such as the one suffered at the Macondo well; and

- Creating a culture where catastrophic safety and environmental risks were routinely accepted, and environmental and other laws, regulations and industry standards were flouted to minimize operational delays and increase short-term profits.

10.     This is material information GlobalSantaFe shareholders would reasonably

consider important in deciding how to vote on the Merger, because it significantly affected

Transocean's prospects and whether the consideration offered in the Merger was adequate.

11.     Thus, the false and misleading Proxy deprived GlobalSantaFe shareholders of

their right under Section 14(a) of the Exchange Act to a fully informed shareholder vote on the

---

[2]  A BOP is a large piece of equipment that sits on top of an undersea well head that is comprised of a series of specialized valves that can seal, control and monitor oil and gas flow.  A BOP also contains the Blind Shear Ram that is designed to cut through drill pipe in an emergency to cut off oil flow and seal the well.

Merger, and concealed that the consideration which they were receiving -- .4757 Transocean shares and $22.46 for each share of GlobalSantaFe – was inadequate.

12.     The truth about Transocean's long-existing and systemic safety and environmental violations began to leak into the market following the *Deepwater Horizon* crisis. On April 20, 2010, a series of mishaps, many later attributed to Transocean management and personnel errors and equipment failures, resulted in an explosion on Transocean's semi-submersible oil rig, the *Deepwater Horizon* operating in the Gulf of Mexico, causing the immediate deaths of eleven workers on the rig and the worst oil spill in U.S. history.  It has been estimated that between 35,000 and 80,000 barrels, or between 1.47 million and 3.36 gallons, of oil flowed into the Gulf of Mexico from the crippled well every day until it was finally brought under control months later.  In total, approximately 5 million barrels of oil were discharged.  The damage caused by the oil spill to fishermen, tourism, and the environment was astronomical -- as is Transocean's exposure to potential criminal and civil liability for the disaster.

13.     The causes of the *Deepwater Horizon* crisis have been the subject of intense fact-finding, including testimony of several Transocean employees on the rig at the time of the explosion, and analysis by various government and industry experts.  The general consensus is that the crisis was the result of systemic management deficiencies, including by Transocean. Thus, e.g., according to the President's National Commission Report, the blowout "was not the product of a series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again.  Rather, the root causes are systemic."  William K. Reilly, co-chair of the National Commission, criticized what he called "a culture of complacency," concluding that all three of the companies implicated in the disaster -- BP, Halliburton and Transocean -- "are in need of top-to-bottom reform."

14.     The explosion, spill and the government investigations and press reports that followed revealed to the market and to Transocean shareholders the widespread and systemic safety and environmental violations and risks that had existed at the time of the Merger and which risks materialized into the worst environmental disaster in U.S. history.  As Transocean's compliance problems came to light beginning on April 20, 2010, and continuing through July 23, 2010, Transocean's stock plummeted, losing more than half of its value, declining from $92.03 on April 20, 2010 to $45.26 on July 23, 2010.[3]

## II.     JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §78(n) & (t)) and Rule 14a-9 promulgated thereunder (17 C.F.R. §240.14a-9).

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1331.

17.     Venue is proper in this District under § 27 of the Exchange Act and 28 U.S.C. §1391(b).  Transocean's common stock trades on the NYSE, a securities exchange headquartered within this District.

18.     In connection with the acts alleged in this complaint, Defendants directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.     PARTIES

19.     Plaintiff Bricklayers and Masons Local Union No. 5 Ohio Pension Fund ("Bricklayers") was appointed to serve as Lead Plaintiff in this action by Stipulation and Order

---

[3] For a description of the drilling process, including animations of the equipment used, and a detailed glossary of terms, see www.oilspillcommission.gov.

of this Court dated January 7, 2011.  At the time the Proxy was issued on October 2, 2007, Bricklayers was a shareholder of GlobalSantaFe.  As part of the Merger, Bricklayers exchanged each of its GlobalSantaFe shares for .4757 Transocean shares and $22.46.  As a result of material false statements and omissions in the Proxy, the value of the Transocean shares which Bricklayers received in the Merger was misrepresented and the Exchange Price it purportedly received was inflated.  Bricklayers' certification is before this Court as Dkt. 24-2, and is incorporated by reference herein.

20.     Plaintiff DeKalb County Pension Fund ("DeKalb") was appointed to serve as Lead Plaintiff in this action by Stipulation and Order of this Court dated January 7, 2011.  At the time the Proxy was issued on October 2, 2007, DeKalb was a shareholder of GlobalSantaFe.  As part of the Merger, DeKalb exchanged each of its GlobalSantaFe shares for .4757 Transocean shares and $22.46.  As a result of material false statements and omissions in the Proxy, the value of Transocean shares which DeKalb received in the Merger was misrepresented and the Exchange Price it purportedly received was inflated.  When the truth about Transocean's systemic and long-standing safety and environmental violations was revealed, Transocean's stock price plummeted and DeKalb suffered losses as a result.  DeKalb's certification is before this Court as Dkt. 27-1, and is incorporated by reference herein.

21.     Transocean is one of the world's largest offshore contract drilling services for oil and gas.  At the time of the Merger, Transocean was known as Transocean Inc. and was incorporated in the Cayman Islands.  In 2008, Transocean was organized as a Swiss company and is now known as Transocean Ltd.  Transocean's common stock traded at the time of the Merger and continues to trade on the New York Stock Exchange ("NYSE") under the ticker symbol "RIG."  The Merger was consummated on the NYSE.

22.     Defendant Long was the CEO of Transocean at the time of the Merger and he signed the false Proxy, without exercising due care to assure that the representations and warranties in the Merger Agreement, and other statements in the Proxy about Transocean's environmental and safety compliance were true and not misleading.  As CEO, Long had control over Transocean and the contents of the Proxy.   After the Merger between Transocean and GlobalSantaFe, Long remained as CEO of the combined company.

23.     Defendant Marshall was the CEO of GlobalSantaFe at the time of the Merger and he signed the false Proxy, without adequately conducting the due diligence to assure that statements in the Proxy, including the Merger Agreement, about Transocean's environmental and safety compliance were true and not misleading.

## IV.    GENERAL ALLEGATIONS

### B.    BACKGROUND

24.     Transocean began drilling operations in 1953, when it was known as The Offshore Company, by launching the first jackup rig in the Gulf of Mexico.  During the 1990's and 2000's the company expanded operations globally through numerous mergers and acquisitions.   In 1996, the company acquired the Norwegian group Transocean ASA.   The company changed its name to Transocean Offshore and began building massive drilling operations with drills capable of drilling in excess of 10,000 feet.  The company expanded its operations further, by merging with Sedco Forex in 1999 and in 2000 the company acquired R&B Falcon.  Many of the companies with which it merged or acquired up to the time of the GlobalSantaFe Merger had themselves been the product of multiple mergers and other forms of business combinations.   By the time of the July 23, 2007 announcement of the Merger with GlobalSantaFe, Transocean was one of the world's largest offshore oil drilling companies.

25.     GlobalSantaFe was, at the time of the Merger, like Transocean, an offshore oil and gas drilling contractor, which owned or operated marine drilling rigs.  GlobalSantaFe's primary business was providing fully-manned mobile drilling rigs to drill offshore.

26.     Transocean and GlobalSantaFe's business is known as contract drilling.  The Companies' price their services on a per-day basis.  Transocean's and GlobalSantaFe's rigs were designed for international operations and were deployed in most of the significant offshore rig markets in the world, including the U.S. Gulf of Mexico, West Africa, the North Sea, South America, the Middle East/Mediterranean and South East Asia.

27.     In the 1990s, technological breakthroughs in imaging and drilling opened new business opportunities in deepwater oil drilling, including in the Gulf of Mexico, in what was termed "ultra-deepwater."

28.     The Gulf has been a focus of deepwater drilling for many years.  The Gulf is the biggest opportunity for drilling near the continental United States, with an estimated 30-40 billion barrels of oil and gas deepwater reserves.  In 1990, most oil and gas from the Gulf had still come from shallow water and average production depth had barely reached 250 feet.  By 1998, the average exceeded 1,000 feet, and deepwater production in terms of barrels of oil per day surpassed that from shallow water for the first time.  Transocean was a major player in developing deepwater production.  In 1999, working for BP in 6,000 feet of water, Transocean's Discoverer Enterprise drilled the largest Gulf field of all time, a prospect called Thunder Horse containing more than 1 billion barrels of recoverable reserves.

29.     As of February 2, 2007, Transocean had a fleet of 82 rigs.  Transocean broke its fleet into four categories.  The first group consisted of 33 "High-Specification Floaters," including 13 Fifth Generation Deepwater Floaters, 16 other Deepwater Floaters, and four Other

High-Specification Floaters.  At the time, the Fifth Generation Floaters were Transocean's most advanced rigs and had high pressure mud pumps and a water depth capability of 7,500 feet or greater.  All of the Fifth Generation Floaters entered service between 1998 and 2001 and, as of February 2, 2007, seven of these rigs were stationed in the Gulf of Mexico.  The other Deepwater Floaters were generally rigs with a water depth capacity of at least 4,500 feet.  All of the other Deepwater Floaters entered service between 1973 and 2000.  The four Other High-Specification Floaters were fourth generation rigs built in the mid to late 1980's.

30.     The second group consisted of 20 other floaters.  This group generally consisted of non-high specification floaters with a water depth capacity of less than 4,500 feet.  All of these rigs entered service prior to 2000.

31.     The third group consisted of 25 "Jackups," which are barges with long support legs that can be raised or lowered and can be used to drill in relatively shallow water, for example 220 to 400 feet.  All of these rigs entered service prior to 2001.  The fourth group consisted of four miscellaneous rigs.

32.     Though deepwater drilling was once prohibitively expensive, high oil prices during 2007 and the first half of 2008 made the economics of deepwater drilling feasible.  As the price of oil increased steadily throughout the 2000s, from less than $30 per barrel in 2000 to more than $90 per barrel in 2008, companies like Transocean sought to capitalize on that increase.

33.     From 2001 to 2004, industry leaders discovered an additional 11 major oil fields beneath between 4,000 and 7,000 of water, requiring wells reaching 30,000 feet in total depth.  Drilling at such depths created a whole new host of issues, and as BP production managers admitted in 2004, "None of the projects can be categorized as 'business as usual.'"   By

September 2009, the *Deepwater Horizon* was drilling in 4,000 feet of water to a world-record

total depth of 35,055 feet.   The National Commission Report prepared after the *Deepwater*

*Horizon* disaster aptly described the challenges involved with deepwater drilling in the Gulf of

Mexico:

> The fanfare around these discoveries and the developments could not disguise the
> fact that the technical challenges of ultra-deepwater drilling and production and
> the subsalt geology remained unique and formidable.  Water depths are extreme,
> down to 10,000 feet.  Total well depths…can go beyond 30,000 feet.  Well shut-in
> pressures can surpass 10,000 pounds per square inch.  Bottom-hole temperatures
> can exceed 350 degrees Fahrenheit.   Salt- and tar-zone formations can be
> problematic.    The sandstone reservoirs are tightly packed, and ensuring
> hydrocarbon flow through risers and pipelines can be difficult.  According to a
> 2008 report from Chevron engineers for the Society of Petroleum Engineers, all
> these factors "separate many [Gulf of Mexico] deepwater and ultra-deepwater
> wells from deepwater and ultra-deepwater wells in other parts of the world."

Thus, Transocean well understood that drilling in extreme water was a hazardous activity

requiring robust safety and maintenance policies and standards, vigorous management and strict

adherence to legal and regulatory requirements.

### C.   TRANSOCEAN'S DEEPWATER DRILLING IN THE GULF WAS STRICTLY REGULATED BY FEDERAL REGULATIONS AND LAWS

34.    During the relevant time period, the Department of Interior's Minerals

Management Service ("MMS") was responsible for the promulgation of the nation's offshore

operating regulations.   According to the MMS, the regulations were written to ensure "safe

operations and preservation of the environment, while balancing the Nation's needs for energy

development."   In particular, the MMS has formulated regulations to control the significant risks

associated with deepwater drilling.   At all relevant times, the federal regulations and laws

described in this Complaint were in effect  and applied to Transocean

35.     30 CFR §250.401 regulates the U.S. offshore operations of drilling operators,

such as Transocean, and requires that operators:

(a) Use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick;

(b) Have a person onsite during drilling operations who represents your interests and can fulfill your responsibilities;

I Ensure that the toolpusher, operator's representative, or a member of the drilling crew maintains continuous surveillance on the rig floor from the beginning of drilling operations until the well is completed or abandoned, unless you have secured the well with blowout preventers (BOPs), bridge plugs, cement plugs, or packers;

(d) Use personnel trained according to the provisions of subpart O; and

(e) Use and maintain equipment and materials necessary to ensure the safety and protection of personnel, equipment, natural resources, and the environment.

36.      30 CFR §250.107 provides that operators, such as Transocean, must protect the environment as well as health, safety and property, by:

(1) Performing all operations in a safe and workmanlike manner; and

(2) Maintaining all equipment and work areas in a safe condition."

30 CFR § 250.107 further provides that operators, such as Transocean, "must immediately control, remove, or otherwise correct any hazardous oil and gas accumulation or other health, safety, or fire hazard" and "must use the best available and safest technology (BAST) whenever practical on all exploration, development, and production operations."

37.      30 CFR §250.300 provides:

(a) During the exploration, development, production, and transportation of oil and gas or sulphur, the lessee shall take measures to prevent unauthorized discharge of pollutants into the offshore waters. The lessee shall not create conditions that will pose unreasonable risk to public health, life, property, aquatic life, wildlife, recreation, navigation, commercial fishing, or other uses of the ocean.

(1) When pollution occurs as a result of operations conducted by or on behalf of the lessee and the pollution damages or threatens to damage life (including fish and other aquatic life), property, any mineral deposits (in areas leased or not leased), or the marine, coastal, or human environment, the control and removal of the pollution to the satisfaction of the District Manager shall be at the expense of the lessee. Immediate

corrective action shall be taken in all cases where pollution has occurred. Corrective action shall be subject to modification when directed by the District Manager.

> A. If the lessee fails to control and remove the pollution, the Director, in cooperation with other appropriate Agencies of Federal, State, and local governments, or in cooperation with the lessee, or both, shall have the right to control and remove the pollution at the lessee's expense. Such action shall not relieve the lessee of any responsibility provided for by law.

38.     30 CFR §250.401 provides that operators, such as Transocean, "must take necessary precautions to keep wells under control at all times" and states that operators "must" "use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick."

39.     30 CFR §250.440 provides that operators, such as Transocean, "must design, install, maintain, test, and use the BOP system and system components to ensure well control. The working-pressure rating of each BOP component must exceed maximum anticipated surface pressures.   The BOP system includes the BOP stack and associated BOP systems and equipment."

40.     30 CFR §250.442 contains numerous requirements for a rigs' blowout preventer.

41.     30 CFR §250.446 required operators to conduct a major inspection of the blowout preventers on its rigs every three to five years.

42.     The Clean Water Act also regulates drilling in the Gulf of Mexico.  For example, 33 U.S.C.A. § 1321(b)(3) states that:

> The Congress hereby declares that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or in connection with activities under the Outer Continental Shelf Lands Act [43 U.S.C.A. § 1331 et seq.] or the Deepwater Port Act of 1974 [33 U.S.C.A. § 1501 et seq.], or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Magnuson-Stevens Fishery Conservation and Management Act

14

43.       33 U.S.C.A §1321(b)(7) provides:

A) Discharge, generally

Any person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3), shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged.

(B) Failure to remove or comply

Any person described in subparagraph (A) who, without sufficient cause--

B. fails to properly carry out removal of the discharge under an order of the President pursuant to subsection I of this section; or

(ii) fails to comply with an order pursuant to subsection (e)(1)(B) of this section;

shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to 3 times the costs incurred by the Oil Spill Liability Trust Fund as a result of such failure.

I Failure to comply with regulation

Any person who fails or refuses to comply with any regulation issued under subsection (j) of this section shall be subject to a civil penalty in an amount up to $25,000 per day of violation.

(D) Gross negligence

In any case in which a violation of paragraph (3) was the result of gross negligence or willful misconduct of a person described in subparagraph (A), the person shall be subject to a civil penalty of not less than $100,000, and not more than $3,000 per barrel of oil or unit of reportable quantity of hazardous substance discharged.

44.       The Oil Pollution Act further regulations drilling in the Gulf of Mexico.  For example, 33 U.S.C.A. §2702  provides:

(a) In general

Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is

discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C.A. §2702(b) defines damages as follows:

(A) Natural resources

Damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a United States trustee, a State trustee, an Indian tribe trustee, or a foreign trustee.

(B) Real or personal property

Damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property.

(C) Subsistence use

Damages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources.

(D) Revenues

Damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by the Government of the United States, a State, or a political subdivision thereof.

(E) Profits and earning capacity

Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant.

(F) Public services

Damages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by a discharge of oil, which shall be recoverable by a State, or a political subdivision of a State.

16

45.    As the owner/operator of rigs in the Gulf of Mexico, Transocean was a "responsible party" within the meaning of the Oil Pollution Act.

46.    Other laws potentially implicated by drilling in the Gulf of Mexico include the Outer Continental Shelf Act, 43 U.S.C. §§1301, *et seq*., the Endangered Species Act of 1973, 16 U.S.C. §§1531, *et seq.*, the Marine Mammal Protection Act, 16 U.S.C. §§1361, *et seq*., the National Marine Sanctuaries Act, 16 U.S.C. §§1431, *et seq.*, and the Park System Resource Protection Act, 16 U.S.C. §§19jj, *et seq.*

47.    In addition, the MODU Code[4] sets forth industry standards for the safe operation of drilling rigs.  Among other things, the MODU Code advocates that rigs undergo two drydock surveys every five years.

48.    In performing its deepwater operations in the Gulf of Mexico, Transocean routinely and systematically flouted these regulations and laws to minimize operating delays and increase its short-term profits.

**D.    THE MERGER BETWEEN TRANSOCEAN AND GLOBALSANTAFE**

49.    In late 2006 and the first half of 2007 Long and Marshall, and other members of management of Transocean and GlobalSantaFe met to discuss a possible combination of the Companies.  By June 21, 2007, Long and Marshall agreed to recommend a merger of the Companies to their respective boards using an exchange ratio which would be based on the closing price of each Company's shares on the last trading day prior to the Merger Agreement. On July 21, 2007, Long and Marshall signed the tentative Merger Agreement.  On July 20, 2007,

---

[4] The MODU Code is an "international standard for mobile offshore drilling units" designed to "ensure a level of safety for such units, and for personnel on board, equivalent to that required" by the International Convention for Safety of Life at Sea and the International Convention on Load Lines.

the closing price of Transocean's ordinary shares was $109.97 and the closing price of GlobalSantaFe's ordinary shares was $74.74.  Under the agreement, a GlobalSantaFe ordinary share would be exchanged for .4757 Transocean shares plus $22.46 in cash.

50.     On July 21, 2007 the Board of Directors of GlobalSantaFe held a special meeting to consider the Merger.  Lehman Brothers ("Lehman") and Simmons & Company ("Simmons") opined that the consideration to be paid to GlobalSantaFe shareholders in exchange for their stock was fair from a financial point of view, and their "fairness opinions" were included in the Proxy.  The Lehman and Simmons fairness opinions assumed the accuracy of information provided to them, including information provided in the Merger Agreement itself.

51.     The Merger Agreement included sections in which both Transocean and GlobalSantaFe made "representations and warranties" about their respective business operations. Transocean represented neither it nor any of its subsidiaries were in "violation of any applicable laws" or that "conditions" then existed which either did or were "reasonably likely to constitute a violation or deficiency" under applicable laws governing its operations.

52.     Specifically, Transocean in the Merger Agreement represented that it was in compliance with "all Environmental Laws," and that there were "no past or present facts, conditions or circumstances" which interfered with its continued compliance with Environmental Laws.

53.     The October 2, 2007 Proxy issued to GlobalSantaFe shareholders represented that one of the "conditions" of the merger was "the accuracy of the representations and warranties of the parties set forth in the merger agreement."

54.     However, by mid-2007, as further described below, Transocean was routinely and systematically violating U.S. environmental laws and safety requirements, and taking excessive

risks, particularly in connection with its deepwater drilling operations.  As a result, Transocean's "representations and warranties" included in the Proxy were false and misleading, its stock price was inflated and the consideration paid to GlobalSantaFe shareholders, in part in the form of Transocean stock, was not, in fact, "fair."  These false and misleading statements included in the Proxy prevented the November 9, 2007 vote on the Merger by GlobalSantaFe shareholders from being made on an informed basis.  These statements also caused GlobalSantaFe shareholders to "overpay" for Transocean shares, and when the truth about Transocean's deficient practices finally became revealed following the *Deepwater Horizon* disaster, the price of Transocean's stock declined, and these shareholders suffered huge losses.

   E.   **TRANSOCEAN SYSTEMATICALLY VIOLATED FEDERAL LAWS AND INDUSTRY STANDARDS DESIGNED TO REDUCE THE RISK OF CATASTROPHIC OIL SPILLS**

       1.   **Transocean Failed to Inspect and Maintain Its Blowout Preventers In Accordance With Law**

          i.   <u>The BOP is a Critical Piece of Equipment on a Deepwater Drilling Rig</u>

   55.   A rig's blowout preventer is a critical piece of equipment that can stop a blowout from progressing or, in the event of a loss oI control, seal in a well and stop Ihe flow of oil.  The BOP is designed to be the final backup, the well's ultimate failsafe device meant to crush, shear and seal the pipe in the event disaster strikes.  Because the blowout preventer is the last line of defense to prevent potentially devastating environmental damage from an offshore oil spill, the U.S. government required drilling operators such as Transocean to dissemble and inspect their blowout preventers every three to five years.  However, in 2007 and continuing up until the time of the *Deepwater Horizon* disaster, it was Transocean's policy to flout this regulatory requirement, in order to reduce the downtime of its offshore rigs.

56.     To maintain well control, rig personnel must create and maintain barriers inside the well that will control subsurface pressure and prevent hydrocarbon flow.  Some barriers are part of the well design itself while others are operational barriers that a drilling team employs during the drilling process.  The blowout preventer is one such barrier.

57.     The blowout preventer is a stack of enormous valves that rig crews use both as a drilling tool and as an emergency safety device.  Once it is put in place, everything needed in the well—drilling pipe, bits, casing, and mud—passes through the blowout preventer.  Every drilling rig has its own BOP, which its crew must test before and during drilling operations.  Blowout preventers are massive devices and can weigh 400 tons and be over fifty feet tall.

58.     As depicted in the below picture from the Chief Counsel's Report of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, (the "Chief Counsel's Report" or "CCR"), the BOP sits on the ocean floor, on top of the well, and directly underneath the rig.



59.     In the event of a blowout, a BOP is equipped with a series of annular preventers and rams that can close off the well.  An annular preventer is a large rubber element designed to close around the drill pipe.  It is like a hard rubber donut.  Upon activation, the annular preventer expands and fills the space with that part of the BOP.  If there is something in the annular preventer (such as a pipe), the annular preventers seals around it.  If no drill pipe is in the hole, the annular preventer can close off and seal the entire opening.

60.     A blowout preventer also has blind shear rams, which consist of two metal blocks with blades on the inner edges and are designed to cut the drill string and seal in the well.  The blind shear rams are designed to withstand and seal a substantial amount of pressure from below. In this regard, the blind shear rams are a last line of defense that can seal and out of control well and stop an oil spill.

61.     The below picture from the Chief Counsel's Report depicts a BOP and the blind shear rams that can be used to seal in the well.



62.     As an MMS representative, Frank Patton, testified before the Joint Commission, the function of a blowout preventer is "to insure that safe control of the well is maintained, especially in the event of intake of gas or high pressure fluids so you can maintain control of the well."   As Patton explained, "the BOP is probably the most important factor in maintaining safety of the well and safety of everything involved, the rig and personnel."[5]

63.     As testimony of a Transocean operations manager, Michael Wright, confirmed, Transocean was responsible at all times for the proper maintenance and operations of the BOP on its rigs.[6]

ii.     <u>Federal Regulations Required Transocean to Maintain its BOPs to Ensure Well Control, Including Disassembly and Inspection</u>.

64.     Federal regulations at 30 CFR §250.440 required Transocean to "… design, install, maintain, test and use the BOP system and system components to ensure well control. The working-pressure rating of each BOP component must exceed maximum anticipated surface pressures.   The BOP system includes the BOP stack and associated BOP systems and equipment."

65.     Federal regulations at 30 CFR §250.446 required Transocean to "… maintain [its] BOP system to ensure that the equipment functions properly.   BOP maintenance must meet or exceed the provisions of Sections 17.10 and 18.10, Inspections; Sections 17.11 and 18.11,

---

[5] Testimony of Frank Patton, New Orleans District Drilling Engineer for Minerals Management Service, Department of the Interior, given on May 11, 2010 to the United States Coast Guard/Minerals Management Service Marine Board of Investigation into the Marine Casualty, Explosion, Fire, Pollution and Sinking of Mobile Offshore Drilling Unit Deepwater Horizon, with Loss of Life in the Gulf of Mexico April 21-22, 2010 (the "Joint Commission"), at 299:2-300:8.

[6] Testimony of Michael Wright, Operations Manager for Transocean, given on December 7, 2010 to the United States Coast Guard/Minerals Management Service Marine Board of Investigation into the Marine Casualty, Explosion, Fire, Pollution and Sinking of Mobile Offshore Drilling Unit Deepwater Horizon, with Loss of Life in the Gulf of Mexico April 21-22, 2010, at 262:25-263:8.

Maintenance; and Sections 17.12 and 18.12, Quality Management, described in API RP 53, Recommended Practices for Blowout Prevention Equipment Systems for Drilling Wells (incorporated by reference as specified in §250.198)." [7]

66.     API 53, Section 18.10.3, referenced in the Federal Regulations and entitled "Major Inspections," provides that "After every 3-5 years of service, the BOP stack, choke manifold, and diverter components should be disassembled and inspected in accordance with the manufacturer's guidelines.  Elastomeric components should be examined for wear and corrosion. Critical dimensions should be checked against the manufacturer's allowable wear limits. Individual components can be inspected on a staggered schedule."  Section 18.10.3 further provides that "A full internal and external inspection of the flexible choke and kill lines should be performed in accordance with the equipment manufacturers guidelines."

67.     As the Chief Counsel's Report stated, the maintenance required by these regulations is "important because it allows individual components to be examined for wear and corrosion.  Any wear or corrosion identified can then be checked against the manufacturer's wear limits."

68.     Indeed, as William Terry Stringfellow, Jr. ("Stringfellow"), Subsea Superintendent with Technical Field Support for Transocean, testified, "it's a well-known fact throu'hout the industry that abrasives can damage BOP components."[8]

69.     Because the major inspection requires complete disassembly of the BOP at the surface, it can take 90 days or longer and generally requires time in dry dock.  Industry papers

_____

[7] API (American Petroleum Institute) is the main U.S. trade association for the oil and gas industry and is also the main body responsible for the establishment of industry standards.

[8] Stringfellow testified on August 25, 2010 to the United States Coast Guard/Minerals Management Service Marine Board of Investigation into the Marine Casualty, Explosion, Fire, Pollution and Sinking of Mobile Offshore Drilling Unit Deepwater Horizon, with Loss of Life in the Gulf of Mexico April 21-22, 2010 ("Stringfellow Testimony"), at 352:10-352:12.

suggest that "the best time to perform maintenance on a complicated BOP control system [is] during a shipyard time of a mobile offshore drilling unit (MODU) during its five-year interval inspection."

iii.    <u>Transocean Ignored The BOP Manufacturer's Recommendations For Inspection and Maintenance</u>

70.    Transocean has acknowledged that the guidelines from Cameron International Corporation, which manufactured the BOP on the Deepwater Horizon, recommend inspections every three to five years.

71.    The three-five year inspection recommendation is also an industry standard based on the API standard and is a recommendation made by other manufacturers of BOPs which Transocean utilized on its drilling rigs.

iv.    <u>Transocean Refused to Adequately Inspect and Test its BOPs in Order to Increase Revenues</u>

72.    As a matter of policy, to avoid the added costs of rig downtime, Transocean failed to conduct a major inspection on its BOPs every three to five years.  As the United States has charged in its complaint against Transocean arising out of the *Deepwater Horizon* disaster, Transocean caused the *Deepwater Horizon* oil spill through "corporate practices of disregarding federal regulations," including 30 CFR §250.446 and by knowingly failing to "maintain, repair, and operate equipment intended to prevent personal injury, loss of life, harm to the environment, and disasters like the *Deepwater Horizon* Spill."

73.    As Transocean Subsea Superintendent Stringfellow admitted during testimony before the Joint Commission on August 25, 2010, Transocean knowingly disregarded 30 CFR 250.446's requirements as to the *Deepwater Horizon* and as to all of the rigs in the Gulf of Mexico.

24

Q:      What is your stacking compliance with this regulation [250.446(a)]?

A:      If you look at this regulation, I would say that it's probably out of compliance with the regulation.

Shortly thereafter Stringfellow further clarified his testimony:

Q:      You testified, if I heard you correctly, initially, that, as you think about it, the stack was out of compliance with the MMS regulation.   Did I understand your testimony correctly?

A:      When you say "out of compliance with the MMS regulation," based on my interpretation, then I guess you could say it is a fact that the BOPs had not been to the shops or been, you know, disassembled by the OEMs in the five years.

74.     Instead of following federal regulations, Transocean implemented what it termed "condition-based maintenance."  According to Transocean's Subsea Maintenance policy, "[t]he condition of the equipment shall define the necessary repair work, if any."  Stringfellow, in his testimony before the Joint Commission, confirmed that under "condition-based maintenance", Transocean did not disassemble its BOPs every three to five years.

75.     The Chief Counsel's Report concluded that Transocean's condition-based maintenance "was misguided insofar as it second guessed manufacturer recommendations, API recommendations, and MMS regulations. Moreover, the decision to forego regular disassembly and inspection may have resulted in necessary maintenance not being performed on critically important equipment."

76.     Moreover, as Stringfellow admitted, the decision to flout federal regulation was made at a management level:

Q.      How high up the chain of command within Transocean did you have this discussion about doing condition-based monitoring rather than following the API 53 recommended practice adopted in the MMS regulation?

25

A.      Condition-based monitoring is – is – comes from the corporate group. I
        mean, that's not just something we d'cided to do on one specific rig.  I
        mean, it's what we do on, you know' all of our vessels. To my knowledge.

Stringfellow Testimony at 412:11-412:20.

77.     By 2007, Transocean had implemented its policy of disobeying federal safety regulations.  As Stringfellow explained, in January 2005, while he was aboard the *Deepwater Horizon*, Transocean received a report from a consultant indicating that the *Deepwater Horizon*, which went into service in 2001, should come in to receive the required maintenance. Transocean did not perform the required maintenance because it had already implemented its so-called "conditions-based maintenance" program.  Indeed, the *Deepwater Horizon* had not been to drydock since 2001, indicating that by April 2010, many pieces of the blowout preventer had not been certified for 9 or 10 years.

78.     Confidential Witness #1 ("CW1") confirms that by 2007, Transocean had abandoned the regulatory requirement that it conduct a major inspection of its blowout preventers every three to five years.  CW1 worked as an officer on Transocean drillships from 2001 to 2008.  From 2001-2004 he was second mate and then chief mate aboard a drillship stationed in Southeast Asia.  From 2005-2008, he was the chief mate aboard two different Transocean drillships stationed in the Gulf of Mexico.  As part of his position as a senior officer aboard several Transocean drillships, CW1 was privy to emails from Transocean's management regarding changes to Transocean's maintenance policies.  According to CW1, in 2004, it became time for the dry docking and five year inspection of the Discoverer Enterprise, in accordance with Section 1.6 of the MODU Code, a publication of the International Maritime Organization. The Discoverer Enterprise entered service in 1999 and was one of the older of Transocean's Fifth Generation Deepwater Floaters, which was Transocean's newest and largest set of drill

ships at the time.  Because of their size, there were very few shipyards in the U.S. that could dry dock the Fifth Generation Deepwater Floaters without pulling the drillships' thrusters out, an additional step that rendered the drydocking process longer and more expensive.  Because the drydocking process was deemed too expensive, at that time, Transocean management decided that its drillships would forgo the five-year drydocking and inspection practice.  Transocean Marine Superintendent communicated this policy change to Transocean's captains in an email and CW1's captain provided this communication to CW1.

79.     As the Chief Counsel's Report stated, Transocean's "willingness to disregard regulatory obligations on a vital piece of rig machinery is **deeply troubling**."  Transocean disobeyed "manufacturer recommendations, API recommendations and MMS regulations." "Given the critical importance of the blowout preventer in maintaining well control, the Chief Counsel's team questions any maintenance regime that could undermine the mechanical integrity of the BOP."

80.     The main reason that Transocean disobeyed federal regulations regarding the maintenance of the BOP was money.  Transocean rented its rigs out for hundreds of thousands of dollars a day.  For example, Transocean rented the *Deepwater Horizon* to BP for $533,495 a day and BP was not obligated to pay for time in excess of 24 hours each month spent on equipment repairs.  A major inspection of a blowout preventer requires a rig to be out of service for 90 days or longer, meaning that compliance with the regulations would cost **$48 million** or more.

81.     Paul Johnson, the rig manager for the *Deepwater Horizon*, confirmed this point:[9]

---

[9] Testimony of Paul Johnson, Rig Manager-Performance (Transocean), given on August 23, 2010 to the United States Coast Guard/Minerals Management Service Marine Board of Investigation into the Marine Casualty, Explosion, Fire, Pollution and Sinking of Mobile Offshore Drilling Unit Deepwater Horizon, with Loss of Life in the Gulf of Mexico April 21-22, 2010, at 352:20 – 353:4.

Q.      Okay.  And if, in fact, under the contract, Transocean had to shut the rig down for more than a day, BP no longer had to pay Transocean the daily rate for that rig; is that correct?

A.      That's correct.

Q.      And so if Transocean knew that it had to take 10 or 15 or 20 days off on a job at DEEPWATER HORIZON to fix things, it would be out 500-and-some thousand dollars every day except for the first day, right?

A.      That's correct, yes.

82.      John Gui'e, the well team leader for BP also confirmed that Transocean did not send the *Deepwater Horizon* to dry dock because it insisted on being paid its daily rate during repairs.

83.      According to Transocean's SEC Form 10-K for the year ending December 31, 2006, the Company's entire class of Fifth Generation Deepwater Floaters, which was the Company's premier class of rigs at the time, entered service between 1998 and 2001.  Thus, by 2007, all thirteen of these rigs were out of compliance with MMS safety regulations mandating major inspections of BOPs every three to five years.  In addition, Transocean identified twenty other "deepwater" or "high specification" rigs that entered service between 1973 and 2001, all of which apparently were out of compliance by 2007.  Further, Transocean identified 45 other rigs, all of which entered service before 2001 and were apparently out of compliance by 2007.  That makes ***78 rigs*** that would have been improperly maintained, essentially, Transocean's entire fleet as of 2007.  Assuming each of these rigs had to go into drydock for 90 days to have their BOPs inspected, and at a rig-rental rate of about $500,000 a day, this maintenance would have cost Transocean approximately $45 million in revenue for each of the 78 rigs -- meaning that Transocean had knowingly flouted federal law and risked devastating environmental damage as a result of its poorly maintained BOPs, to boost its earnings by billions of dollars.

28

### 2.      Transocean Otherwise Failed to Safely Maintain Its Equipment to Cut Costs

84.      Transocean failed to maintain redundant features with respect to the blind shear rams on the BOP.  The blind shear ram is designed to cut drill pipe and shut the well in an emergency well control situation.  Blind shear rams are not designed to cut through multiple pieces of drill pipe or tool joints connecting two sections of a drill pipe.  It is critically important to ensure that there is a piece of pipe, and not a joint, across the blind shear ram before it is activated.  Transocean's *Deepwater Horizon* BOP had only one blind shear ram even though Transocean knew of the risk that a joint may be in the path of the blind shear ram at the time of an attempted activation.

85.      Reflecting Transocean's decade of neglect, the BOP aboard the *Deepwater Horizon* suffered from numerous maintenance issues and failed to seal the well after the blowout. For example, a BOP has a "deadman system" that automatically closes the BOP in emergency situations.  But this system relies upon two redundant control pods (yellow or blue) to function. If both pods are inoperable, the system would not have functioned.  Post-explosion examinations revealed low battery charges in one BOP control pod and a faulty valve in another, faults that potentially could have prevented the deadman and autoshear functions from closing the blind shear rams and sealing the well.  Moreover, in the event that electric power from the rig to BOP is cut off, the BOP's control systems are powered by batteries contained in the pods.  The Chief Counsel's Report indicates that "records suggest that Transocean did not adequately maintain and replace its BOP pod batteries."  Cameron, the BOP manufacturer recommends replacing pod batteries annually and recommends yearly battery inspection.  Transocean itself recommends yearly battery inspection.  But internal Transocean records suggest that the *Deepwater Horizon* crew had not replaced the batteries on one pod for two-and-a-half years prior to the April 20

blowout and had not replaced the batteries in another pod for a year. As the Chief Counsel's Report stated, "This appears to have been a pattern: Company records show that rig personnel found all of the batteries in on *Deepwater Horizon* BOP pod dead in November 2007."

86.     Confidential Witness #2 ("CW2") commented that he had seen reports that Transocean had failed to maintain the batteries in the BOP pods and found this neglect consistent with his observation that Transocean was willing to operate its rigs in an unsafe manner in order to keep drilling and earn as much money as possible. According to CW2, "it cost money to stop the [drilling] process" to replace the batteries and Transocean was not willing to do that.

87.     The BOP control pods also rely on functioning solenoid valves. The solenoid valves open and close in response to electrical signals and thereby send hydraulic pilot signals from the pods to the BOP elements. The pilot signals in turn open hydraulic valves, which then deliver pressurized hydraulic fluid into BOP rams to close them. Tests on the yellow pod conducted by Cameron after the blowout revealed that the key solenoid valve used to close the blind shear ram was inoperable.

88.     Furthermore, the BOP aboard the *Deepwater Horizon* had subsea accumulator bottles that provided pressurized hydraulic fluid used to operate different BOP elements. If the hydraulic line between the rig and the BOP is severed, these accumulators must have a sufficient charge to power the blind shear ram. BP's internal investigation suggests that accumulator pressure levels may have been low based on fluid levels discovered post-explosion, though not at levels that would have prevented the accumulators from functioning. However, response crews observed additional leaks form accumulators during post-explosion attempts to activate the BOP.

89.     The ability of the BOP to close quickly may also be impaired by leaks. A total of five leaks have been identified on the *Deepwater Horizon* blowout preventer, including leaks to

the test ram, upper annular preventer, ST lock close hydraulic circuit leak (the same hydraulic circuit as the blind shear ram), the blind shear ram ST lock circuit, and the lower annular preventer open circuit.

90.     A confidential maintenance audit conducted by BP in September 2009 and sent to Transocean found serious concerns that could "lead to loss of life, serious injury, or environmental damage as a result of inadequate use and/or failure of equipment."  For example, the audit found excessive overdue maintenance – including 390 separate repairs, including many that were "high priority" and would require more than 3,500 man hours to remedy.  Thirty-one of these jobs were related to well control system issues, six related to BOP maintenance concerns, and the remaining problems dealt with concerns related to the electronic alarm systems, ballast systems used to stabilize the vessel, and other problems.

### 3.     Transocean Refused to Staff Its Rigs With Licensed Engineers and Other Qualified Personnel Needed to Safely Operate Its Rigs

91.     To cut costs, Transocean made a knowing choice to under staff its rigs for many years.  As a chief mate aboard various Transocean drilling rigs between 2002 and early 2008, CW1 was privy to the dispute between several drillship captains and Transocean management about Transocean's failure to staff the rigs with enough licensed and qualified employees to safely operate the rigs.  In particular, he saw the e-mail communications on this subject, in which the captains stated that Transocean ships were undermanned and did not have enough skilled employees.  The lack of licensed engineers was a particular focus of the captains' concern in these communications.  These concerns were conveyed to Transocean Marine Superintendent Mark Canada who responded by e-mail that he had conferred with higher level management at Transocean and that the decision had been made to not provide any additional trained staff.

92.     Indeed, CW1 explained that Transocean largely attempted to avoid hiring trained and licensed engineers because they were too expensive.   Instead, and in contrast to GlobalSantaFe's pre-merger practices, Transocean retained what are known as "MODU" engineers.   A "MODU engineer" is a worker on the rig who does not have an engineering degree.   Instead, someone may be considered to be a "MODU engineer" by working on a rig for a certain amount of time and taking a firefighting training course.

93.     Testimony given by Transocean subsea engineer Mark Hay on August 25, 2010 to the MMS Board of Investigation on the *Deepwater Horizon* spill, corroborated the information provided by CW1.   Testifying before the Joint Commission, Hay explained that he was able to attain a position of "subsea engineer" with a high school education and a few on-the-job training courses.   Nonetheless his title was "senior subsea engineer," and it was his job to maintain the well-control equipment on the *Deepwater Horizon*, including the BOP.   Hay confirmed that he had no formal training in maintenance and inspection requirements for the BOP.

94.     Douglas Brown, Chief Mechanic and Acting Second Engineer for Transocean and one of the original crew members of the *Deepwater Horizon*, testified in Congressional Hearings on May 27, 2010, that it had long been Transocean's practice to knowingly under-man its rigs. Brown, who was on the *Deepwater Horizon* the night of the disaster and survived but sustained serious injuries, testified:

> I think it is important to understand how Transocean manning decisions changed over time.  When we first went to work on the Deepwater Horizon, we had a fully manned engine room which consisted of six people: Chief engineer, first engineer, second engineer, third engineer, and two motormen.  As the years went by, for reasons I do not understand, the flagging of the vessel changed from Panamanian to the Marshall Islands.  [By 2003,] Transocean eliminated positions so that we were only left with three people: Chief engineer, second engineer, and one motorman.  Three people were left to do six people's job.  While this often made it difficult to timely complete our daily preventative maintenance, we worked hard and did the best we could have.

Douglas Brown's written statement, submitted to the House Judiciary Committee on May 27, 2010, contained additional information on the effects of an under-manned rig and the reasoning behind Transocean's decision to under-man its rigs:

> Because of the cuts in the number of engine room personnel, we were often days, weeks, and even months behind in completing the necessary preventive maintenance (PM) requirements.  This was documented in our lack of completion of the PM forms which were transmitted via electronic data to the mainland.  I and others complained that we did not have enough manpower to keep up with the work and the preventive maintenance.  We were always told "we will see what we can do."

> When the Deepwater Horizon initially left Korea, I believe she was flagged Panamanian.  Sometime thereafter, she switched to Marshall Islands flagging.  Though I cannot testify to the exact Minimum Safe Manning Requirements of Panama, the Marshall Islands, or the United States, it is my belief, which is supported by discussions I have had with other crewmen, that the Minimum Safe Manning Requirements of the Marshall Islands is far less in number than the United States Coast Guard Requirements.  Thus, my belief is that the reductions were due to cost saving measures.

### 4. Transocean Systematically Flouted Laws Requiring It To Train Its Rig Crew On Critical Safety Tests and Well Control Procedures

95.     Transocean repeatedly exposed itself and the U.S. to massive risks by failing, at a company-wide level, to provide its employees with the training and resources necessary to safely operate its rigs.  As the Chief Counsel Report stated Transocean "failed to provide the rig crew and well site leaders . . . with adequate training, information procedures, and support to do their jobs effectively."

96.     As the United States and the State of Louisiana have charged, Transocean's dereliction of its obligation to safely operate its rigs constituted "gross negligence" and violated numerous federal regulations including  30 C.F.R. §§250.107, 250.300 and 250.401.

97.     The safe operation of a rig requires well-trained employees who can competently use the complex drilling and safety equipment aboard the rigs.  In the words of the Chief Counsel

Report, "[d]rilling is as much about people it is about hydrocarbons and equipment . . . People especially mattered at Macondo because [Transocean] placed heavy reliance on human judgment."  For example, effective use of the bottomhole cement as a barrier in the wellbore requires rig workers to competently conduct and interpret a negative pressure test to determine whether cement has sealed the well.  Effective use of the blowout preventer relies on rig workers to competently monitor and respond to signs that a kick may be underway.

98.     Despite the obvious necessity of having well-trained and supported crew members aboard rigs, the Chief Counsel Report found that "Transocean inadequately trained [its] personnel . . . Transocean did not adequately train its rig personnel regarding kick monitoring during end-of-well, nondrilling activities, such as temporary abandonment.  It also did not adequately train its crews how to respond to emergency situations. . . Inadequate training set employees up for failure in the face of events outside their expertise and training."

i.     Transocean Failed to Train Its Employees On How To Conduct a Negative Pressure Test and Correctly Interpret Its Results

99.     Transocean failed to train its crews to competently use and interpret a negative pressure test to determine whether a well has integrity, a critical step in protecting against a well blowout.

100.     When a well is going to be temporarily abandoned (as was the case with the *Deepwater Horizon*), the crew of the rig that drilled the well is responsible to secure the well and ensure that nothing leaks in or out – to confirm the well's integrity.  In order to confirm the well's integrity, the drilling rig crew performs multiple tests, the most important being the Negative Pressure Test.  Nonetheless, Transocean did not establish formal procedures for its crews on how to conduct the test, nor did it train them on how to interpret its results.  This was confirmed by the testimony of Daun Winslow, Transocean's General Manager for the Gulf of

Mexico, who stated that he was unaware of any uniform Transocean procedure on how to align the piping in valves for the negative pressure test.

101.    During the *Deepwater Horizon* investigation, Transocean admitted that it did not train its personnel in the conduct or interpretation of negative pressure tests, that its Well Control Handbook did not describe a negative pressure test, and that, as a consequence, it had been unable to determine whether its crew aboard the *Deepwater Horizon* was capable of competently performing a negative pressure test to determine if the well had integrity. As Bill Ambrose, the Transocean Director of Special Projects testified on November 8, 2010, he could not say whether the Deepwater Horizon had the training or experience to interpret this test -- that was the "role of an engineer."

102.    Transocean's systemic neglect of a vital test necessary to establish well integrity created unsafe conditions and posed unreasonable risks to its rig crews, and the environment in violation of 30 C.F.R. §§250.107, 250.300 and 250.401. Transocean also violated 30 C.F.R. § 250.1501, which required Transocean to "ensure that [its] employees and contract personnel engaged in well control, deepwater well control, or production safety operations understand and can properly perform their duties."

ii.    Transocean Failed to Adequately Train Its Employees to Detect "Kicks"

103.    A kick is an unwanted influx of fluid or gas into the wellbore. The influx enters the wellbore because a barrier, such as cement or mud, has failed to control fluid pressure in the formation. In order to control the kick, personnel on the rig must first detect it, then stop it from progressing by adding one or more barriers. The crew must then circulate the influx out of the wellbore. If the crew does not react properly, fluids will continue to enter the wellbore. This will eventually escalate into uncontrolled flow from the well, *i.e.*, a blowout.

104.    For this reason, in order to operate safely, a rig must have personnel who can competently detect and neutralize a kick.  In order to detect a kick, rig crews examine various indicators of surface and downhole conditions.  These indicators include pit gain, flow-out versus flow-in, drill pipe pressure, and gas content in the mud.

105.    Rig personnel rely on data recorded and displayed by proprietary sensors, hardware, and software.  For example, aboard the *Deepwater Horizon*, the Sperry-Sun system collected data from various sensors regarding pit volumes, flow-in, drill pipe pressure and kill line pressure and made it available to Transocean employees aboard the rig.  Much of the responsibility for monitoring these indicators falls to the Transocean crew operating the rig, who need to be trained to read and correctly interpret this complex data.

106.    As the Chief Counsel Report found, "Transocean personnel lacked sufficient training to recognize that certain data anomalies indicated a kick."  In particular, Transocean's crew were not sufficiently trained to recognize that certain drill pipe pressure anomalies signaled that a kick was in progress.

   iii. <u>Transocean Failed to Train Its Employees on How to Respond to Low Frequency, High Risk Events</u>

107.    Given the nature of its business, Transocean was well aware that a blow-out with its dire threat to the lives and safety of its crew and potentially devastating impact on the environment was a foreseeable event and needed to be planned for.  Transocean also knew that its rig personnel had to be trained to quickly and properly respond to the crisis.  For example, in a 2004 Major Accident Hazard Risk Assessment, Transocean gave *Deepwater Horizon* a 5B risk rating for reservoir blowout, meaning that there was "Low" likelihood of a blowout occurring, but if one did occur, the event would have "Extremely Severe" consequences: "Multiple

personnel injuries and/or fatalities," "Major environmental impact," and "Major structural damage and possible loss of vessel."

108.    Yet despite this knowledge, as the Chief Counsel Report stated, Transocean failed to train its employees to respond and contain the emergency.  Thus, as ultimately transpired on the *Deepwater Horizon*, the rig crew failed to respond appropriately at the first signs that a blow-out was about to occur, and unnecessarily lost control of the well.  Because of their lack of training, the *Deepwater Horizon* crew failed to quickly divert the build-up of mud and gas flow overboard once a kick had started, which could have either avoided or at least delayed the explosions on the rig.

109.    In the aftermath of the *Deepwater Horizon* disaster, BP, based upon its own investigation, determined that Transocean had failed to properly train its crew to respond to an emergency situation.  In its report on the *Deepwater Horizon* oil disaster, BP stated that "Transocean's shut-in protocols did not fully address how to respond to high flow emergency situations after well control has been lost.  Well control actions taken prior to the explosion suggest the rig crew was not sufficiently prepared to manage an escalating well control situation."  BP *Deepwater Horizon* Accident Investigation Report, dated September 8, 2010, at 43.

110.    CW1 corroborates this observation.  CW1 observed that while Transocean did have a one week "Major Emergency Management" class concerning how to respond to a crisis, it was not required for the Offshore Installation Manager ("OIM"), which is the individual in charge of the rig when it is drilling, the captain or the chief mate.

F.    **TRANSOCEAN'S MANAGEMENT POLICIES CREATED UNSAFE OPERATING CONDITIONS THROUGH THE COMPANY**

### 1.   Transocean Management Shifted Blame To Low-Level Employees Rather Than Developing Standards and Correcting Safety Hazards

111.   In the summer and fall of 2009, Britain's HSE conducted an investigation of Transocean's operations in the North Sea, investigating four rigs operating off the coast of Scotland and Norway and interviewing about 150 workers and managers.  The resulting report (the "2009 HSE Report"), an executive summary of which was obtained by *Time*, was unpublished and written for Transocean managers, and found the Company's safety standards and practices to be mediocre at best.  The report stated: "The company has not considered the human contribution to safety in a structured and systematic manner."  The report further stated that the organizational culture of Transocean is "based on blame and intolerance" and warned Transocean that its reported corporate culture of "blame" could be a serious safety hazard.  In addition, the report stated that "the most prominent and consistent indicator of Transocean's organizational culture is one of discipline, blame and zero tolerance," and that the Company gave "little consideration" to workers' behavior which could pose serious safety hazards, like "fatigue, distraction, communication failures, or defective equipment."  The report reflects that Transocean corporate management was largely responsible for the conditions that resulted in systemic safety violations, because of their preference for blaming safety incidents on lower level employees, such as rig workers, rather than addressing their own failures to create protocols and standards, consistent with industry practices and regulations, that needed to be implemented across the Company.

112.   As *Time* reported, the 2009 HSE Report also found that manuals were in short supply on the rigs the investigators visited, and those that were available were out of date. Further, if rig workers wanted to complain, or alert the "top brass" about problems, there were few people to whom they could talk.  Transocean's senior officials stayed on dry land, venturing

offshore on "VIP trips with superficial tours of the rig."  And even offshore, Transocean had few safety representatives, and even they "met infrequently."  As the 2009 HSE Report stated, the criticisms were of little surprise to union leader, Jake Malloy, regional organizer for offshore oil in Scotland for Britain's National Union of Rail, Maritime and Transport Workers, who called Transocean "one of the worst offenders" in instilling safe workplace procedures on its rigs. "When an incident occurs," Malloy said, "you should learn from it, but Transocean seeks to punish those people and it gets really ugly."  Malloy warned ominously, "Inevitably we're going to end up with a big bang, accidents with the potential for major injuries or fatalities."

113.  Transocean commissioned Lloyd's Register Group, a maritime and risk-management organization, in the weeks before the disaster to conduct a broad review of the safety culture of the Company's North America operations.  Lloyd's conducted focus safety groups and one-on-one interviews with at least 40 *Deepwater Horizon* workers.  According to confidential internal reports obtained by *The New York Times*, the report determined that a lack of hands-on experience for workers and managers contributed to safety concerns.  Many crew members and front-line supervisors were too readily promoted without sufficient on-the-job experience to appreciate the hazards.  "Front-line crews are potentially working with a mind-set that they believe they are fully aware of the hazards when it is highly likely that they are not," investigators said, add that workload, and thus the risks, on the rigs were increasing.

      **2.**      **Transocean Created Unsafe Conditions By Disregarding Industry Rig Inspection Standards In Favor of Less Costly Measures**

114.  MODU Code, a publication of the International Maritime Organization was adopted in 1989 and amended in 1991 and 1994.  The MODU Code was "developed to provide an international standard for mobile offshore drilling units . . . which will . . . ensure a level of safety for such units, and for personnel on board, equivalent to that required by International

Convention for Safety of Life at Sea, 1974, as amended, and the International Convention on Load Lines, 1966, as amended, for conventional ships engaged on international voyages."   In particular, the MODU Code developed "safety measures for mobile offshore drilling units so as to minimize the risk to such units, to the personnel on board and to the environment."

115.     Section 1.6 of the MODU Code states that a drill ship should have "a minimum of two *drydock surveys* during any five-year period" and that "the intervals between any two such surveys should not exceed 36 months." [italics in original].   Section 1.6.2 provides that "the drydock survey and the inspection of items surveyed at the same time should be such as to ensure that they remain satisfactory for the service for which the unit is intended." A company may only substitute an underwater inspection for a dry dock survey if such an inspection is the "equivalent" to a drydock survey.   According to CW1, who was familiar with the regularity requirements imposed on drill ships, the five year drydock requirement was also imposed by the Marshall Islands, which was the flag state of many of Transocean's drilling ships.   According to CW1, the five year drydock requirement was also standard industry procedure.

116.     In disregard of this standard safety practice, Transocean stopped doing regular dry dock surveys sometime around 2004.   Instead, Transocean implemented the "Underwater Inspection in Lieu of Dry-docking" ("UWILD") whereby Transocean conducted underwater inspections that were clearly inferior to the drydock surveys called for by the MODU Code.

117.     As the Chief Mate aboard three Transocean drill ships between 2002 and 2008, CW1 planned and supervised the UWILD process.   As part of that responsibility, CW1 reviewed video footage of the UWILD and documents related to the process.

118.     CW1 explained that the UWILD was a patently inferior process.   In a UWILD, the ship typically does not stop drilling or running its props.   Rather, divers merely descend to

the hull of the drill ship with a video camera and scrapers.   The divers then conduct a superficial video inspection by scraping off a portion of the hull and taking a photograph.

119.    The UWILD was inferior to a drydock survey and undermined rig safety.  For example, in a March 2010 Lloyd's Register survey, rig crews expressed concern that the lack of dry dock time could generally undermine equipment reliability.  According to the survey, the maintenance department was looking forward to a scheduled dry dock visit in 2011 "to carry out evasive [preventative maintenance] routines that they normally could not do."

120.    In his October 5, 2010 testimony, Robert McKechnie, the Transocean Director of Upgrade and Repair Projects within the Engineering and Technical Support Group for Transocean, confirmed that the rig damage analysis performed in dry dock was more comprehensive than what was performed in the UWILD process:

Q.    Okay. Is there any requirement to do a dry-docking within Transocean?

A.    Specifically dry-docking, we can do a UWILD, Underwater Inspection in Lieu of Drydock.

Q.    Is that the same thing, sir, a UWILD?

A.    It's not the same thing.

Q.    'f you do a damage analysis between the two, is it the same thing?

A.    It's not the same thing, no.

Q.    Which one is more comprehensive?

A.    The dry dock.[10]

---

[10] Testimony of Robert McKechnie, Director of Upgrade and Repair Projects Within the Engineering and Technical Support Group for Transocean, given on October 5, 2010 to the United States Coast Guard/Minerals Management Service Marine Board of Investigation into the Marine Casualty, Explosion, Fire, Pollution and Sinking of Mobile Offshore Drilling Unit Deepwater Horizon, with Loss of Life in the Gulf of Mexico April 21-22, 2010, at 55:5-55:15.

121.   As CW1 explained, the reason that Transocean adopted an inferior maintenance program was money.   The UWILD program was specifically formulated by Transocean management because it did not want to have its rigs out of commission during drydock, when they would not be earning the huge daily rental fees.   The Chief Counsel Report endorsed this view when it concluded that Transocean placed short-term profit above safety, stating Transocean's own rig crews raised concerns that drilling priorities took precedence over maintenance.

122.   Confidential Witness #2 ("CW2") further corroborates this point.   CW2 was a Transocean safety instructor aboard a Transocean rig from 2003 to 2005.   In the course of his job responsibility, CW2 observed that Transocean safety personal feared losing their jobs if they were "aggressive" and attempted to prioritize safety ahead of "production."   For instance, the safety personnel were supposed to have "stop the job authority," meaning that they should have been given free rein to stop an ongoing oil drilling job if safety issues were present.   However, when Transocean was making "a quarter of a million dollars per day or higher," there was "a lot of pressure" to avoid stopping ongoing drilling jobs and the safety personnel were "beat up verbally" if they attempted to do so.   The safety personnel "did not feel comfortable" stopping a job because of safety-related issues and were "scared to death of [losing] their jobs" if they invoked their "stop the job authority."

### G.   TRANSOCEAN MANAGEMENT REPEATEDLY UNDER-REPORTED CRITICAL SAFETY INCIDENTS, IGNORED SAFETY HAZARDS AND SILENCED WHISTLEBLOWERS

123.   CW1 reported that, between 2005 and 2007, while he work on two Transocean rigs stationed in the Gulf of Mexico, he observed Transocean management fail to report safety incidents as required and falsify other incident reports.

124.     Based on his educational background and his job responsibilities as Chief Mate, CW1 was familiar with the reporting requirements governing Transocean rigs.  CW1 attended the State University of New York's Maritime College, where he received a Bachelors of Science in Marine Transportation.  CW1's coursework included navigation, celestial navigation and ship safety, a course that was dependent on knowing sections of the Code of Federal Regulations ("CFR") relevant to ship safety.  In order to begin his career as a third officer, CW1 had to take an exam regarding these CFRs.  As Chief Mate, CW1 was in charge of maintenance of the vessel, vessel safety, navigation, fire safety, and equipment.  CW1 also had supervisory responsibilities for the crew as a whole.  As CW1 moved from third officer, to second officer to Chief Mate, he was required to take additional courses from maritime training institutes certified by the Coast Guard.

125.     In the course of his responsibilities, CW1 was familiar with safety issues on the rigs on which he was stationed.  In the ordinary course, CW1 met with the supervisor of the rig's subsea crew to coordinate safety issues.  As CW1 was in charge of making purchases for the ship, he was aware of any parts that needed to be brought onto the ship for repairs.  In addition, CW1 was regularly informed of all incidents by the rig's captain in a daily meeting regarding the status of the rig.

126.     Between 2005 and 2007, CW1 observed several instances where Transocean failed to report safety incidents as required or to address safety hazards.  On one rig, Transocean had used low grade steel to build fuel lines in the rig.  The lines went over an electronic control panel and were never properly maintained by, for example, being inspected during a drydock. The cheap steel broke in 2005, spilling oil onto the electronic control panel, destroying the panel and causing a fire that CW1 had to respond to in connection with his fire safety duties.  And

though bursting of the pipes was a serious safety incident that caused a significant amount of damage to the rig, CW1 checked but found no evidence that the incident was reported to the MMS, or apparently the Coast Guard, even though the incident was reported to Transocean management on shore by the captain of the rig.

127.    Transocean's budget did not contain enough money to both repair the fuel lines and also purchase a rescue boat that was necessary to protect the crew.  Accordingly, the rig management opted to buy the rescue boat and leave the fuel lines unrepaired.

128.    CW1 also described that, in mid 2007, one of the pistons aboard the rig CW1 was on seized and then blew apart.  The explosion showered the engine room with shrapnel.  No one was killed because the engine room was unattended, but the incident qualified as a "near miss" under Transocean's Health Safety and Environment manual.  Because of their significance to the safety of Transocean's operations company-wide, "near misses" are required to be reported to the rig manager, then to the team manager, and then to the operations manager, and then a report is supposed to be disseminated to the entire fleet.  In addition, the engine needed to be replaced, which would cost millions of dollars.  In addition, though required, there was no evidence that the incident was reported to the MMS.

129.    In early 2008, a filter caught fire in the radar, emitting smoke, filling up the bridge.  It took about an hour and a half to figure out what caused the smoke.  The fire was a serious threat to people's lives because the incident occurred near the sleep bunks and could have spread.   The fire was a result of Transocean's poor maintenance.   The filters hadn't been maintained (changed out) and so they overheated.  The maintenance supervisor was supposed to have changed the filter but he was short on personnel so had failed to take care of it.  The captain

of the rig told CW1 that they would not report the incident because there had been "too many incidents" on the rig already and that there would be no written report.

130.    The captain refused to disclose the incident in the log book as required, so CW1 refused to sign the log book.  CW1 then went to the Offshore Installation Manager, who was the Transocean official in charge of the rig, and explained why reporting the incident was necessary. CW1 advised the OIM that he wanted to notify the Transocean personnel on shore responsible for the rig and intended to file a complaint with human resources about the Captain's refusal to disclose and report the incident.

131.    The next day, the captain came to CW1 and threatened his career by pointing out that CW1 was nearing promotion to captain and suggesting that continuing to press the matter about the radar fire would derail his promotion.  CW1 persisted, telling the OIM that he intended to report the fire, and also the misconduct of the captain.

132.    A few hours later, the corporate head of Transocean's human resources, Debra Pettitte called CW1 and told him that Transocean would conduct an investigation and that CW1 should take some time off while that was occurring.  Accordingly, CW1 took a week off travelling home, away from his station on the rig.

133.    A week later, Pettitte called CW1 and told him that the captain had been cleared of any wrongdoing and that there had not really been a fire, just smoke and that Transocean was not going to report the incident.  When CW1 tried to explain that the smoke was a serious issue because it threatened the lives of rig members and that it seemed unlikely that there could be smoke without fire, Pettitte told him to drop the issue and asked him if he wanted to be transferred from the Gulf of Mexico to Nigeria.

134.    Pettitte then put CW1 on an extended involuntary medical leave and, after six months, terminated him.

135.    Shortly after being placed on medical leave, CW1 learned that the rig on which CW1 had been stationed suffered a huge fire as the fuel lines in the engine room burst, completely gutting the engine room.  As a consequence, Transocean lost its drilling contract with the oil company.  Transocean reported this incident to the MMS as causing only $250,000 in damages (an amount that would not trigger an extensive investigation by MMS), which, given the extent of the description of the damage, seemed to be an impossibly low estimate.

136.    CW2 observed Transocean repeatedly failing to correct safety hazards as well in the course of his employment as a Transocean safety advisor.  For example, approximately 5 times between 2003 and 2005, CW2 voiced concerns about "gases coming in from the drilling floor" exceeding the CFR limits.  CW2 explained that when the gases coming into the drill floor exceed a certain amount, Transocean should have stopped drilling to investigate.  But when CW2 voiced his concerns to the rig OIM, he was told to "back-off" and no such investigation was conducted.

137.    CW2 also observed Transocean ignore the safety of its crew.  CW2 explained that there is considerable danger present when the seas are rough and the crane operators are attempting to move equipment and get equipment in place to facilitate the drilling process. There are 90-foot joints that weigh "several thousand pounds" that the crane operators move about on the rig.  There are large "casings" and "piping" that have to be moved across the rig and ultimately drilled into the ground.  The roustabouts and tool pushers are in grave danger when the seas are rough and the winds are blowing at high speeds because they are tasked with assisting the crane operator from the deck of the rig with the proper placement and movement of

the heavy drilling equipment.  As a precaution to control these risks, CW2 advised the management of the rig that the movement of equipment should cease when the wind exceeded 40 mph or the seas were unusually rough.  But his safety measure was rejected by the OIM.

138.    Confidential Witness #3 ("CW3") also observed that Transocean failed to correct safety hazards on its rigs.  CW3 worked for Transocean from 2002 to 2005.  Her job was to provide support from shore to those performing engineering functions on Transocean rigs.  CW3 observed that Transocean frequently failed to provide rig crews with updated engineering and maintenance manuals.  This hampered repairs because rig crews often had to rely on outdated manuals when making repairs to rig equipment.  In the course of her work, CW3 heard discussion between rig crew members regarding incident reports that misrepresented events to regulatory authorities.  In particular, CW3 heard rig crew members discuss how Transocean made misrepresentations regarding the underreporting of damage, including fire-related injuries, such as one instance were Transocean failed to properly report an incident where a crane operator's arm was smashed.

139.    The observations of the confidential witnesses are corroborated by media reports.  As reported in the *Houston Chronicle*, MMS accident reports indicate that fire struck Transocean rigs in 2008 and 2009, and 4 of the 19 accidents recorded on Transocean platforms for the past four years resulted in injuries to workers that required evacuation to shore and caused $1.9 million in damage.  Yet, evidence shows that the incidents reported to MMS are only a handful of the total number of incidents that occur and should be reported.  Attorneys who often represent off-shore workers in injury cases told the *Houston Chronicle* that accidents aboard Gulf oil platforms tend to be underreported by at least a third.

140.    The investigation into the *Deepwater Horizon* uncovered further evidence of Transocean's systemic failure to adequately address safety issues.  For example, Transocean's practice was to destroy BOP test records at the end of each well, a practice that makes it difficult to track the reliability of the BOPs.  The Chief Counsel's Report found that "Transocean's practice of destroying test records at the end of each well creates unnecessary information gaps that may undermine BOP maintenance" and constitutes a "major shortcoming[] in the overall program for managing proper functioning of the BOP Stack."  As another example, the Chief Counsel's Report stated that "it is not clear" that "Transocean adequately responded to known leaks" to the BOP.  According to Transocean senior subsea supervisor Owen McWhorter "the only thing I can swear to is the fact that the leaks discovered by me, on my hitch, were brought to my supervisor's attention and the Company man's attention."

141.    Furthermore, 30 C.F.R. §250.466(f) states that drilling records must contain information on "any significant malfunction or problem."  Yet, at least two BOP leaks identified on the *Deepwater Horizon* pre-explosion were not listed in daily reports.  Neither a pilot leak on the test ram open circuit shuttle valve nor a leak on an upper annular preventer hose fitting were reported to the MMS by either BP or Transocean.  As the Chief Counsel's Report found, the "failure to report these leaks potentially violated MMS reporting regulations."

## V.    THE PROXY CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMITTED MATERIAL INFORMATION

### A.    THE PROXY CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS WHICH DEPRIVED THE GLOBALSANTAFE SHAREHOLDERS OF THEIR RIGHT UNDER SECTION 14(a) TO A FULLY INFORMED VOTE

142.    On October 2, 2007, in advance of the November 9, 2007 GlobalSantaFe shareholder meeting, Transocean and GlobalSantaFe distributed a joint Proxy regarding the

Merger and the proposed vote. The Proxy is attached hereto and incorporated herein as Exhibit A.

143.    The Proxy included the Merger Agreement that had been signed on July 21, 2007 by Long and Marshall.  The Merger Agreement included the "Representations and Warranties" by Transocean about its compliance with Environmental and other laws.  Particularly, Section 6.5 of the Merger Agreement, entitled "Compliance with Laws; Permits," stated:

Except for such matters as, individually or in the aggregate, do not and are not reasonably likely to have a Transocean Material Adverse Effect and except for matters arising under Environmental Laws which are treated exclusively in Section 6.13:

> (a) *Neither Transocean nor any Subsidiary of Transocean is in violation of any Applicable Laws* relating to the ownership or operation of any of their respective assets or businesses, and no claim is pending or, to the knowledge of Transocean, threatened with respect to any such matters.  *No condition exists that is not disclosed in the Transocean Disclosure Letter and which does or is reasonably likely to constitute a violation of or deficiency under any Applicable Law relating to the ownership or operation of the assets or conduct of businesses of Transocean or any Subsidiary of Transocean.*

"Applicable Laws" was defined elsewhere Merger Agreement as "any applicable law, rule, regulation, code, governmental determination, order, treaty, convention, governmental certification requirement or public limitation, U.S. or non-U.S."

144.    Section 6.13 of the Merger Agreement, entitled "Environmental Matters," stated:

> (a) *Transocean and each Subsidiary of Transocean has been and is in compliance with all Environmental Laws* except for such matters as do not and are not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect.  *There are no past or present facts, conditions or circumstances that interfere (or are reasonably likely to interfere in the future) with the conduct of any of their respective businesses in the manner now conducted or which interfere with continued compliance with any Environmental Law*, except for any non-compliance or interference that is not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect.

> (b) Except for such matters as do not and are not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect, no judicial or administrative proceedings or governmental investigations are pending or, to the

49

knowledge of Transocean, threatened against Transocean or its Subsidiaries that allege the violation of or seek to impose liability pursuant to any Environmental Law, and *there are no past or present facts, conditions or circumstances at, on or arising out of, or otherwise associated with, any current (or, to the knowledge of Transocean or its Subsidiaries, former) businesses, assets or properties of Transocean* or any Subsidiary of Transocean, including but not limited to on-site or off-site disposal, release or spill of any Hazardous Materials *which violate Environmental Law or are reasonably likely to give rise under any Environmental Law to (i) costs, expenses, liabilities or obligations related to any cleanup, remediation, investigation, disposal or corrective action, (ii) claims arising for personal injury, property damage or damage to natural resources, or (iii) fines, penalties or injunctive relief.*

"Environmental Law" was defined elsewhere in the Merger Agreement as "any Applicable Law related to human health and the environment, including the common law."

145.    In addition to incorporating the Merger Agreement as part of the Proxy, the Proxy also incorporated the Company's 2006 Form 10-K.  The 2006 Form 10-K misrepresented that Transocean had conducted "extensive" training and safety programs.

146.    The Proxy also misrepresented that the exchange – 0.4757 Transocean shares and $22.46 cash for each GlobalSantaFe share – was "fair."

147.    These statements were false and misleading, and, as discussed below, omitted material information because, in fact, in order to increase short-term profits, Transocean was regularly and systemically flouting U.S. Environmental Laws, creating unsafe conditions and assuming enormous risks in the operations of its deepwater rigs, by:

- Failing to adequately inspect and maintain its Blowout Preventers ("BOP"), including by ignoring manufacturer recommendations regarding maintenance and making after-market modifications to BOPs that affected their performance;

- Failing to adequately staff, train and supervise maritime and drilling rig personnel, particularly with respect to emergency conditions and drilling incidents on its rigs;

- Failing to perform required inspections and repairs for its deepwater drilling rigs, such as the *Deepwater Horizon*;

- Discouraging staff reports, or misreporting and destroying records for safety incidents on its rigs;

- Failing to implement safety systems which were adequate to protect the environment from deep water blowouts such as the one suffered at the Macondo well; and

- Creating a culture where catastrophic safety and environmental risks were routinely accepted, and environmental and other laws, regulations and industry standards were flouted to minimize operational delays and increase short-term profits.

148. Specifically, the Environmental Laws that governed Transocean's conduct and which it violated are set forth in Section IV B above. The particular conduct in which Transocean engaged that violated these laws, created unsafe conditions and risks, and which demonstrated that the Company, in fact, short-changed training and safety, is described in Sections IV D (1)-(4). The true state of affairs is further described in Section VI which outlines the "truth" as it was revealed in the government investigations and in reports published in the aftermath of the *Deepwater Horizon* disaster. All of this information further shows that the Exchange Price GlobalSantaFe shareholders received in the Merger was, in fact, not "fair," because part of the consideration, namely the Transocean stock, had been inflated by Defendants' misconduct.

149. While many of Transocean's environmental and safety deficiencies were revealed as a result of the investigations into the *Deepwater Horizon* spill in 2010, the statements by Confidential Witnesses who were employed at Transocean in 2007 and earlier, the testimony of Transocean's current and former employees, documents produced in the investigations of the spill, and investigative and news reports demonstrate that Transocean's environmental and safety violations were systemic and in existence at the time of the Proxy.

**B.    THE PROXY WAS FALSE AND MISLEADING BECAUSE IT OMITTED MATERIAL INFORMATION WHICH DEPRIVED GLOBALSANTAFE SHAREHOLDERS OF THEIR RIGHT UNDER SECTION 14(a) TO A FULLY INFORMED VOTE**

150.    In light of the false statements Defendants made in the Proxy with respect to Transocean's compliance with environmental and other laws, its safety programs and training, and misrepresentations that the Exchange Price was fair, Defendants had a duty to make adequate disclosures on these subjects to assure that GlobalSantaFe shareholders were not misled in voting on the Merger.  Defendants failed in that duty, and the Proxy was false and misleading because of the material omissions described below.

**1.    The Proxy Failed To Disclose That Transocean Failed To Inspect And Maintain Its Drilling Rigs Including Its BOPs as Required**

151.    The Proxy failed to disclose that by October 2007 Transocean had implemented equipment maintenance programs that violated U.S. regulations, and industry standards, and which assumed excessive risks for the safety of its deepwater drilling operations.   As Stringfellow explained, by January 2005, rather than complying with costly requirements of inspections and performing preventative maintenance on its deepwater drilling rigs, the Company implemented a so-called "conditions-based maintenance" program under which it performed repairs as equipment broke.  Thus, *e.g.*, the *Deepwater Horizon* had not been to drydock since 2001, meaning that by October 2007, many pieces of the blowout preventer had not been certified for over five years.

152.    Similarly, CW1 explained that Transocean had abandoned the regulatory requirement that it conduct a major inspection of its blowout preventers every three to five years

and that this change had occurred before the date that the Proxy issued.[11]   According to CW1, in 2004, it became time for the dry docking and five year inspection of the Discoverer Enterprise, because the Discoverer Enterprise entered service in 1999 and was one of the older of Transocean's Fifth Generation Deepwater Floaters, which was Transocean's newest and largest set of drill ships at the time.  Because of their size, there were very few shipyards in the U.S. that could dry dock the Fifth Generation Deepwater Floaters without pulling the drillships' thrusters out, an additional step that rendered the drydocking process longer and more expensive.  Due to this expense, Transocean management then made a policy decision that its drillships would forgo the five-year drydocking and inspection practice.   Transocean Marine Superintendent communicated this policy change to Transocean's captains in an email and CW1's captain provided this communication to CW1.

153.   As the Chief Counsel's Report noted, "[g]iven the critical importance of the blowout preventer in maintaining well control, the Chief Counsel's team questions any maintenance regime that could undermine the mechanical integrity of the BOP," and Transocean's "willingness to disregard regulatory obligations on a vital piece of rig machinery is deeply troubling."

154.   As information gleaned from the investigations into the *Deepwater Horizon* shows, Transocean and its management routinely disregarded basic equipment maintenance requirements in favor of meeting production schedules, greatly increasing the undisclosed risks of a devastating blow-out.  The reckless nature and number of maintenance violations on the

---

[11] CW1 worked as an officer on Transocean drillships from 2001 to 2008.  From 2001-2004 he was second mate and then chief mate aboard a drillship stationed in southeast Asia.  From 2005-2008, he was the chief mate aboard two different Transocean drillships stationed in the Gulf of Mexico.  As part of his position as a senior officer aboard several Transocean drillships, CW1 was privy to emails from Transocean's management regarding changes to Transocean's maintenance policies, so he was in a position to know the information he was discussing.

*Deepwater Horizon* BOP demonstrate a pattern at odds with the Proxy's representation regarding Transocean's "extensive safety program," and thus needed to be disclosed to GlobalSantaFe shareholders for purposes of their vote. *See, e.g.*, ¶¶72-90.

> **2.     The Proxy Failed To Disclose That Transocean's Training Practices Were Grossly Deficient**

155.    The Proxy failed to disclose Transocean's systemic disregard for training its deepwater drilling crews on fundamental requirements for well control, testing and emergency management. *See, e.g.,* ¶¶95-110.

> **3.     The Proxy Failed To Disclose That Transocean Misreported and Failed To Report Safety Incidents And Punished Whistleblowers**

156.    The Proxy also failed to disclose to GlobalSantaFe shareholders that Transocean's corporate culture increased the risks of major environmental and safety incidents by discouraging the legally required reporting of safety incidents, ignoring safety hazards that delayed production and silencing whistleblowers.  This pattern is most vividly demonstrated through the experiences of CW1.  CW1 reported that, between 2005 and 2007, while he worked on two Transocean rigs stationed in the Gulf of Mexico, he personally observed Transocean management fail to report critical safety incidents, and falsify other incident reports.  *See* ¶¶123-35.  CW1 was put on extended "medical" leave and then terminated when he insisted that a fire which threatened the lives of the crew be reported.  *See* ¶134.

157.    CW2, a former rig safety advisor, similarly recounted his observations of a management culture where safety personnel were intimidated and threatened with the loss of their employment if they permitted safety concerns to interfere with production schedules.  *See* ¶¶136-37.

> **4.     The Proxy Failed To Disclose A Culture That Routinely Sacrificed Safety for Profits**

158.    The Proxy also failed to disclose that there existed at Transocean a .culture where catastrophic safety and environmental risks were routinely accepted, and environmental and other laws, regulations and industry standards were flouted to minimize operational delays and increase short-term profits.  See Section IV.

## VI.    THE TRUTH IS REVEALED/LOSS CAUSATION

159.    In the days, weeks and months following the Macondo blowout, through investigative reporting, published governmental hearings, witness testimony, and lawsuits, the true flawed state of Transocean's safety, employee training, and maintenance protocols for its deepwater rigs began to leak out to the market with devastating effects to Transocean's stock price and causing losses to Plaintiffs and the Class.

160.    In the days after the disaster, the blowout preventer aboard the rig failed to seal the well, focusing attention on Transocean's potential role in causing or exacerbating the disaster through inadequate maintenance.  On April 27, 2010, in an article entitled "Failure of Blowout Preventer Is Key to Rig Disaster," *The Energy Daily* described how the apparent failure of the blowout preventer had caused many experts to question whether Transocean had properly maintained its rig equipment.  On April 28, 2010, *The Wall Street Journal* reported that two senior House Democrats, Reps. Henry Waxman (D. California) and Bart Stupak, had called on BP and Transocean to "explain what they knew about the risks of drilling at the site of last week's deadly oil rig explosion in the Gulf of Mexico."  The lawmakers said in a written statement that they would "investigate what the companies knew about the risks of drilling at the site."

161.    On April 29, 2010, *The Wall Street Journal* revealed that Transocean had not equipped the *Deepwater Horizon* with a "remote-control shut-off switch" used by other major oil industry companies such as Royal Dutch Shell PLC and France's Total S.A.  Also on April 29, 2010, it was reported by the Agence France Presse that two Louisiana shrimpers had a filed a class action against, *inter alia*, BP and Transocean, alleging that they negligently caused the oil spill by failing to "operate the rig properly; fail[ing] to properly inspect the rig 'to assure that its equipment and personnel were fit for the intended purpose'; act[ing] 'in a careless and negligent manner with due regard for the safety of others'; fail[ing] to 'react to danger signs'; and employing 'untrained or poorly trained employees.'"  As described herein, these were all problems that had dated back to the time of the Merger.  These disclosures about Transocean's culpable role in the *Deepwater Horizon* disaster and its inadequate maintenance, training and safety protocols caused the price of Transocean stock to decline.  As StreetInsider.com reported on April 29, "BP and Transocean Ltd. are under heavy pressure today as the oil leak in the Gulf of Mexico appears much bigger than originally thought, and now fears about future liabilities of the two companies involved have spooked investors."  On April 29, the price of Transocean stock dropped $6.32, or 7.45% on heavy volume.

162.    On April 30, 2010, FBR Capital Markets downgraded Transocean because of its connection to the *Deepwater Horizon* oil spill disaster.  Also on April 30, 2010, *The New York Times* ran an article discussing how BP had assigned blame for the *Deepwater Horizon* to the failure of equipment that Transocean had a duty to maintain.  On April 30, Transocean stock dropped  $6.19 or 7.88%.

163.    On May 4, 2010, it was reported in *PR News* that that the family of Aaron Dale Burkeen, one of 11 men killed in the *Deepwater Horizon* disaster, had filed suit against

Transocean, alleging that the *Deepwater Horizon* was "unseaworthy" and that Transocean had failed to properly maintain the rig and failed to meet federal safety standards.  Also on May 4, 2010, it was reported in the *National Journal* that Congressman Darrell Issa requested that regulators hand over all communications between the MMS, Transocean and BP regarding MMS inspections and certifications of the rig.  It was reported by the *Dow Jones Newswire* that U.S. House lawmakers had concluded that Transocean lacked adequate backup plans to deal with a disaster.  Congressman Ed Markey was quoted as saying "It was pretty clear here that there was not a proper preparation for the worst-case scenario."

164.    On May 5, 2010, Defendants announced in the Company's SEC Form 10-Q that the Departments of Homeland Security and Interior, including the MMS, had begun a joint investigation into Transocean and the cause of the continuing disaster, and that the Company had been requested to participate in disaster-related government hearings.  The Company disclosed that it had received a notice from the U.S. Department of Justice ("DOJ") to preserve all information related to the Macondo blowout, and that one of the Company's subsidiaries had been designated as a source of oil discharges and designated as responsible party under the Oil Pollution Act of 1990.  Also on May 5, 2010, *Mclatchy Newspapers* published an article entitled "Report Adds to Doubts About Key Oil Rig Safety Equipment."  The article discussed a 2003 report by a Transocean executive, which was delivered at an academic conference, that "warned that the industry wasn't taking time to find and fix the problems that commonly plagued blowout preventers – the supposed failsafe mechanisms designed to stop oil spills such as the one now threatening the gulf coast."  The article further stated that the 2003 report "suggests that the industry was so focused on drilling that it was willing to pay higher maintenance costs to keep

rigs operating and avoid downtime rather than address some of the fundamental problems with the blowout preventers."

165.    A May 6, 2010 article in the *Daily Telegraph* entitled "Transocean On the Block Over Rig Safety Records, Equipment Operator Was No Minor Player in the Gulf of Mexico Oil Spill," described the rising tide of safety incidents at Transocean, going back to 2005.  Reflecting the continued revelations about its safety deficiencies, the price of Transocean stock fell $3.06 or 4.21% on May 6.

166.    On May 10, 2010, Lamar McKay, chairman and president of BP America blamed Transocean for the *Deepwater Horizon* oil spill, arguing that the blowout preventer aboard the rig was to be the "fail-safe" for the rig and that determining why it failed was critical to understanding why the oil spill occurred.  Also on May 10, 2010, an article in *The Wall Street Journal* entitled "Rig Owner Had Rising Tally of Accidents" detailed Transocean's poor safety record and numerous safety incidents, including a 2006 incident in which "extended use" of a blowout preventer "without inspection/maintenance" had led to a malfunction.  On May 10, the price of Transocean stock fell $1.67 or 2.46%.

167.    On May 29, 2010, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  The article described newly-available internal BP documents, totaling 50,000 pages, that reporters obtained through a Freedom of Information Act Request that provided additional information to the market regarding Transocean's long-existing failings, including:

- "Internal documents from BP show that there were serious problems and safety concerns with the *Deepwater Horizon* rig far earlier than those the company described to Congress last week" and these problems related to the blowout preventer;

- That BP had had doubts about the reliability of Transocean's blowout preventer for months;

- On at least three occasions, BP records indicate, the blowout preventer was leaking fluid, which the manufacturer of the device has said limits its ability to operate properly;

- That the blowout preventer was tested at a lower pressure, 6,500 pounds per square inch, rather than the 10,000 pounds that had been previously used;

- That Transocean was responsible for maintenance of rig equipment and for any equipment failures.

168.    Then, on June 1, 2010, U.S. Attorney General Eric Holder announced that the DOJ was investigating whether criminal or civil charges were warranted under the Clean Water Act, the Migratory Bird Treaty Act, the Endangered Species Act and the Oil Pollution Act as well as criminal statutes, promising to hold the parties responsible for the Macondo disaster liable. As reported in the *Miami Herald* on that date, "Two companies, their employees and their practices are almost certainly at the heart of the investigation: BP, which owned the well and is responsible for the spill, and Transocean, which owned and operated the rig that exploded, caught fire and sank to the bottom of the sea."

169.    As a result of *The New York Times* article and news of the DOJ investigation, Transocean's stock price declined $6.73 on June 1, 2010 (the next trading day after the May 29, 2010 *The New York Times* article), or 11.85%.

170.    On July 19, 2010, Stephen Bertone ("Bertone"), Transocean's Chief Engineer aboard the *Deepwater Horizon*, provided testimony to the Joint Commission regarding a September 2009 rig safety audit performed by BP. Bertone's testimony revealed that in September 2009, BP identified 390 preventative maintenance tasks for the DWH amounting to 3,545 man hours, which Transocean had failed to perform. On this news, which again revealed that Transocean was not committed to safety as it had repeatedly claimed, the Company's share

price fell $4.00 or 7.68% on July 19.  On July 21, 2010, *The Wall Street Journal* ran an article

entitled "BP Supervisor Says Rig Safety Device Flawed."  The article described some of the

testimony provided by Ronald Sepulvado ("Sepulvado"), a BP employee overseeing certain

*Deepwater Horizon* rig operations.  The article described Sepulvado's testimony that workers

aboard the *Deepwater Horizon* had discovered a leak in the blowout preventers' hydraulic

system a month before the disaster.  The article reported that, according to federal investigators,

continuing to drill with a faulty hydraulic system could have been a violation of federal

regulations, which require companies to stop drilling if either of a blowout preventer's two

control systems does not work properly.  The article also reported that Mr. Sepulvado

acknowledged he was aware of an April audit that found the *Deepwater Horizon*'s blowout

preventer was long overdue for a major inspection that is supposed to take place every three to

five years and that Mr. Sepulvado stated that he had raised concerns about Transocean's

maintenance but was brushed off by Transocean.

171.    On July 21, 2010, *The New York Times* published an article entitled "Workers on

Doomed Rig Voiced Concern About Safety," which also revealed that Transocean's prior

representations concerning the efficacy of the Company's safety protocols and

comprehensiveness of its employee training was materially misleading.  In this regard, the article

detailed two separate confidential March 2010 internal reports – one on the Company's "safety

culture" aboard the *Deepwater Horizon* and one on the status of its equipment (the "Reports") –

commissioned by Transocean that *The New York Times* secured through a FOIA request.  The

Reports were purportedly the findings of the audit performed on behalf of the Company by

Lloyd's.  As disclosed by *The New York Times*, the observations and conclusions within the

Reports stood in stark contrast to the project safety statements that Transocean made in its SEC

filings and other public pronouncements.  For example, according to *The New York Times*, the

Reports found that:

- Many of Transocean workers were concerned about safety practices and feared reprisals if they reported mistakes or other problems;

- Transocean workers said that company plans were not carried out properly and that they "often saw unsafe behaviors on the rig";

- Some workers also voiced concerns about poor equipment reliability, "which they believed was a result of drilling priorities taking precedence over planned maintenance";

- "At nine years old, Deepwater Horizon has never been in dry dock," one worker told investigators. "We can only work around so much";

- "Run it, break it, fix it," another worker said.  "That's how they work";

- Many key components — including the blowout preventer rams and failsafe valves — had not been fully inspected since 2000, even though guidelines require inspection of the preventer every three to five years;

- At least 26 components and systems on the rig were in "bad" or "poor" condition;

- Workers felt that Transocean management, in Houston, would engage in reprisals if safety hazards were reported; and

- "Many workers" reported "fake data" regarding safety incidents.

172.    As a result of the foregoing news, the Company's share price declined another

$1.25 to close at $47.75 on July 21, 2010.  The Company's share price declined $1.08 the next

day, a decline of 2.26%.  On July 22, 2010, *The Wall Street Journal* revealed that "Documents

Show Key Safety Switch on Deepwater Horizon Didn't Work."   The article disclosed that

"internal documents" reviewed by *The Wall Street Journal* showed that the "deadman's switch"

aboard the *Deepwater Horizon* was inoperable.  The "deadman switch," should have activated

once the floating rig erupted into flames and lost communication with well-control equipment a

mile below the surface.  The switch should have triggered the blowout preventer, a 450-ton set of

valves designed to shut down the well.  The article further noted that "federal investigators have had tough questions for Transocean, probing the driller's maintenance of the blowout preventer, safety systems and other equipment aboard the rig."   Based upon the foregoing news, the Company's share declined another $1.41 to close at $45.26, or 3.02% on July 23.

173.    As a result of the disclosure of previously misrepresented and concealed material facts concerning Transocean's adherence to Environmental Laws and safety protocols, the Company's common stock price declined from $92.03 per share on April 20, 2010 to $45.26 at the close of trading on July 23, 2010.  This decline resulted from disclosures of previously misrepresented material facts concerning the Company's compliance with environmental laws and regulations, safety culture and employee training and removed artificial inflation from Transocean's stock price, causing real economic loss of as much as $46.77 per share to GlobalSantaFe shareholders who had exchanged their shares for Transocean shares in the Merger.

174.    As the truth was revealed and it became apparent that: (1) Transocean's safety mechanisms and protocols had long been deficient and failed, (2) Transocean had contributed to fatalities and injuries and had been a root cause of the multi-million gallon oil spill, and (3) Transocean had been the subject of numerous and recurring citations and investigations disclosing a pattern of poor operational and safety performance, the price of the Company's securities declined in a series of material steps that removed the artificial inflation from Transocean's share price.

## VII.    CLASS ACTION ALLEGATIONS

175.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the federal Rules of Civil Procedure, on behalf of all former GlobalSantaFe shareholders, and their successors in interest, who exchanged their shares in the Merger and suffered harm as a result.

176.    This action is properly maintained as a class action.

177.    The Class of stockholders is so numerous that joinder of all members if impracticable.  Pursuant to the Proxy, approximately 230,306,877 shares in GlobalSantaFe were exchanged for Transocean stock in the Merger, and millions of those Transocean shares continued to be held by former GlobalSantaFe shareholders when the first corrective disclosures about Transocean's misconduct began to leak into the market in April 2010.

178.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, but are not limited to:

- Whether the statements in the Proxy were false or misleading;

- Whether the false or misleading statements were material; and

- Whether Plaintiffs suffered losses as a result of the false or misleading statements, and if so, what relief is appropriate.

179.    Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class.

180.    Plaintiffs are committed to prosecuting this action, have retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

181.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

182.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

183.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

**Against All Defendants
for Violations of §14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder**

184.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

185.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to made the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

186.    Defendants Long and Marshall signed the Proxy and Defendants disseminated the false and misleading Proxy which misrepresented Transocean's compliance with Environmental Laws and safety requirements, and all Defendants negligently failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

187.    As stated herein, the Proxy contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, which proxy statement was an essential link in the consummation of the Merger.

188.    The written communications made by the Defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications were materially false and/or misleading and were provided in a negligent manner.

189.    As described herein, the Proxy misrepresented and/or concealed material information.   As a direct result of the Defendants' negligent preparation, review and dissemination of the false and/or misleading Proxy statement, Plaintiffs and the Class received inadequate consideration of .4757 Transocean shares and $22.46 for each share of GlobalSantaFe.  The false and/or misleading Proxy  deprived Plaintiffs and the Class of their right to a fully informed shareholder vote in connection with the Merger and the full and fair value for their GlobalSantaFe shares.

190.    At all relevant times to the dissemination of the materially false and/or misleading Proxy, Defendants were aware of and/or had access to the true facts concerning Transocean's operations and the extreme risk of a catastrophic oil rig disaster that their statements misrepresented.  When the true facts were revealed, the price of the Transocean stock Plaintiffs had received in the Merger plummeted, and Plaintiffs suffered millions of dollars of losses as a result.  Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to obtain shareholder approval of and thereby consummate the Merger, Plaintiffs and the Class have suffered damage and actual economic losses in an amount to be determined at trial and are entitled to such equitable relief as the Court deems proper.  By reason

of the misconduct detailed herein, the Defendants are liable pursuant to §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

**COUNT II**

**Against Defendant Long
for Violations of §20(a) of the Exchange Act**

191. Plaintiffs herein repeat and reallege each and every allegation contained above as if fully set forth herein.

192. Long acted as a controlling person of Transocean within the meaning of §20(a) of the Exchange Act.  By reason of his position as CEO of Transocean, Long had the power and authority to cause, and did in fact cause, Transocean to engage in the wrongful conduct complained of herein.  By reason of such conduct, Long is liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class;

B. Declaring that the Proxy distributed by Defendants to shareholders was materially false and misleading, in violation of Rule 14a-9 and §14(a);

C. Awarding Plaintiffs and members of the Class compensatory and/or rescissory damages against the Defendants, including but not limited to, pre-judgment and post-judgment interest, as well as reasonably attorneys' fees, expert witness fees and other costs;

D. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies;

E.      Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: April 7, 2011                                      Respectfully submitted,

                                                          **SCOTT+SCOTT LLP**

                                                          By

                                                          Beth A. Kaswan (BK-0264)
                                                          Thomas L. Laughlin (TL-8888)
                                                          500 Fifth Avenue, 40th Floor
                                                          New York, NY 10110
                                                          Tel:    (212) 223-6444
                                                          Fax:    (212) 223-6334
                                                          Email: bkaswan@scott-scott.com
                                                                    tlaughlin@scott-scott.com

                                                          David R. Scott (DS-8053)
                                                          156 S. Main Street
                                                          P.O. Box 192
                                                          Colchester, CT 06415
                                                          Tel:    (860) 537-5537
                                                          Fax:    (860) 537-4432
                                                          Email: drscott@scott-scott.com

                                                          Geoffrey M. Johnson
                                                          12434 Cedar Road, Suite 12
                                                          Cleveland Heights, OH 44106
                                                          Tel:    (216) 229-6088
                                                          Fax:    (216) 229-6092
                                                          Email: gjohnson@scott-scott.com

                                                          **CHITWOOD HARLEY HARNES LLP**
                                                          James M. Wilson, Jr. (JW-8569)
                                                          Robert W. Killorin
                                                          Mary Kathryn King
                                                          1230 Peachtree Street, NE, Suite 2300
                                                          Atlanta, GA 30309
                                                          Tel:    (404) 873-3900
                                                          Fax:    (404) 876-4476
                                                          Email: jwilson@chitwoodlaw.com
                                                                    rkillorin@chitwoodlaw.com
                                                                    kking@chitwoodlaw.com

67

*Counsel for Lead Plaintiffs and*
*Co-Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Amended Class Action Complaint was

mailed this 7th day of April, 2011 to counsel for Defendants, as follows:

    John H. Fleming
    Patricia A. Gorham
    Sutherland Asbill & Brennan LLP
    999 Peachtree St NE
    Atlanta, GA 30309

                        BETH A. KASWAN