## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BRICKLAYERS AND MASONS LOCAL
UNION NO. 5 OHIO PENSION FUND and
DEKALB COUNTY PENSION FUND on
behalf of themselves and all others similarly
situated,

                Plaintiffs,

                -against-

TRANSOCEAN LTD., ROBERT L. LONG
and JON A. MARSHALL,

                Defendants.

CIVIL ACTION No. 10-cv-7498-LTS

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

John W. Spiegel (admitted *pro hac vice*)
Ronald K. Meyer (*pro hac vice*
forthcoming)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Tel. 213.683.9152
Fax. 213.683.5152
*john.spiegel@mto.com*
*ronald.meyer@mto.com*

John H. Fleming (admitted *pro hac vice*)
Patricia A. Gorham (admitted *pro hac vice*)
Benjamin C. Morgan (*pro hac vice* forthcoming)
SUTHERLAND ASBILL & BRENNAN LLP
999 Peachtree Street, N.E., Suite 2300
Atlanta, Georgia 30309
Tel.  404.853.8000
Fax.  404.853.8806
*john.fleming@sutherland.com*
*patricia.gorham@sutherland.com*
*ben.morgan@sutherland.com*

Peter Ligh
SUTHERLAND ASBILL & BRENNAN LLP
1114 Avenue of the Americas, 40th Floor
New York, NY 10036-7703
Tel. 202-389-5000
Fax. 212-389-5099
*peter.ligh@sutherland.com*

*Attorneys for Defendants Transocean Ltd., Robert L. Long, and Jon A. Marshall*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................................................1

PLAINTIFFS' ALLEGATIONS ...................................................................................3

    I.    The Merger ........................................................................................4

    II.   Alleged Misstatements and Omissions ...........................................................5

ARGUMENT .........................................................................................................5

    I.    The Complaint Should Be Dismissed as to Defendant Transocean Ltd.
        Because It Is a Separate Legal Entity and Was Not Involved in the Proxy or
        Merger.............................................................................................6

    II.   The Complaint Should Be Dismissed Because Plaintiffs Lack Standing..................7

    III.  The Complaint Should Be Dismissed for Failure to State a Claim Under
        Section 14 and SEC Rule 14a-9......................................................................8

        A.   The Elements of Plaintiffs' Claims..................................................8

        B.   The Pleading Requirements for Plaintiffs' Claims ............................9

        C.   Plaintiffs Fail to Plead Facts Showing a Misstatement or Omission. .............10

            1.   Plaintiffs fail to allege a misrepresentation based on Transocean's
                statements regarding compliance with "Environmental Laws."............11

                a.   Maintaining blowout preventers (¶¶72-83) ......................12

                b.   Maintaining other equipment (¶¶84-90)...........................14

                c.   Staffing rigs and training crews (¶¶91-110)....................16

                d.   Policies impacting safety (¶¶111-22) ...............................17

                e.   Reporting of safety issues (¶¶123-41) ..............................17

            2.   Plaintiffs fail to allege a misrepresentation based on Transocean's
                statement of "'extensive' training and safety programs."......................19

3.   Plaintiffs fail to allege a misrepresentation based on the statement that the "Exchange Price" was "fair." .....................................................21

4.   The alleged omissions regarding management, equipment and safety issues are not actionable (¶¶151-58). ...........................................22

D.   Plaintiffs Fail to Plead Facts Showing Defendants Had the Requisite State of Mind to Violate Section 14/Rule 14a-9. ...........................................23

1.   Plaintiffs' claim against Transocean sounds in fraud but Plaintiffs fail to plead facts supporting this claim. ...............................................23

2.   Plaintiffs' claim against the individual Defendants fails to plead facts showing that either acted negligently in connection with the Proxy statements. ..................................................................................26

E.   Plaintiffs Fail to Plead Facts Showing Loss Causation. ................................27

CONCLUSION .....................................................................................................................35

## TABLE OF AUTHORITIES

### CASES

*7547 Corp. v. Parker & Parsley Develop. Partners, L.P.*, 38 F.3d 211 (5th Cir. 1994) ...............7

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004) ........................................................................................................................7

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .............................6, 10, 27

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) ......................................................27

*In re Am. Express Co. S'holder Litig.*, 840 F. Supp. 260 (S.D.N.Y. 1993) ...................................17

*In re Am. Express Co. Sec. Litig.*, No. 02 Civ. 5533(WHP), 2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008) ....................................................................................................................15

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ...............................................................................9, 13

*In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214 (E.D. Wash. 2005) .....................................31

*In re Bank of Am. Corp. Sec., Der. & ERISA Litig.*, 757 F. Supp. 2d 260, 326 (S.D.N.Y. 2010) ...........................................................................................................10, 20, 22

*Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003) .............................................................................7

*In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323 (W.D.N.Y. 2008) ...........................6

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..............................................................9, 27

*Berlin v. Emerald Partners*, 552 A.2d 482, 494 (Del. 1989) .......................................................7

*Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074 (JSM), 2003 WL 21058251 (S.D.N.Y. May 9, 2003)........................................................................................... *passim*

*In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) .............................6

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) ......................23-24

*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001)............................................10

*Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992)...................................................10, 27

*City of Austin Police Ret. Sys. ITT Educ. Serv. Inc.*, 388 F. Supp. 2d 932 (S.D. Ind. 2005).........31

*In re Compuware Sec. Litig.*, 386 F. Supp. 2d 913 (E.D. Mich. 2005) ..........................................34

*Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ....................................................................35

*DCML LLC v. Dana Bus. Sys. PLC*, 08 Civ. 5829(SAS), 2008 WL 5069528 (S.D.N.Y. Nov. 26, 2008) ..............................................................................................................................7, 9

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005).............................................................. passim

*ECA & Local IBEW v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009).........................19, 25

*Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) .........28

*In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189 (3d Cir. 2007) ..................................................24

*Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998) .........................................8

*In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382 (S.D.N.Y. 2010) ....................................29

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)...................................28

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009)...........................27, 35

*In re GeoPharma, Sec. Litig.*, 411 F. Supp. 2d 434 (S.D.N.Y 2006) ............................................26

*Glaser v. The9, Ltd.*, No. 09 Civ. 08904(RJH), ___ F. Supp. 2d ___, 2011 WL 1106713 (S.D.N.Y. Mar. 28, 2011) ..............................................................................................................15

*Grace v. Rosenstock*, 228 F.3d 40 (2d Cir. 2000)..........................................................................10

*Gross v. Summa Four, Inc.*, 93 F.3d 987 (1st Cir. 1996)...............................................................19

*Healthcare Fin. Group, Inc. v. Bank Leumi USA*, 669 F. Supp. 2d 344 (S.D.N.Y. 2009) ...........28

*Hirsch v. du Pont*, 553 F.2d 750 (2d Cir. 1977) ............................................................................25

*Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009)...............................................11

*In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262 (D.N.J. 2007) ..................................................34

*In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005)......................... 9, 23-24

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ..............................................................................26

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) ...............................................28

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)....................................................27, 28

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009)....................................................28, 35

*Maldonado v. Flynn*, 597 F.2d 789 (2d Cir. 1979) ........................................................................17

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 536 F. Supp. 2d 313 (S.D.N.Y. 2007)...........9, 24

*In re MRU Holdings Sec. Litig.*, No. 09 Civ. 3807 (RMB), 2011 WL 650792 (S.D.N.Y. Feb. 17, 2001) ....................................................................................................................................15

*In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002) .........................................................11

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) .......................................................................15, 27

*In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681 (S.D.N.Y. 2008) ............................................20

*In re Pfizer Inc. S'holder Der. Litig.*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010)...............................23

*Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146 (S.D.N.Y 2004)..................................20

*Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210 (S.D.N.Y. 2009)... *passim*

*Resnik v. Swartz*, 303 F.3d 147 (2d Cir. 2002) ..........................................................................9, 23

*Rombach v. Chang*, 355 F.3d 165 (2d Cir. 2004) .................................................................. *passim*

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ...............................................................................5

*San Leandro Emer. Med. Group PSP v. Philip Morris Cos., Inc.*, 75 F.3d 801 (2d Cir. 1996) ...............................................................................................................................................11

*In re Sanofi-Aventis Sec. Litig.*, Nos. 07-cv-10279 (GBD), 08-cv-00021(GBD), ___ F. Supp. 2d ___, 2011 WL 1196052 (S.D.N.Y. Mar. 30, 2011).....................................................20

*In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569 (S.D.N.Y. 2010) ............................28

*Seinfeld v. Gray*, 404 F.3d 645 (2d Cir. 2005)..............................................................................23

*Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171 (S.D.N.Y. 1996) ..............................25

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ..................................................26

*Shurkin v. Golden State Vintners, Inc.*, No. C04-3434MJJ, 2005 WL 1926620 (N.D. Cal. Aug. 10, 2005) ..........................................................................................................................22

*Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010) ............................................................25

*Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406 (2d Cir. 2008) ...............................................6

*Suez Equity Investors v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) ...........................10

*Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ................................................15, 25

*In re Textainer P'ship Sec. Litig.*, No. C-05-0969MCC, 2005 WL 3801596 (N.D. Cal. Dec. 12, 2005) .......................................................................................................................22

*In re Time Warner, Inc. Sec. Litig*, 9 F.3d 259 (2d Cir. 1993) .......................................................8

*United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190 (2d Cir. 1993) .....................7

*United States v. Bestfoods*, 524 U.S. 51 (1998) ..............................................................................6

*Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) ............................................................21

*Warth v. Seldin*, 422 U.S. 490 (1975) .............................................................................................7

*Wilson v. Great Am. Ind., Inc.*, 855 F.2d 987 (2d Cir. 1988) .......................................................10

## STATUTES, REGULATIONS & RULES

15 U.S.C. §78n .................................................................................................................................8

15 U.S.C. §78u-4(b)(1) ....................................................................................................................9

15 U.S.C. §78u-4(b)(2) .............................................................................................................10, 24

15 U.S.C. §78u-4(b)(4) ..................................................................................................................10

33 U.S.C. §2702(a) .........................................................................................................................29

17 C.F.R. §240.14a-9(a) ..................................................................................................................8

30 C.F.R. §250.401 .......................................................................................................................16

30 C.F.R. §250.446(a) .......................................................................................................12, 14, 25

46 C.F.R. §107.267 ........................................................................................................................17

Fed. R. Civ. P. 8(a)(2) .....................................................................................................................9

Fed. R. Civ. P. 9(b) .......................................................................................................................24

## MISCELLANEOUS

U.S.C.G. Marine Safety Manual, Vol. II, Sec. B, Chapter 3 .......................................................17

Republic of Marshall Islands, Mobile Offshore Drilling Unit Standards (MI-293) (Rev. 8/02) Part V(B)(1) at 12................................................................................................................17

*American Heritage Dictionary of the English Language* (4th ed. 2006)......................................19

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

In October 2007, Transocean Inc., a subsidiary of Defendant Transocean Ltd., merged with another deepwater drilling company, GlobalSantaFe Corporation ("GSF"). The joint Proxy by which the companies solicited shareholder approval for the merger contained the customary opinions that the terms were fair and that the merging companies were in compliance with various laws.  No issue was raised at the time or for years after the merger regarding the accuracy of any of the statements in the Proxy.

Two and a half years later, on April 20, 2010, a tragic accident occurred on a drilling rig, the *Deepwater Horizon*, owned by a Transocean indirect subsidiary, in the Macondo area of the Gulf of Mexico.  Men died, and millions of barrels of oil spilled into the Gulf after the accident. Transocean's stock price declined during the three month period following the accident, as did the stock of other companies in the industry.  The inevitable class actions alleging securities law violations under Section 10b of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 soon followed.  The 10b-5 actions allege misrepresentations by Transocean about its training and safety practices from August 2009 through July 2010.[1]

On or about September 30, 2010, Plaintiffs filed this securities class action under Section 14 of the Exchange Act, alleging that the October 2007 Proxy contained misrepresentations and omissions about the environmental, safety and training practices of Transocean.  These misrepresentations/omissions are alleged to have caused GSF's shareholders to accept "inadequate consideration" in the merger because, if they had known the truth about these practices, they would have supposedly demanded additional consideration.  This attempt to create a securities law claim for the Macondo incident based on the October 2007 Proxy is fatally flawed and should be dismissed for at least the following reasons.

First, Transocean Ltd. should be dismissed from this action because it is a separate legal

---

[1] These actions have been consolidated in this District before Judge Buchwald styled as *Foley v. Transocean Ltd.*, Civil Action 1:10-CV-5233-NRB.  On May 17, 2011, Defendants in *Foley* filed a motion to dismiss the complaint.

entity from Transocean Inc. and had no involvement in the Proxy or the merger with GSF.

Second, the Complaint should be dismissed as to all Defendants because Plaintiffs do not allege facts to show standing.  Plaintiffs do not allege that they were "holders of record" of GSF stock on the "record date" of October 1, 2007 so they could be entitled to vote on the merger.  In addition, Plaintiffs do not allege that they continued to hold the Transocean stock they received in the merger through the time that Transocean's allegedly deficient practices were disclosed after the Macondo spill, so that Plaintiffs could claim "injury" from these alleged disclosures.

Third, Plaintiffs fail to allege facts that show an actionable misstatement or omission. Plaintiffs claim the Proxy was misleading with respect to Transocean's compliance with Environmental Laws and its safety, training and maintenance practices for deepwater drilling; its "'extensive' training and safety programs;" and its representation that the "Exchange Price" (Transocean shares and cash) paid to GSF shareholders for their GSF stock was "fair."

Plaintiffs' allegations are based only on speculative possibilities and lack plausibility. The test for whether a defendant has violated the proxy solicitation rules is whether the proxy contains a statement that was false or misleading *at the time made*.  But Plaintiffs do not allege facts about Transocean's compliance with Environmental Laws or its safety, training and maintenance practices at the time the Proxy was issued in October 2007.  Instead, Plaintiffs attempt to rely on information from other time periods well before and after the merger in Fall 2007, including testimony, reports and claims more than two years later, after the Macondo spill. None of the information alleged addresses Transocean's compliance with Environmental Laws or its safety, training and maintenance practices at the time the Proxy was issued in October 2007 (nor plausibly shows any violation of Environmental Laws or unsafe practices at any other time). Moreover, Plaintiffs do not allege facts showing that any alleged violation of Environmental Laws had or was reasonably likely to have a "Material Adverse Effect" so as to render false Transocean's representations in the Merger Agreement.

Plaintiffs also do not allege facts to support that Transocean's shares were unfairly valued in Fall 2007, or allege that GSF shares were correctly valued at the time, in order to support their

claim the merger consideration paid to GSF shareholders was not "fair."  In addition, Plaintiffs' assertions of whether Transocean's safety and training programs were "extensive" or the merger consideration "fair" are statements of opinion.  Plaintiffs have not alleged facts, as required, that show that these opinions were objectively false and not subjectively believed to be true.

Fourth, Plaintiffs fail to plead facts showing Defendants had the requisite state of mind. Despite use of the term "negligent," Plaintiffs' claims plainly sound in fraud, asserting that Defendants knowingly and systematically violated environmental laws and disregarded sound safety and training practices to boost earnings and then lied about it in the Proxy.  These claims fail because Plaintiffs do not allege facts giving rise to a strong inference of intent to deceive or defraud, nor do they allege with particularity facts showing a strong inference of negligence.

Fifth, Plaintiffs fail to plead facts showing loss causation.  Plaintiffs' allegations that they can show the inadequacy of the merger consideration they received in Fall 2007 by pointing to declines in the Transocean stock price after the Macondo spill more than two years later lack any plausibility.  Not only does the more than two-year time difference undercut any plausible allegation of a connection between the two, but Plaintiffs' own allegations, as well as facts subject to judicial notice, demonstrate that the stock price declines after the Macondo spill are much more plausibly attributable to other factors and disclosure of other information unrelated to Transocean's safety, training and equipment maintenance practices.  Plaintiffs have not alleged any facts to support a connection between the merger consideration paid for GSF stock in Fall 2007 and the declines in the Transocean stock price after the Macondo spill in April 2010.

In sum, Plaintiffs have cobbled together pieces of information from unrelated time periods to try to support a securities claim linking the 2007 Proxy with the accident and spill more than two years later.  There is no basis for such a claim.  Because Plaintiffs' allegations are flawed beyond repair, they should be dismissed with prejudice.

## PLAINTIFFS' ALLEGATIONS

On April 7, 2011, Plaintiffs Bricklayers And Masons Local Union No. 5 Ohio Pension Fund and DeKalb County Pension Fund ("Plaintiffs") filed their Amended Class Action

Complaint ("Complaint").  Plaintiffs seek relief on behalf of a class of persons who owned stock of GSF and exchanged their stock in the Fall 2007 merger between Transocean Inc. and GSF. ¶¶1, 175. [2]  The Defendants are Transocean Ltd.,[3] Robert L. Long, Transocean's CEO at the time of the merger, and Jon A. Marshall, GSF's CEO at the time of the merger.  ¶¶21-23.

### I.    The Merger

At the time of the merger in Fall 2007, Transocean (including its subsidiaries) was one of the world's largest offshore oil drilling companies that provided contract drilling services for oil and gas.  ¶¶21, 24, 26, 29.  GSF also was an offshore oil and gas drilling contractor.  ¶¶25.  Each company's rigs were deployed in offshore rig markets throughout the world.  ¶26.

On July 21, 2007, Transocean and GSF signed a Merger Agreement which provided for a merger using an exchange ratio based on the closing price of each Company's shares on the last trading day prior to the Merger Agreement, July 20, 2007.  ¶49.  As a result, a GSF share would be exchanged for .4757 Transocean shares and $22.46 in cash.  *Id*.  Lehman Brothers and Simmons & Company each gave a "fairness opinion" that the consideration to be paid to GSF shareholders was "fair from a financial point of view."  ¶50.

The Merger Agreement included "representations and warranties" by each party about its business operations.  ¶51.  Transocean represented that it was in compliance with "Environmental Laws" as defined in the Merger Agreement, except for such matters not having a "Material Adverse Effect," and that "there were 'no past or present facts, conditions or circumstances' which interfered with its continued compliance with Environmental Laws" that

---

[2] Unless otherwise indicated, all paragraph citations are to the paragraphs of the Complaint. Well-pleaded factual allegations are assumed to be true for the purpose of this Motion only.

[3] Plaintiffs allege Transocean Ltd. and Transocean Inc. are the same entity, defining Transocean Ltd. as "Transocean" and stating "[a]t the time of the Merger, Transocean was known as Transocean Inc. . . . ."  ¶21.  As shown below, Transocean Inc. and Transocean Ltd. are separate entities, Transocean Inc. continues to exist, and Transocean Ltd. had no involvement in the merger.  Transocean Ltd. should therefore be dismissed.  Except for this argument for dismissal, because Plaintiffs do not distinguish between Transocean Ltd. and Transocean Inc., or other Transocean operating subsidiaries, Defendants will not do so here and refer to the entity merging with GSF as "Transocean."  Defendants, however, do not waive these distinctions.

had or was reasonably likely to have a "Material Adverse Effect."  ¶¶52, 143-44.

On October 2, 2007, Transocean and GSF issued a joint Proxy, signed by Messrs. Long and Marshall, seeking shareholder approval of the merger.  ¶¶7, 142.  The Proxy included as an Annex the Merger Agreement, and both are attached as Ex. A to the Complaint.  ¶¶1 n.1, 143.  GSF shareholders approved the merger on November 9, 2007.  ¶54.

## II.    Alleged Misstatements and Omissions

Plaintiffs claim that Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by making materially false statements in and omitting material information from the Proxy.  ¶¶1, 11, 15.  Plaintiffs' allegations fall into four categories:  (1) in the Merger Agreement Defendants falsely represented that Transocean was "in compliance with Environmental Laws" (¶¶3, 144); (2) Transocean's 2006 Form 10-K, incorporated into the Proxy, misrepresented that "Transocean conducted 'extensive' training and safety programs" (¶¶4, 145); (3) the Proxy misrepresented that the "Exchange Price" "was 'fair' when in fact it was not" (¶¶5, 146, 150); and (4) Defendants failed to disclose that Transocean management through "systemic and company-wide policies and practices, had reduced its equipment maintenance and safety compliance for its deepwater drilling rigs and equipment" and "assumed excessive safety risks in its deepwater drilling operations and short-changed training" (¶¶4, 9, 83, 151, 154-58).

Plaintiffs allege that "as a result of the material false statements and omissions in the Proxy, the value of the Transocean shares which [Plaintiffs] received in the Merger was misrepresented and the Exchange Price [Plaintiffs] received was inflated" and that, as the truth about Transocean's systemic safety and environmental violations and risks began to be disclosed to the market during the "days, weeks and months" following the Macondo incident on April 20, 2010, and continuing through July 23, 2010, the Transocean share price decreased nearly $47 per share.  ¶¶12, 14, 19-20, 54, 159, 160-74.

## ARGUMENT

In deciding this motion, the Court is required to accept as true only well-pleaded, non-conclusory factual allegations.  *Roth v. Jennings*, 489 F.3d 499, 501 (2d Cir. 2007).  The Court

may consider the entirety of statements alleged or documents incorporated into the Complaint, SEC filings, and any documents on which Plaintiffs rely. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).[4]  "[T]he court need not accept as true an allegation that is contradicted by documents on which the complaint relies." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004).  The Court may also consider matters subject to judicial notice. *Staehr v. Hartford Fin. Servs. Group, Inc*., 547 F.3d 406, 425 (2d Cir. 2008).[5]

**I.     The Complaint Should Be Dismissed as to Defendant Transocean Ltd. Because It Is a Separate Legal Entity and Was Not Involved in the Proxy or Merger.**

The November 2007 merger was between Transocean Inc. and GSF.  Compl., Ex. A.  In December 2008, a year later, Transocean Ltd. completed a transaction pursuant to an "Agreement and Plan of Merger" among Transocean Ltd., Transocean Inc. and an entity known as "Transocean Cayman."  Ex. 4 (Transocean Ltd. 2008 Form 10-K); Ex. 5 (Agreement and Plan of Merger).  As a result of this transaction, "Transocean Inc. became a direct, wholly-owned subsidiary of Transocean Ltd."  Ex. 4 at 7.  After the transaction Transocean Inc. continues to exist as a subsidiary of Transocean Ltd.  Ex. 6 (Form 15 filed with SEC by Transocean Inc. on March 2, 2009).[6]  Because Transocean Inc. issued the Proxy and continues to exist as a legal entity, Plaintiffs have no legal basis for their Section 14 claim alleging liability of Transocean Ltd., and the Complaint should be dismissed as to Transocean Ltd.  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law . . . that a parent corporation . . . is not liable for the acts of its subsidiaries.").

---

[4] Documents submitted by Defendants incorporated by reference or on which Plaintiffs rely are Exs. 7-15, 19, 40, 42 of Defendants' Appendix ("Ds' App.").  Unless otherwise stated, all "Ex." citations are to the Exhibits in Ds' App.  Defendants have submitted the cited portions of lengthy documents.  Defendants will submit an entire document to the Court and Plaintiffs if desired.

[5] Concurrently with filing of this motion, Defendants are filing a Request for Judicial Notice. The documents for which Defendants request judicial notice are Exs. 1-6, 16-18, 20-39, 41.

[6] The Court can take judicial notice of these documents filed with the SEC which contradict the allegation (¶21) that Transocean Inc. "is now known as Transocean Ltd."  *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 351 n.30 (W.D.N.Y. 2008) ("It is well established that a Court need not accept as true any allegations that are contradicted by documents . . . or materials amenable to judicial notice." (internal quotes and citations omitted)).

## II.    The Complaint Should Be Dismissed Because Plaintiffs Lack Standing.

Standing is a federal jurisdictional question "determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  "[A] plaintiff must demonstrate standing for each claim and form of relief sought." *Baur v. Veneman*, 352 F.3d 625, 642 n.15 (2d Cir. 2003).  For Plaintiffs' claims here, "only shareholders who were entitled to vote on a transaction have standing under section 14(a) to challenge the proxy materials issued by a corporation regarding that transaction." *DCML LLC v. Dana Bus. Sys. PLC*, No. 08 Civ. 5829(SAS), 2008 WL 5069528, at *2 (S.D.N.Y. Nov. 26, 2008).  *See United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1197-98 (2d Cir. 1993) ("The SEC . . . promulgated Rule 14a-9 with the goal of preserving for all shareholders who are entitled to vote . . . the right to make decisions based on information that is not false or misleading."); *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 230 (5th Cir. 1994) ("[W]e are unwilling to expand standing under section 14(a) . . . to interest-holders who are not qualified to vote.").

As stated in the Proxy (Compl., Ex. A), the only GSF shareholders entitled to vote on the Merger were "holders of record" as of October 1, 2007.[7]  Each Plaintiff, however, alleges only that it owned GSF stock on October 2, 2007.  ¶¶19-20.  Neither alleges that it owned GSF stock on the "record date" of October 1, 2007, or that it was a "holder of record" of GSF shares.[8]  As a result, neither Plaintiff has alleged facts to show standing.  *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 241 (S.D.N.Y. 2004) ("only shareholders who owned . . . common stock on the record date . . .  are permitted to bring Section 14(a) claims").

To have standing, a plaintiff also must "allege[ ] a distinct and palpable injury to [it]self."

---

[7]Compl., Ex. A at 42-43 ("Only holders of record of GlobalSantaFe shares on the record date are entitled to notice of and to vote . . . . You will not be the holder of record of shares that you hold in 'street name.'  Instead, the depository . . . or other nominee will be the holder of record of such shares."); H-4 ("Record Date" is October 1, 2007); H-10 ("Shareholders of GSF and the number of GSF shares that they hold for the purposes of voting at the Scheme Meeting shall be determined as those recorded on the Register of Members as at the Record Date.").

[8] "Shares of . . . corporations are often held in the name of brokers or fiduciaries (commonly called 'street name') for the account of the beneficial owners.  The brokers or fiduciaries are the stockholders of record."  *Berlin v. Emerald Partners*, 552 A.2d 482, 494 (Del. 1989).

*Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998).  Plaintiffs allege that in the merger they received Transocean stock for their GSF stock (¶¶19-20), but neither alleges that it continued to own the stock after April 20, 2010, at the time of the alleged disclosures of Transocean's allegedly deficient practices, which purportedly caused Transocean's stock price to decline and Plaintiffs' alleged loss.  *Id*.  *See* ¶177 (alleging that "millions" of Transocean shares continued to be held by former GSF shareholders in April 2010 without alleging that Plaintiffs continued to hold Transocean shares).  Plaintiffs therefore lack standing for this reason as well. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) ("[A]t the moment the transaction takes place, the plaintiff has suffered no loss; . . . if . . . the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.").

**III.    The Complaint Should Be Dismissed for Failure to State a Claim Under Section 14 and SEC Rule 14a-9.**

**A.    The Elements of Plaintiffs' Claims**

To state a claim for violation of the proxy rules,[9] a plaintiff must allege facts showing (a) a proxy statement contained a material misrepresentation or omission, which (b) caused plaintiff's injury and (c) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.  *Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 226 (S.D.N.Y. 2009); *Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074 (JSM), 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003), *aff'd*, 87 Fed. App'x 772 (2d Cir. 2004).  Where an omission is asserted, the plaintiff must allege facts showing that the defendant had a duty to disclose the omitted information.  *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).

---

[9] Rule 14a-9, 17 C.F.R. §240.14a-9(a), adopted pursuant to Section 14 of the Exchange Act, 15 U.S.C. §78n, states, in pertinent part:

> No solicitation . . . shall be made by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances in which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statement therein not false or misleading.

Omission of information is actionable "if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002).

### B.    The Pleading Requirements for Plaintiffs' Claims

The *Twombly/Iqbal* plausibility standard applies to a Rule 12(b)(6) motion to dismiss a Section 14 claim.[10]  "[T]he plaintiff must plead enough facts to state a claim to relief that is plausible on its face." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 536 F. Supp. 2d 313, 319 (S.D.N.Y. 2007) (quotations omitted).  "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 545).  Where "plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.  As the *Iqbal* Court explained:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  . . .   [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]"—"that the pleader is entitled to relief."

129 S. Ct. at 1940-50 (quoting Fed. R. Civ. P. 8(a)(2)) (second alteration in original).

The heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA") also apply to Section 14 claims.  *DCML LLC*, 2008 WL 5069528, at *1; *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005).  The PSLRA requires that:

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. §78u-4(b)(1).  Plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*,

---

[10] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009).

355 F.3d 165, 174 (2d Cir. 2004); *ATSI*, 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient."). In addition, Plaintiffs must show that the statement or omission is "materially false." *Bond Opp. Fund*, 2003 WL 21058251, at *3-4.

While a Section 14 claim may be based on an allegation of negligence (*Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988)), the complaint "must plead with particularity facts that give rise to a strong inference of negligence on the part of all Defendants." *Bond Opp. Fund*, 2003 WL 21058251, at *4; 15 U.S.C. §78u-4(b)(2) (complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"); *In re Bank of Am. Corp. Sec., Der. & ERISA Litig.*, 757 F. Supp. 2d 260, 326 (S.D.N.Y. 2010) (finding Section 14 claim alleged "a strong inference of negligence on the part of the defendants").

A Section 14 plaintiff must also plead facts showing "loss causation." *Grace v. Rosenstock*, 228 F.3d 40, 46-47 (2d Cir. 2000); 15 U.S.C. §78u-4(b)(4).[11]  As the Supreme Court explained in *Dura*, 544 U.S. at 346, "plaintiffs' need to *prove* proximate causation in economic loss leads us also to conclude that the plaintiffs' complaint here failed adequately to *allege* these requirements." *See Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992) (affirming securities claim dismissal for failure to plead facts showing loss causation).

### C.    Plaintiffs Fail to Plead Facts Showing a Misstatement or Omission.

As set out above, Plaintiffs' allegations include purported misrepresentations and omissions in four different categories: (1) statements about Transocean's compliance with "Environmental Laws"; (2) a statement that Transocean conducted "'extensive' training and safety programs"; (3) the statement that the "Exchange Price" was "fair"; and (4) the alleged

---

[11] "It is settled that causation under federal securities laws is two-pronged: a plaintiff must allege both transaction causation, *i.e.,* that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.,* that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001) (quoting *Suez Equity Investors v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis in original)).

failure to disclose that Transocean assumed excessive risk in its drilling operations.  Plaintiffs do

not allege facts to show that any of these assertions states a claim on which relief can be granted.

     **1.**       **Plaintiffs fail to allege a misrepresentation based on Transocean's statements regarding compliance with "Environmental Laws."**

     Plaintiffs allege that Transocean misrepresented in the Merger Agreement that it

> "has been and is in compliance with all Environmental Laws except for such matters as do not and are not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect" and that

> "Except for such matters as do not and are not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect, . . . there are no past or present facts, conditions or circumstances . . . which violate Environmental Law or are reasonably likely to give rise under any Environmental Law to (i) costs, expenses, liabilities or obligations related to any cleanup, remediation, investigation, disposal or corrective action, (ii) claims arising for personal injury, property damage or damage to natural resources, or (iii) fines, penalties or injunctive relief." ¶¶3, 52, 144, 148.[12]

     By its terms, Rule 14a-9 prohibits a statement in a proxy that is false and misleading "at

the time it was made." *Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009)

(quoting *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002)); *Bond Opp. Fund*,

2003 WL 21058251, at *10 (same, quoting *NAHC*).  *See San Leandro Emer. Med. Group PSP v.*

*Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) (affirming dismissal where plaintiffs failed

to allege facts showing statements were false at the time made).

     In the Complaint Plaintiffs identify several different specific laws and regulations (¶¶35-

---

[12] "Environmental Laws" is defined in the Merger Agreement (§5.13) as "all applicable orders of any court, Governmental Entity or arbitration board or tribunal and any Applicable Law related to human health and the environment, including the common law."  "Applicable Law" is "any applicable law, rule, regulation, code, governmental determination, order, treaty, convention, governmental certification requirement or other public limitation, U.S. or non-U.S." *Id*. §5.5.

"Material Adverse Effect" is defined, in pertinent part, as "any fact, circumstance, event, change, effect or occurrence that, individually or in the aggregate, with all other facts, circumstances, events, changes, effects or occurrences, has had or would be reasonably likely to have a material adverse effect on the assets, properties, business, results of operation or condition (financial or otherwise) of such Person and its Subsidiaries, taken as a whole, or that would be reasonably likely to prevent or materially delay or materially impair the ability of such Person to perform its obligations hereunder or to consummate the Merger . . . ." *Id*. §10.9(c).

44, 46) and refer to "other laws potentially implicated by drilling in the Gulf of Mexico"  (¶46).
But while Plaintiffs allege generally that "Transocean routinely and systematically flouted these
regulations and laws . . . ." (¶48), Plaintiffs do not allege facts that "demonstrate with specificity"
(*Rombach*, 355 F.3d at 174) that Transocean's statements with respect to compliance with
Environmental Laws were false at the time made on October 2, 2007 (or at any time), or any
noncompliance that had or was reasonably likely to have a "Material Adverse Effect."

a. <strong>Maintaining blowout preventers (¶¶72-83)</strong>

Plaintiffs allege Transocean failed to follow the purported regulatory requirement that
drilling operators disassemble and inspect blowout preventers ("BOPs") every three to five
years.  ¶72.[13]  Plaintiffs' assertion that Transocean was required to follow this procedure is
legally wrong because by its terms the 3-5 year disassembly procedure referenced in RP 53 is a
recommendation, not a legal requirement.  The foreword to RP 53 as of October 2007 states that
the "[p]ractices set forth herein are considered acceptable for accomplishing the job as described;
however, equivalent alternative . . . practices may be utilized to accomplish the same objectives"
and "[t]he formulation and publication of API recommended practices is not intended, in any
way, to inhibit anyone from using other practices."  Ex. 7 at iii.  RP 53 itself distinguishes
between the words "shall" and "should."  "Should" in RP 53 "[d]enotes recommended
practice(s) . . . ."  *Id*.  Moreover, an example of "manufacturer's guidelines" referenced in RP 53
§18.10.3 (*see* note 13) and relied upon by Plaintiffs (¶70) provides:

> API RP53 is not considered to be an industry standard.  It is a Recommended
> Practice and, as such, is intended to be a guideline, providing advice for operation
> and maintenance of Well Control and Drilling Equipment.

Ex. 40 at 4.  For these reasons, the allegation that Transocean did not follow the
"recommendation" of RP 53 would not show a violation of any "Environmental Law."

---

[13] In ¶65, Plaintiffs cite 30 C.F.R. §250.446(a) which states BOP maintenance "must meet or
exceed the provisions" of American Petroleum Institute ("API") "RP 53, Recommended
Practices for Blowout Prevention Equipment Systems . . . ."  RP 53 §18.10.3, states that "[a]fter
every 3-5 years of service, the BOP stack, choke manifold, and diverter components should be
disassembled in accordance with the manufacturer's guidelines."  Ex. 7 at 56.  *See* ¶¶65-66.

Even assuming that RP 53 required an appropriate inspection every 3-5 years, Plaintiffs' assertion that Transocean did not comply as of October 2007 is not based on facts, but on speculation and the "mere possibility of misconduct," and their allegations do not show that Plaintiffs are "entitled to relief." *Iqbal*, 129 S. Ct. at 1950.  Initially, the claims and testimony cited by Plaintiffs (1) were made/given years after the merger in 2010 and 2011, (2) refer to alleged conditions and events at the time of and after the Macondo spill in April 2010 and (3) do not address whether Transocean did or did not follow RP 53 on October 2, 2007.[14]

In addition, the August 2010 testimony that "BOPs had not been . . . disassembled by the OEMs in the five years" previous (¶73) would mean only BOPs had not been disassembled since 2005, within five years of that 2010 testimony.  That statement does not provide any facts to show that Transocean BOPs had not been disassembled and inspected after October 2002 and before 2005, within the 3-5 years set forth in RP 53, before the Proxy was issued on October 2, 2007, or that BOPs had not otherwise been maintained appropriately.

For similar reasons, Plaintiffs' citation (¶77) to testimony that Transocean began a "condition-based maintenance program" for BOPs in 2005, within 2 years of the Proxy in October 2007, does not support that Transocean had not appropriately maintained BOPs within 3-5 years of its October 2, 2007 statements in the Proxy.  In addition, Plaintiffs cite this testimony incorrectly to assert that because the *Deepwater Horizon* had not been to dry dock since 2001, no maintenance of its BOP had been performed.  *Id*.  But, as Plaintiffs allege, such an inspection only "generally requires time in dry dock" and "industry papers" only "suggest that 'the best time to perform maintenance . . . [is] during a shipyard time.'"  ¶69.[15]

---

[14] *See*, *e.g.*, ¶72 ("As the United States has charged in its Complaint . . ., Transocean caused the *Deepwater Horizon* oil spill [in April 2010] . . . ."); ¶¶73, 76 (testimony given August 25, 2010, without reference to facts existing in October 2007; *e.g.*, "What *is* your stacking compliance with this regulation [250.446(a)]?" (emphasis added)); ¶¶74, 81 (same, 2010 testimony); ¶¶75, 79 (citing 2011 Chief Counsel's Report without reference to facts existing in October 2007).

[15] For the same reasons, the statement by "Confidential Witness #1" that Transocean decided not to dry dock the *Discoverer Enterprise* in 2004 (¶78) does not show that it did not maintain its BOP within 3-5 years of October 2, 2007.  Similarly, Plaintiffs' allegations, based on identification of rigs in Transocean's 2006 Form 10-K, that Transocean's rigs "were *apparently*

According to Plaintiffs, "Confidential Witness #1" says that "by 2007" Transocean had abandoned inspecting BOPs every 3-5 years.  ¶78.  Even if true, abandonment of inspections "by 2007" does not demonstrate Transocean did not maintain BOPs within 3-5 years of October 2, 2007, and certainly does not demonstrate Transocean at that time failed to "meet or exceed" (30 C.F.R. §250.446(a)) the recommended procedure that RP 53 only provided "should" be followed.

In short, while Plaintiffs speculate that Transocean did not dry dock and thus "apparently" did not maintain its BOPs as required (¶83), Plaintiffs do not allege any facts to "demonstrate with specificity" (*Rombach*, 355 F.3d at 174) that even if RP 53 were mandatory (and it is not), Transocean did not comply with "Environmental Laws" for maintenance of its BOPs as of October 2, 2007 (or at any other time).  In addition, Plaintiffs have not demonstrated that any alleged noncompliance had or was reasonably likely to have a "Material Adverse Effect," so as to render false Transocean's representations in the Merger Agreement.[16]

### b.    Maintaining other equipment (¶¶84-90)

Plaintiffs also allege Transocean failed to maintain other equipment.  These allegations suffer many of the same defects as their allegations about BOP maintenance, and provide no

---

out of compliance by 2007" (emphasis added) (¶83) because the *Deepwater Horizon* and other rigs allegedly had not been dry docked (¶¶80-83), does not support a violation of any Environmental Law as of the date of the Proxy on October 2, 2007.  Plaintiffs' assertion, again, is based on the incorrect premise that the only way to maintain BOPs is at dry dock, instead of, as Plaintiffs concede (¶69), dry dock being only a "suggest[ed]" procedure.

[16] Although not necessary for the Court's decision on this motion, a response is required to Plaintiffs' allegations that Transocean "had been a root cause" of the Macondo spill (¶174) and that the *Deepwater Horizon*'s BOP allegedly failed to seal the well, "focusing attention on Transocean's potential role in causing or exacerbating the disaster" (¶160).  As to the cause of the blowout, the Chief Counsel's Report—on which Plaintiffs so heavily rely (¶¶75, 79, 85, 95, 97-98, 106, 108, 121, 140-41, 153)—concludes in its executive summary:  "The root technical cause of the blowout is now clear:  The cement that BP and Halliburton pumped to the bottom of the well did not seal off hydrocarbons in the formation."  Ex. 8 at x.  As to the role of the BOP in causing the spill, the March 2011 *Det Norske Veritas* ("DNV") report of the results of the forensic analysis of the BOP, which report was forecast in and associated with the Chief Counsel's Report (Ex. 8 at 2), states that a design flaw in the BOP, not associated with Transocean's maintenance, caused the BOP's failure to seal the well.  Ex. 9 at 5.

information on whether Transocean's maintenance was in violation of an Environmental Law at the time the Proxy was issued in October 2007, let alone satisfying the definition of "Material Adverse Effect."  Initially, most of Plaintiffs' allegations are premised on statements made after the investigations of the Macondo spill in April 2010 (¶¶84-85, 87-89) or refer to a "maintenance audit" by BP in September 2009 (¶90), both well after October 2007.

Plaintiffs also cite statements from "Confidential Witness #2" (¶86), who was only on a Transocean rig from 2003-2005.  ¶122.  Even if "confidential witness" statements may be considered in some circumstances, Plaintiffs' allegation that "CW2" was only employed from 2003-2005, not at the time the Proxy was issued in 2007, establishes "CW2" may not be considered on this motion.[17]  *Glaser v. The9, Ltd.*, No. 09 Civ. 08904(RJH), ___ F. Supp. 2d ___, 2011 WL 1106713, at *13 (S.D.N.Y. Mar. 28, 2011) (granting dismissal, stating "[f]or a court to credit such information, confidential sources must be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged'") (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)); *In re Am. Express Co. Sec. Litig.*, No. 02 Civ. 5533(WHP), 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) (granting dismissal, stating "Plaintiffs have also failed to allege any facts showing that the confidential sources . . . would have knowledge of what [the Individual Defendants] knew or should have known during the Class Period").[18]

In addition, Plaintiffs' allegations leave one to speculate what "Environmental Law" was

---

[17] "CW3" was employed from 2002-2005 (¶138), not in 2007, and also may not be considered.

[18] As the Court stated in *Glaser*, 2011 WL 1106713, at *13 n.12, it is unclear after the decision in *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007), whether confidential witnesses may be considered on a securities claim in any circumstance:  "It appears that a split exists in this District as to whether the use of confidential witnesses to plead securities fraud cases remains viable following the Supreme Court's decision in *Tellabs*," quoting *In re MRU Holdings Sec. Litig.*, No. 09 Civ. 3807 (RMB), 2011 WL 650792, at *14 (S.D.N.Y. Feb. 17, 2001) ("Plaintiffs' reliance on 'confidential witnesses' . . . 'must be discounted' because '[i]t is hard to see how information from anonymous sources could be deemed "compelling" or how [the Court] could take account of plausible opposing inferences.'") (alterations in original)).

allegedly violated by a failure as of October 2007 to maintain equipment other than BOPs.[19]
And, even if there were some non-compliance with an "Environmental Law," Plaintiffs allege no
facts to demonstrate that it constituted a "Material Adverse Effect."

### c.      Staffing rigs and training crews (¶¶91-110)

Plaintiffs contend that Transocean failed to staff rigs and train crews adequately. These
allegations also do not show that at the time the Proxy issued Transocean was in violation of an
"Environmental Law" and that the violation gave rise to a "Material Adverse Effect."  Most of
Plaintiffs' allegations are based on testimony given, claims made and reports issued after the
Macondo spill in April 2010, allegations which do not demonstrate the state of Transocean's
staffing and training when the Proxy was issued in October 2007.[20]

Plaintiffs also piece together a number of statements about training and staffing at
Transocean from "CW1," alleging that he stated generally, and without identifying the particular
time period, that Transocean did not staff its rigs with "enough licensed and qualified
employees," "Transocean ships were undermanned"(¶¶91-92), and a one week "'Major
Emergency Management' class . . . was not required for the Offshore Installation Manager"
(¶110).  But Plaintiffs, again, do not allege any facts to support these general assertions or facts
identifying the "Environmental Law(s)" such circumstances would violate.  The allegations do
not show, for example, that Transocean did not "have a person onsite during drilling operations
who represents your interests and can fulfill your responsibilities" (30 C.F.R. §250.401(b)) (*see*
¶35); that it did not "[u]se personnel trained according to the provisions of subpart O"
(§250.401(d)) (*id.*); or that it violated any other Environmental Law.  Plaintiffs also do not allege
facts showing a violation of an "Environmental Law" having or reasonably likely to have a
"Material Adverse Effect."

---

[19] For example, Plaintiffs do not allege any Environmental Law required in October 2007 that
Transocean BOPs have more than one "blind shear ram" (¶84), and the Chief Counsel's Report
on which Plaintiffs rely states that the MMS did not require two blind shear rams. Ex. 8 at 217.

[20] *See* ¶¶93-94, 100-01, 105, 109 (testimony and investigation after Macondo spill), ¶¶95, 97-98,
106, 108 (2011 Chief Counsel's Report), ¶96 (claim by Louisiana after the Macondo spill).

### d.    Policies impacting safety (¶¶111-22)

Plaintiffs allege that Transocean failed to disclose in the Proxy that it had "management policies" that created unsafe conditions.  Here too, most of Plaintiffs' allegations relate to time periods before or after October 2007 and do not provide information at the time of the Proxy.[21]

Plaintiffs also allege that Transocean's use of "Underwater Inspection in Lieu of Dry-docking" ("UWILD") violated the "MODU Code," which provide for "dry dock surveys" or their "equivalent."   ¶¶115-20.  But, as recognized by the United States Coast Guard, the UWILD process is acceptable if it is conducted in accordance with a plan approved by the Coast Guard. 46 C.F.R. §107.267.[22]  Plaintiffs do not assert that the MODU Code is an "Environmental Law" (alleging instead that it "sets forth industry standards" (¶¶47, 114, 116)).  Even if it were, however, Plaintiffs do not allege facts (nor could they) showing that Transocean did not have approval for its UWILD inspections.  And Plaintiffs also fail to allege facts, assuming a violation, that would show a "Material Adverse Effect."[23]

### e.    Reporting of safety issues (¶¶123-41)

Plaintiffs' allegations regarding reporting of safety issues also do not show violation of a

---

[21] *See* ¶¶111-12 (2009 Report), ¶¶113, 119 (2010 reports), ¶120 (2010 testimony), ¶121 (2011 Chief Counsel's Report).  In addition, as set forth above, even if it could be considered in some circumstances, Plaintiffs' allegations of statements by "CW2" (¶122) do not support a misrepresentation in October 2007 since "CW2" was employed by Transocean only "from 2003 to 2005." *Id.*  Moreover  the allegations do not show a violation of any Environmental Law.

[22] *See* U.S.C.G. Marine Safety Manual, Vol. II, Sec. B, Chapter 3:  "Hull Examinations" (stating UWILD is an inspection method allowed by regulation subject to U.S.C.G. approval and setting forth procedures for obtaining approval and for the inspection). Ex. 41.  The Marshall Islands also recognizes the UWILD process as an acceptable equivalent for the drydocking of MODUs. Republic of Marshall Islands, Mobile Offshore Drilling Unit Standards (MI-293) (Rev. 8/02) Part V(B)(1) at 12.  Ex. 42.

[23] Given Plaintiffs have not identified any statement in the Proxy that misrepresented information relating to Transocean's compliance with Environmental Laws or its safety, maintenance or training practices at the time the Proxy was issued, Plaintiffs may be arguing Defendants had a duty to disclose information about alleged practices because they reflect "mismanagement." *See, e.g.*, ¶9 (alleged "company-wide polices and practices").  But "the Second Circuit has consistently rejected attempts to 'dress up' mismanagement and breach of fiduciary duty claims 'in a § 14(a) suit of clothes.'"  *In re Am. Express Co. S'holder Litig.*, 840 F. Supp. 260, 268 (S.D.N.Y. 1993) (quoting *Maldonado v. Flynn*, 597 F.2d 789, 796 (2d Cir. 1979)).

representation in the Merger Agreement regarding Transocean's compliance with Environmental Laws or of a "Material Adverse Effect."  Again, most of the allegations relate to time periods well before or after October 2007 and provide no factual information regarding Transocean's compliance with Environmental Laws at the time of the Proxy on October 2, 2007.[24]

While "CW1" purports to make statements regarding the period between "2005 and 2007" (¶126), the statements do not provide any facts showing a violation of an "Environmental Law" as of October 2, 2007, let alone one having a "Material Adverse Effect."  "CW1" first refers to an incident in "2005," for which he says only that he "found no evidence that the incident was reported to the MMS, or apparently the Coast Guard . . . ."  ¶126.  These statements do not provide facts demonstrating that (1) the incident was not reported, (2) any "Environmental Law" required reporting,[25] or (3) as a result of this incident "in 2005" Transocean was in noncompliance with Environmental Laws when the Proxy was issued in October 2007 and an alleged noncompliance had a "Material Adverse Effect."  Plaintiffs also rely on "CW1" for an alleged incident in "mid-2007" when "one of the pistons aboard the rig CW1 was on seized and then blew apart."  ¶128.  But "CW1" only says he was not aware of "evidence" this incident was reported to MMS.  *Id.*  Missing are facts demonstrating that (1) the incident was not reported, (2) any "Environmental Law" requiring reporting and (3) as a result of the alleged incident "in mid-2007," Transocean was in noncompliance with Environmental Laws when the Proxy was issued in October 2007 and an alleged noncompliance had a "Material Adverse Effect."

\* \* \* \*

In sum, Plaintiffs have not alleged facts that demonstrate, "with specificity" (*Rombach*, 355 F.3d at 174), that Transocean was in violation of any "Environmental Law" as of issuance of

---

[24] *See* ¶¶129-35 (alleged events in 2008), ¶¶136-37 (statements by "CW2" employed only from 2003-2005 (¶122)), ¶138 (statements by "CW3" employed only from 2002-2005), ¶139 (2008 and 2009), ¶¶140-41 (investigation after Macondo spill).

[25] Neither "CW1" nor Plaintiffs' other allegations identify any C.F.R. provision or other "Environmental Law" violated by Transocean by the purported failure to report.  None of the regulations and statutes Plaintiffs state are "the federal regulations and laws . . . [that] were in effect and applied to Transocean" (¶¶34-46) are identified by Plaintiffs as requiring reports.

the Proxy on October 2, 2007 or that, even if there were a violation, it had or was reasonably likely to have a "Material Adverse Effect," contrary to Transocean's representations in the Merger Agreement.  Instead, Plaintiffs principally rely on alleged information from well before and after the Proxy was issued in October 2007.  *See Gross v. Summa Four, Inc.*, 93 F.3d 987, 995 (1st Cir. 1996), *superseded by statute on other grounds*, (where defendant's statement was made in May 1994, plaintiff's allegation of events before (February 1994) and after (July 1994) the statement "does not set forth sufficiently particular facts from which one could reasonably infer that" that the statement was false at the time made).  Plaintiffs' allegations relating to Transocean's compliance with Environmental Laws do not state a claim.

### 2.    Plaintiffs fail to allege a misrepresentation based on Transocean's statement of "'extensive' training and safety programs."

Plaintiffs allege that Transocean's 2006 Form 10-K, incorporated by reference into the Proxy, misrepresented that Transocean "conducted 'extensive' training and safety programs."[26] ¶¶4, 145.  The word "extensive" means "large in extent and range or amount."  *American Heritage Dictionary of the English Language* (4th ed. 2006).  It therefore addresses the *quantity* of the training and safety programs.  Plaintiffs allege no facts demonstrating that Transocean's training and safety programs were not "large in extent and range or amount."  *See Rombach*, 355 F.3d at 174 (dismissing claim for failure to plead "with specificity why and how" statements were false and misleading).

In addition, a general statement that training and safety programs are "extensive" is puffery and not the kind of statement that could support Plaintiffs' claim, as a matter of law.  *Id.* ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations.").  For example, in *ECA & Local IBEW v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009), the plaintiffs claimed the defendant's statements that it had "highly disciplined risk management" and "set the standard for integrity" were misleading and supported a claim under the securities

---

[26] Ex. 10 at 22, 26 ("We require highly skilled personnel to operate our drilling units.  As a result we conduct extensive personnel recruiting, training and safety programs.").

laws. *Id*. at 205-06.  The Second Circuit disagreed, holding the defendant's "statements were merely generalizations regarding [its] business practices" and "[s]uch generalizations are 'precisely the type of "puffery" that this and other circuits have consistently held to be inactionable.'"  *Id*. at 206.  Similarly, the statement that Transocean conducted "'extensive' training and safety programs" is a "generalization" that is "puffery" and does not give rise to a securities violation.  *Id*. at 205-06.  Certainly the statement cannot reasonably be read as a guarantee that safety or other accidents or incidents would not occur, and Transocean's 2006 Form 10-K, on which Plaintiffs rely for this alleged "misrepresentation," warns otherwise.[27]

In addition to being immaterial puffery, the description of programs as "extensive" is a statement of opinion.  To plead that a statement of opinion was materially misleading, the plaintiff must "allege 'with particularity' provable facts to demonstrate that the statement of opinion is both objectively and subjectively false"—so the plaintiff "must show both that the [Defendants] did not actually hold the belief or opinion stated, *and* that the opinion stated was in fact incorrect."  *In re Sanofi-Aventis Sec. Litig.*, Nos. 07-cv-10279(GBD), 08-cv-00021(GBD), ___ F. Supp. 2d ___, 2011 WL 1196052, at *10 (S.D.N.Y. Mar. 30, 2011) (citations omitted); *In re Bank of Am. Corp.*, 757 F. Supp. 2d at 319 ("statements of opinion are actionable under Section 14(a) only if they are objectively and subjectively false").  As set forth above, Plaintiffs do not plead facts showing that Transocean's programs were not "extensive," so as to show objective falsity.  "To satisfy the subjective falsity requirement, 'plaintiffs must allege that defendants did not sincerely believe the opinion they purported to hold.'"  *Id*. (quoting *Podany v. Robertson Stephens, Inc.*, 381 F. Supp. 2d 146, 154 (S.D.N.Y. 2004)).  Plaintiffs also do not allege facts to support a contention that Defendants did not truly hold the opinion stated in the

---

[27] Ex. 10 at 26 ("Our operations are subject to the usual hazards inherent in the drilling of oil and gas wells, such as blowouts, . . . loss of well control, . . . fires . . . .").  The Proxy disclosed these same risks.  Compl., Ex. A at 26.  *See In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) ("If . . . allegations . . . conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true.").

Proxy that Transocean's training and safety programs were "extensive."  Plaintiffs therefore have not alleged a misrepresentation based on this statement.

>**3.**    **Plaintiffs fail to allege a misrepresentation based on the statement that the "Exchange Price" was "fair."**

Plaintiffs allege that the Proxy "misrepresented that the Exchange Price . . . was 'fair' when in fact it was not" because "the purported value of the Transocean stock was inflated." ¶¶5, 8, 54, 146, 148, 150.  These allegations do not plead a misrepresentation.

Plaintiffs allege (¶50) that the Proxy states GSF's investment bankers Lehman Brothers and Simmons had given their opinions that the Exchange Price was "fair" to GSF shareholders "from a financial point of view."  Compl., Ex. A at 7, 56, 67, 74, 77, C-2, D-3.  "Plaintiffs who charge that a . . . fairness opinion . . . is materially misleading, must allege 'with particularity' 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false.  *Bond Opp. Fund*,  2003 WL 21058251 at *5 (quoting *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1093-98 (1991)).  Plaintiffs' allegations do not satisfy either requirement.

First, Plaintiffs do not allege "with particularity" any "provable facts" showing that the "Exchange Price" was not a "fair" valuation of Transocean stock in October 2007, to demonstrate that the investment bankers' opinions were objectively false.  Plaintiffs' only attempt to do so is their allegations of declines in Transocean's stock price more than *two years* later, after the Macondo spill in April 2010.  But these allegations do not provide any facts for the value of Transocean shares in October 2007.  Even assuming Transocean had deficient practices in October 2007 and that these alleged practices had been disclosed in October 2007 (as Plaintiffs allege they should have been), the "true" valuation of Transocean in October 2007 would reflect only the *possibility* of these practices resulting in an unfortunate event such as the Macondo spill at some point in the future.  This is not the same valuation as Plaintiffs assert, by hindsight, in valuing Transocean in October 2007 based on the Transocean stock price declines that occurred after more than two years had passed and the Macondo spill had occurred.  *See* ¶148.  Moreover, as shown in the discussion of "loss causation" below, the declines in

Transocean's stock price after the Macondo spill are much more closely tied to the disclosure of other information, not to disclosure of the allegedly deficient safety, training and maintenance practices on which Plaintiffs rely.  In short, the stock price declines in 2010 do not support that the Transocean stock price was "inflated" in October 2007 as a result of the non-disclosure by Transocean of the allegedly deficient practices.  *Cf. Bond Opp. Fund*, 2003 WL 21058251, at *10 ("The mere fact that the shares increased in value over the eighteen months subsequent to the merger does not, in itself, constitute any evidence of a securities law violation.").

In addition, even if Plaintiffs had alleged facts showing Transocean stock was not properly valued in Fall 2007, Plaintiffs have not alleged facts as to whether GSF shares were fairly valued at that time, a necessary predicate of their claim that the amount of Transocean shares and cash that GSF shareholders received for giving up their GSF stock was "unfair."

Simply put, Plaintiffs' allegations of the stock price declines in 2010, the sole basis for Plaintiffs' assertion that the price was "inflated" in October 2007, do not provide any facts demonstrating that the opinion in October 2007 that the Exchange Price was "fair" was "objectively false" because the "fair" value was different.  *See Shurkin v. Golden State Vintners, Inc.*, No. C04-3434MJJ, 2005 WL 1926620, at *9 n.9 (N.D. Cal., Aug. 10, 2005) (dismissing misrepresentation claim based on fairness opinion because Plaintiff "failed to plead with particularity how the fairness opinion was *objectively* false").

Plaintiffs also do not allege any facts to support Defendants did not subjectively believe the opinion that the Exchange Price was "fair."  *In re Bank of Am. Corp.*, 747 F. Supp. 2d at 331. For this reason as well, Plaintiffs fail to allege a misrepresentation based on these statements.  *In re Textainer P'ship Sec. Litig.*, No. C-05-0969MCC, 2005 WL 3801596, at *10 (N.D. Cal. Dec. 12, 2005) (Section 14 claim based on fairness opinion dismissed where Plaintiff "fails to allege that the . . . Defendants did not actually hold the opinion stated").

**4.    The alleged omissions regarding management, equipment and safety issues are not actionable (¶¶151-58).**

The remainder of Plaintiffs' allegations rely on alleged omissions.  But in support of

these alleged "omissions," Plaintiffs allege the same information that they assert Transocean "misrepresented" (¶¶72-141) and claim that Transocean was obligated to disclose the "correct" information that these deficiencies existed.[28]

The allegations based on "omissions" fail to state a claim because Plaintiffs do not allege facts showing Transocean had a duty to disclose the "omitted" information. Plaintiffs do not allege that "SEC regulations specifically require[d] disclosure of the omitted information in a proxy statement." *Resnik*, 303 F.3d at 151. Plaintiffs also do not allege facts showing "the omission makes other statements in the proxy statement materially false or misleading." *Id*. Because (1) the alleged omissions are based on the *same* information Plaintiffs allege Transocean "misrepresented" and (2) Plaintiffs have not alleged facts showing Transocean made any statement in the Proxy misrepresenting information about its safety, maintenance or training practices, Plaintiffs have not shown Transocean was required to disclose the "omitted" information to ensure statements in the Proxy were not false and misleading. *Seinfeld v. Gray*, 404 F.3d 645, 650-51 (2d Cir. 2005) (Rule 14a-9 claim properly dismissed since disclosure of omitted information was not necessary to ensure proxy statements not false or misleading); *In re Pfizer Inc. S'holder Der. Lit.*, 722 F. Supp. 2d 453, 464 (S.D.N.Y. 2010) (claim based on omitted information "not actionable" since omission did not make proxy statements misleading).

**D.     Plaintiffs Fail to Plead Facts Showing Defendants Had the Requisite State of Mind to Violate Section 14/Rule 14a-9.**

**1.     Plaintiffs' claim against Transocean sounds in fraud but Plaintiffs fail to plead facts supporting this claim.**

While Plaintiffs are not required to include allegations of fraud in their claim, "[w]hen plaintiffs assert Section 14(a) claims grounded in fraudulent conduct, they are subject to heightened pleading requirements, . . . even if they disclaim reliance on a fraud theory." *JP*

---

[28] *Cf.* ¶151 w/ ¶¶74, 77 (Transocean implemented a "conditions-based maintenance program" and *Deepwater Horizon* had not been to dry dock since 2001); ¶152 w/ ¶78 (in 2004 Transocean abandoned the requirement it conduct an inspection of its BOPs every 3-5 years); ¶154 w/ ¶95 (Transocean did not have an "'extensive safety program'"); ¶155 /w ¶95 ("systemic disregard for training"); ¶¶156-57 w/ ¶122 ("discourag[ed] employees from reporting safety incidents"); ¶158 w/ ¶83 (Transocean flouted federal law).

*Morgan Chase*, 363 F. Supp. 2d at 636 (citing *Rombach,* 355 F.3d at 170).  *Accord*, *SafeNet,*

*Inc.*, 645 F. Supp. 2d at 238; *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144-

45 (3d Cir. 2004).

Although Plaintiffs use "negligent" and "negligently" to describe Defendants' conduct

(¶¶186, 188-89), it is clear as to Transocean "the wording and imputations of the complaint are

classically associated with fraud." *Rombach*, 355 F.3d at 172.  Plaintiffs allege the statements in

the Proxy concerning Transocean's compliance with Environmental Laws and "safety and

training" were "knowingly" false, because Transocean was "routinely and systematically

violating U.S. environmental laws and safety requirements," had a "policy of disobeying federal

safety regulations" and "knowingly flout[ing] federal law," all for the purpose of "increas[ing]

short-term profits" and "boost[ing] earnings."  ¶¶54, 77, 83, 147.  These allegations are

"classically associated with fraud" (*Rombach*, 355 F.3d at 172) and inconsistent with a claim in

negligence.  *See SafeNet, Inc.*, 645 F. Supp. at 238 ("The basis for Plaintiffs' claims is that

SafeNet officers and directors failed to properly disclose that they were backdating stock options

and using improper revenue-recognition accounting methods, and that they did so to enrich

themselves by inflating SafeNet stock prices.  This is essentially a fraud claim, and Plaintiffs will

not be allowed to reclassify their claims to avoid the pleading standards of Rule 9(b).").

Because Plaintiffs' allegations against Transocean sound in fraud, the PSLRA

requirement that Plaintiffs "must state with particularity facts giving rise to a strong inference

that the defendant acted with the required [fraudulent] state of mind" (15 U.S.C. §78u-4(b)(2))

applies to the allegations.  *Rombach,* 355 F.3d at 170.  Fed. R. Civ. P. 9(b) also applies.  *In re*

*Marsh & McLennan*, 536 F. Supp. 2d at 320; *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189,

197 (3d Cir. 2007) (same, citing *Rombach*).  Rule 9(b) requires that a complaint "(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent."

*Rombach*, 355 F.3d at 170.  Initially, Plaintiffs have failed to allege scienter as required by the

PSLRA and Rule 9(b) because, as shown above, Plaintiffs have not alleged facts showing any

actionable misrepresentation or omission in the Proxy.  *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 179 (S.D.N.Y. 1996) ("[S]ince the Court finds that the Complaint fails sufficiently to allege that statements in the prospectus were false or misleading (either affirmatively or through omissions), plaintiffs' allegations also fail to establish an inference of reckless or conscious misbehavior on the part of defendants in making such statements.").

In addition, even if an otherwise actionable misstatement or omission had been alleged, Plaintiffs do not plead facts showing "scienter," *i.e.*, "an intent 'to deceive, manipulate, or defraud.'"  *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 313).   First, Plaintiffs have not pled "with particularity" facts showing scienter.  Although Plaintiffs allege that Transocean's statements in the Proxy of its compliance with Environmental Laws were "knowingly" false (¶83), the Complaint alleges no facts to support this assertion (or even identify an "Environmental Law" that Transocean was violating at the time the Proxy was issued).  Plaintiffs principally rely on the Chief Counsel's Report for their assertion that Transocean did not comply with RP 53 for maintenance of BOPs.  ¶¶66-67, 75, 79, 153.  But that Report states Transocean believed that "its system of condition-based monitoring is superior to the manufacturer's recommended procedures . . . ."  Ex. 8 at 216.  It therefore was reasonable for Transocean to believe that its BOP maintenance procedures were in compliance with 30 C.F.R. §250.446 because they did "meet or exceed" the recommendation in RP 53 (*see* note 13).[29]  *See Hirsch v. du Pont*, 553 F.2d 750, 759 (2d Cir. 1977) ("scienter" for purpose of securities laws is not present where the defendant has a "reasonable belief" the facts have been fully disclosed).

Second, under the heightened standard applicable to Plaintiffs' claim, "'a complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (quoting *Tellabs*, 551 U.S. at 324).  "Courts often

---

[29] Similarly, as to the MODU Code, Plaintiffs do not allege facts showing that Transocean did not reasonably believe that its "UWILD" method of inspecting rigs (¶116) was the "'equivalent' to a drydock survey."  *See* ¶115.

refuse to infer scienter, even on a recklessness theory, when confronted with illogical allegations." *In re GeoPharma, Sec. Litig.*, 411 F. Supp. 2d 434, 446 n.83 (S.D.N.Y 2006). Plaintiffs here present an illogical argument that Transocean attempted to defraud the market (and GSF shareholders) by misrepresenting its compliance with Environmental Laws and safety requirements, but do not explain why Transocean would deliberately risk death and "devastating environmental damage." ¶¶83, 107. "Where 'plaintiff's view of the facts defies economic reason, . . . [it] does not yield a reasonable inference of fraudulent intent.'" *Kalnit v. Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)).[30]

> **2.      Plaintiffs' claim against the individual Defendants fails to plead facts showing that either acted negligently in connection with the Proxy statements.**

To the extent that Plaintiffs base their claim against Messrs. Long and Marshall on fraud, it fails for this same reason that the claim fails to allege scienter.  The claim against these individuals also fails for the additional reason that Plaintiffs have not alleged facts showing either acted even negligently, because Plaintiffs have not plead with particularity facts showing a "strong inference of negligence." *Bond Opp. Fund*, 2003 WL 21058251, at *4.

Plaintiffs allege Mr. Marshall was GSF's CEO at the Merger and he signed the Proxy, "without adequately conducting due diligence to assure that the statements in the Proxy . . . were true and not misleading." ¶¶23, 186.  As to Mr. Long, Plaintiffs allege he was Transocean's CEO at the Merger and "had control over Transocean and the contents of the Proxy." ¶22. Plaintiffs also allege Mr. Long signed the Proxy "without exercising due care to assure that the representations and warranties in the Merger Agreement and other statements in the Proxy . . . were true and not misleading." ¶¶22, 186.  Plaintiffs allege no facts to support these general assertions and therefore do not satisfy the requirement that they plead a "strong inference of

---

[30] Plaintiffs' allegation (¶121) that the Chief Counsel's Report "concluded that Transocean placed short-term profit above safety" is wrong.  The Report (Ex. 8 at 222) states "[t]he Chief Counsel's team cannot be certain whether . . . financial pressures influenced maintenance decisions."

negligence." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) (allegations that defendant, "because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which courts, on numerous occasions, have determined to be inadequate" (internal quotations omitted)).

Plaintiffs' conclusory allegation (¶190) that Defendants "were aware of and/or had access to the true facts" is also insufficient. Plaintiffs do not allege how Mr. Marshall or Mr. Long became "aware" of the true facts. *Advanta*, 180 F.3d at 539. Although Plaintiffs allege the individual Defendants had "access" to the alleged truth, they fail to specify the reports or statements that contained this information. *See Novak*, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts [to those stated in the proxy materials], they must specifically identify the reports or statements containing this information.").[31]

### E.      Plaintiffs Fail to Plead Facts Showing Loss Causation.

Plaintiffs' failure to plead loss causation also requires dismissal. "To establish loss causation, a plaintiff must show that the economic harm that is suffered *occurred as a result of* the alleged misrepresentations." *Citibank, N.A.*, 968 F.2d at 1495. The plaintiff must distinguish the alleged fraud from the "tangle of factors" that affect a stock's price (*Dura*, 544 U.S. at 343) and "disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements" (*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (quoting *Dura*, 544 U.S. at 342-43)).

To plead loss causation, a complaint must therefore "allege facts that support an inference that [defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005). To survive a motion to dismiss, "something beyond the mere possibility of loss causation must be

---

[31] Plaintiffs' failure to plead a primary violation of Section 14 also requires dismissal of the secondary claim against Mr. Long under Section 20(a). *ATSI*, 493 F.3d at 108.

alleged." *Twombly*, 550 U.S. at 557-58 (citing *Dura*, 544 U.S. at 347).  *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (Under *Twombly*, a plaintiff is required "to allege . . . a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss.").

As a general rule, determination of whether a loss "was caused by an intervening event . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). An important exception to this general rule, however, is set forth in *Lentell*, 396 F.3d at 174 (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994)):

> "[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases," and a plaintiff's claim fails when "it has not adequately [pleaded] facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events."

This exception was applied in *In re Sec. Cap. Assur. Ltd. Sec. Lit.*, 729 F. Supp. 2d 569 (S.D.N.Y. 2010) in support of dismissal of the plaintiffs' securities claims.  The Court explained:

> [R]ather than pleading facts which, if proven, would show that Plaintiffs' loss was caused by the Defendants' alleged misstatements, as opposed to the intervening events of the housing market crisis and actions by third parties, Plaintiffs' allegations themselves incorporate intervening events and actors, and at times present (rather inexplicably) wide event windows that welcome into their narrative noise and information from other events that make it difficult to isolate the impact of Defendants alleged misrepresentations, and their revelation to the market.  *Id.* at 599-600.[32]

Plaintiffs contend that the Proxy allegedly misrepresented and omitted facts about "the true flawed state of Transocean's safety employee training and maintenance protocols" (¶159)

---

[32] *See also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (plaintiffs failed to allege "facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [defendant's] misstatements"); *SafeNet*, 645 F. Supp. 2d at 229 (plaintiffs "failed to show . . . why the April 6 disclosure they focus on caused the decline, as opposed to the simultaneous disclosure of the collapse of the nCipher transaction"); *Healthcare Fin. Group, Inc. v. Bank Leumi USA*, 669 F. Supp. 2d 344, 350 (S.D.N.Y. 2009) (plaintiff "has not plausibly alleged that the collapse of the auction rate securities market and the market for Jefferson County securities was caused by the revelation of the information that Bank Leumi had allegedly misrepresented or suppressed").

(collectively "allegedly deficient Transocean practices"), that the truth only began to be disclosed after the Macondo incident on April 20, 2010, and that Transocean's stock price began to fall as a result.  ¶¶14, 159, 173-74, 190.  Plaintiffs' allegations of loss causation fail because Plaintiffs do not plead facts that plausibly distinguish between price declines caused by alleged disclosures of the allegedly deficient Transocean practices and declines caused by the "tangle of [other] factors" (*Dura*, 544 U.S. at 343) that negatively affected Transocean's stock price.

Plaintiffs assert the date of each alleged disclosure of allegedly deficient Transocean practices and their alleged effect on Transocean's stock price.  The chart submitted as Ex. 1 puts these in context.  The second through sixth columns set forth:  (1) the date and substance of each of the disclosures alleged by Plaintiffs from the Macondo spill on April 20, 2010, through the end of the putative class period on July 23, 2010; and (2) Transocean's stock prices during this period.  As indicated, in addition to pleading the alleged disclosure after April 20 of what they claim are allegedly deficient Transocean practices, Plaintiffs also plead disclosures of other information, disclosures not providing information of allegedly deficient Transocean practices.  These allegations include Transocean was being investigated and asked to participate in hearings (¶¶163-64); lawsuits had been filed (¶¶159, 163); a Transocean subsidiary had been designated a "responsible party" under the Oil Pollution Act of 1990 (¶164);[33] the DOJ was investigating if charges should be brought (¶168); and a stock analyst had "downgraded Transocean because of its connection to the Deepwater Horizon oil spill disaster" (¶162).

As shown by the movement of Transocean's stock price on the date of each of these alleged disclosures, this "tangle of factors" (*Dura*, 544 U.S. at 343) and "intervening events" (*In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 397 (S.D.N.Y. 2010)), other than the disclosure of allegedly deficient Transocean practices, negatively affected Transocean's stock price, but Plaintiffs ignore their impact.  Ex. 1.  Plaintiffs do not attempt to allege facts showing what portion, if any, of the decrease in the stock price was caused by the alleged disclosure of the

---

[33] Designation as a "responsible party" does not require a finding of any safety deficiency or misconduct by Transocean.  *See* 33 U.S.C. §2702(a).

allegedly deficient Transocean practices rather than disclosure of the other information they allege, including the Macondo spill itself.  Plaintiffs simply allege as a conclusion that disclosure of information about allegedly deficient Transocean practices caused the stock price to decrease.

For example, Transocean's stock price fell more than $4 between the date of the Macondo spill on April 20 and April 26, 2010, the day before the first disclosure Plaintiffs allege.  Ex. 1 at 1.  Then, the first two disclosures Plaintiffs allege (¶160) do not even mention deficient Transocean safety practices.  Instead, the *Energy Daily* (Ex. 11) states "it remains unclear" what caused the Macondo spill and that "opponents of offshore drilling . . . say the tragedy shows major offshore spills remain far more of a threat than the oil industry admitted," while the *Wall Street Journal* (Ex. 12) states "the prospect of oil-blackened beaches could set back the oil industry's long effort to get access to undersea tracts kept off limits by environmental fears."  It is not surprising that Transocean's stock price would fall after these articles disclosed the probable negative effect of the spill on the oil-drilling industry as a whole, while they do not disclose information describing allegedly deficient Transocean practices.

Plaintiffs allege (¶161) the stock price fell again on April 29 because of disclosures in another *Wall Street Journal* article that the *Deepwater Horizon* did not have a "shut-off switch."  But the article states "U.S. regulators don't mandate use of the" devices and that the "efficacy of the devices is unclear."  Ex. 13 at 1.  A much more important disclosure (ignored by Plaintiffs) in this same article, as well as in *Agency France Presse* (Ex. 14) and in the Internet Website *Streetinsider.com* (Ex. 15) cited by Plaintiffs (¶161), was that the magnitude of the leak had grown five-fold.  Again, it is not surprising that Transocean's stock price would fall after the disclosures that the spill had significantly increased, given the spill involved a Transocean rig, as well as the probable negative effect on the oil-drilling industry.

Plaintiffs also ignore that, on the morning of the day before, April 28, the *Wall Street Journal* had published online an almost identical article on the shut-off switch.  That article, however, did not report on the five-fold increase in the oil spill.  Ex. 16.  The market did not react negatively to the April 28 article discussing the shut-off switch but not the expanding oil

leak.  Transocean's stock price closed $0.31 higher on April 28 and opened even stronger on April 29.  It was only after the April 29 *Wall Street Journal* article, reporting also on the increase in the oil spill, that Transocean's stock price dropped $6.60 on April 29.  It would be difficult to identify clearer direct evidence of the absence of a causal link between the disclosure of no switch on the *Deepwater Horizon* and the decrease in Transocean's stock price.

Plaintiffs allege (¶162) that on April 30 Transocean's stock price fell more than $6.  On that day a *New York Times* article stated that BP "assigned blame" for the failure of equipment to Transocean.  Plaintiffs do not allege the article disclosed any allegedly deficient Transocean practice, and it did not.  Ex. 18.  Moreover, Plaintiffs allege (¶162) that on the same day a stock analyst "downgraded Transocean because of its connection to the [Macondo spill]."  It would, of course, be expected Transocean's stock price would fall when an analyst downgraded Transocean because of its "connection" to the spill.  Plaintiffs do not allege that the downgrade was a result of the disclosure of deficient Transocean practices, and it was not.[34]

Plaintiffs also allege (¶¶168-69) that Transocean's stock price fell more than $6 on June 1, the day the DOJ announced an investigation of possible criminal and civil charges against Transocean.  Plaintiffs do not allege that these disclosures revealed deficient Transocean practices.  The allegations of these "investigations" therefore do not support Plaintiffs' theory of "loss causation," namely, that the stock price dropped as a result of disclosure of allegedly deficient Transocean practices.  *In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214, 1220-21 (E.D. Wash. 2005) (investors failed to plead loss causation because announcement of government investigations, although they caused stock price to plummet, did not disclose any facts relating to the company's alleged misrepresentations); *City of Austin Police Ret. Sys. ITT Educ. Serv. Inc.*, 388 F. Supp. 2d 932, 942 (S.D. Ind. 2005) ("the sharp drop in ITT's share price on the day it disclosed the search warrants shows that a company's share price can drop suddenly without any evidence or finding of wrongdoing by the company or its senior management").

---

[34] Ex. 17 ("FBR Capital Markets" downgrades stock to "market perform" from "outperform," "citing investor worry on potential liability associated related to the recent oil rig accident.").

Moreover, the "Other Disclosures" column in Ex. 1 sets out additional information of which the Court may take judicial notice.  Plaintiffs disregard this other information published during the same April 20-July 23, 2010 time period even though Transocean's stock price more closely tracks the disclosure of this other information than it does disclosure of the allegedly deficient Transocean practices on which Plaintiffs rely.  For example:

- Transocean's stock price fell almost $3 on Thursday, May 6, the day the federal government ordered a one-month moratorium on deepwater drilling (Ex. 20) and after Transocean filed its Form 10-Q after the close of trading on May 5 (Ex. 19), the financial news reporting on May 6 that Transocean "shares fell Thursday as the company disclosed $200 million in fresh costs related to the . . . [Macondo spill], in addition to more than $1.1 billion in company related expenses already tied" to the Macondo incident.  Ex. 21 at 1; Ex. 19 at 2-3.

- On Monday, May 24, 18 U.S. Senators asked U.S. Attorney General to investigate Transocean's financial transactions (Ex. 23), and Transocean's stock price fell almost $6 that day, the financial news reporting "Monday's decline can likely be attributed to the fact that 18 U.S. Senators . . . on Monday wrote a letter to U.S. Attorney General Holder asking that the [DOJ] look into [Transocean's] financial transactions."  Ex. 22 at 1; Ex. 23 (press release).[35]

- On Thursday, May 27, when President Obama ordered the six-month extension of the moratorium on deepwater drilling in the Gulf of Mexico (Ex. 24), Transocean's stock price fell almost $3 the next day, the financial news reporting Transocean "has 14 rigs under contract in the Gulf of Mexico . . . that . . . represents about a quarter of its revenue."  Ex. 25.

- Transocean's stock price fell more than $6 on Tuesday, June 1, after the media disclosed during the Memorial Day weekend that BP's effort to plug the oil leak had "failed, crushing hopes for a quick end to the largest oil spill in U.S. history . . . ."  Ex. 26.

In addition to the one downgrading of Transocean's stock that Plaintiffs allege (¶162), Plaintiffs ignore the disclosure during this time period of at least eight other stock analyst

---

[35] Despite the significant stock price declines during the period, Plaintiffs do not allege any disclosure, of Transocean practices or otherwise, from May 11 to May 29.  ¶¶166-67.

downgrades or negative comments about Transocean's stock because of the imposition of the drilling moratorium, the fact of its involvement in the spill (without regard to the merit of the allegations against it), the investigations that had begun, and the lawsuits that had been filed. None of these reports discussed the allegedly deficient Transocean practices.[36] But Transocean's stock price fell at each of these disclosures. Ex. 1.

Although alleging some of them, Plaintiffs ignore these disclosures of information other than the allegedly deficient Transocean practices that caused Transocean's stock price to drop. As a result, Plaintiffs have not alleged facts to "distinguish the alleged fraud from the 'tangle of [other] factors'" that affected Transocean's stock price. *SafeNet*, 645 F. Supp. 2d at 229.

That the decrease in Transocean's stock price after the Macondo spill is more plausibly attributable to other factors not based on disclosure of allegedly deficient Transocean practices is also demonstrated by the movement of the stock prices of other oil drilling companies during this time period. As stated in the Proxy, in assessing the "fairness" of the merger Transocean's investment banker Goldman Sachs and GSF's investment bankers Lehman Brothers and Simmons identified in the aggregate eight other companies that they determined had operations similar to Transocean: Atwood Oceanics, Inc.; Diamond Offshore Drilling, Inc.; Ensco International Inc.; Hercules Offshore, Inc.; Noble Corporation; Pride International, Inc.; Rowan Companies, Inc.; and Ocean Rig ASA. Compl., Ex. A at 60, 70, 78. The chart submitted as Ex. 2 shows the movement of the stock prices of seven of these companies compared against the movement of Transocean's stock price during the period at issue from April 20 to July 23, 2010.[37] As shown on Ex. 2, the stock price of these seven other companies tracks very closely the movement of Transocean's stock price. This demonstrates, as one would expect, that the factors discussed above, such as imposition of the deepwater drilling moratorium and concern about the effect of the Macondo spill on greater regulation of the oil drilling industry, caused a

---

[36] 4/21, 4/26, 4/30, 5/7, 5/17, 6/8, 7/21, 7/22. *See* Exs. 17, 27, 28, 29, 31, 33, 38, 39.

[37] Ocean Rig is excluded because it only trades on the Norwegian over-the-counter market so that its stock price information is not available through standard public sources.

similar marketwide effect on the stock price of other companies like Transocean involved in oil drilling.  Indeed, as the financial media reported on June 8, 2010, "[m]ore analysts are throwing in the towel on deepwater drilling stocks . . . , cutting estimates and downgrading shares as they raise the question of how long drilling will be disrupted."  Ex. 33 at 1.

In addition, the effect of the Macondo spill and its aftermath was not limited to drilling companies, but had a broad effect on the oil services industry generally, as reflected in the "Philadelphia Oil Service Sector Index," a stock price index of 15 companies that is designed to track the performance of companies in the oil services sector.  As shown on Ex. 3, this index also tracks very closely the movement of Transocean's stock price during the period at issue for Plaintiffs' claims, April 20 to July 23, 2010.  This also demonstrates the marketwide effect on the oil drilling industry as a whole from imposition of the deepwater drilling moratorium, concern about the effect of the spill on greater regulation and the other factors identified above.

In sum, Plaintiffs pick selective disclosures over a three-month period and try to match them to days on which there was a decrease in Transocean's stock price.  But Plaintiffs' own allegations, and the facts subject to judicial notice, show the existence of a myriad of intervening events, actions by third parties, and non-parties' statements, as well as the crisis of the Macondo spill itself, that were not disclosures of allegedly deficient Transocean practices but significantly affected Transocean's stock price.  *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 297 (D.N.J. 2007) ("If the price of a security declines after the purchase for reasons unrelated to the fraud . . . the investor has no right to recovery."); *In re Compuware Sec. Litig.*, 386 F. Supp. 2d 913, 919 (E.D. Mich. 2005) (announcement was not corrective disclosure because it did not reveal facts showing falsity of alleged statements).

All of this information shows that what caused the decline in Transocean's stock price and others in the oil industry after April 20, 2010 was the huge and terrible accident, blow-out and spill of the type that Transocean consistently advised in the Proxy and elsewhere was a risk (*see* note 27), not any disclosures revealing alleged misstatements or omissions in the Proxy about particular Transocean safety, maintenance or training practices.  Plaintiffs have not pled

34

loss causation because they have not pled facts that "allege . . . a facially 'plausible' causal relationship between the . . . statements or omissions and plaintiffs' economic loss." *Lormand*, 565 F.3d at 258.  *See also Dura*, 544 U.S. at 343; *Flag Telecom*, 574 F.3d at 36.

**CONCLUSION**

For all of the reasons set forth above, the Complaint should be dismissed.  Plaintiffs' allegations, the documents on which they are based, and other publicly available information make clear that Plaintiffs' central theory of liability is flawed beyond repair.  Therefore, leave to amend should be denied.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("[A] futile request to replead should be denied.").

Dated: June 6, 2011                                      Respectfully submitted,

John W. Spiegel (admitted *pro hac vice*)        /s/  John H. Fleming_____
Ronald K. Meyer (*pro hac vice*                     John H. Fleming (admitted *pro hac vice*)
forthcoming)                                             Patricia A. Gorham (admitted *pro hac vice*)
MUNGER, TOLLES & OLSON LLP            Benjamin C. Morgan (*pro hac vice* forthcoming)
355 South Grand Avenue, 35th Floor         SUTHERLAND ASBILL & BRENNAN LLP
Los Angeles, CA 90071                            999 Peachtree Street, N.E., Suite 2300
Tel. 213.683.9152                                    Atlanta, Georgia 30309
Fax. 213.683.5152                                    Tel.  404.853.8000
*john.spiegel@mto.com*                            Fax.  404.853.8806
*ronald.meyer@mto.com*                          *john.fleming@sutherland.com*
                                                           *patricia.gorham@sutherland.com*
                                                           *ben.morgan@sutherland.com*

                                                           Peter Ligh
                                                           SUTHERLAND ASBILL & BRENNAN LLP
                                                           1114 Avenue of the Americas, 40th Floor
                                                           New York, NY 10036-7703
                                                           Tel. 202-389-5000
                                                           Fax. 212-389-5099
                                                           *peter.ligh@sutherland.com*

*Attorneys for Defendants Transocean Ltd., Robert L. Long, and Jon A. Marshall*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 6, 2011, I electronically filed the above and foregoing with the

Clerk of the Court using the CM/ECF system.


/s/ John H. Fleming_____
John H. Fleming