UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRICKLAYERS AND MASONS LOCAL UNION NO. 5 OHIO PENSION FUND, and DEKALB COUNTY PENSION FUND on behalf of themselves and all others similarly situated, | Electronically Filed<br><br>Civil Action No. 10-cv-7498-LTS<br><br>Judge:  Laura Taylor Swain |
| Plaintiffs, | |
| - against - | |
| TRANSOCEAN LTD., ROBERT L. LONG and JON A. MARSHALL, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 4

    A. Transocean Specialized in Offshore Oil and Gas Drilling and Had Extensive Operations in American Coastal Waters ................................................................................... 4

    B. Transocean's Deepwater Drilling in the Gulf Was Strictly Regulated By Federal Statutes and Regulations ................................................................................................................. 5

    C. By January 2005, Transocean Was Systematically Violating Federal Laws and Industry Standards Designed to Reduce the Risk of Catastrophic Oil Spills ....................................... 6

        1. Transocean Instituted a Company-wide Policy Flouting the Federal Requirement That It Disassemble and Inspect the Blowout Preventers Aboard Its Rigs ............................. 6

           i. Blowout Preventers Are Critical Safety Equipment That Must be Properly Maintained to Limit the Risk of Blowouts and Oilspills ................................................. 6

           ii. Federal Law Required the Disassembly and Inspection of Blowout Preventers Every Three to Five Years ................................................................................................... 7

           iii. By January 2005, Transocean Had Changed Its Official Policy So That None of Its Blowout Preventers Received the Required Inspections ............................................. 7

        2. Transocean's Systemic Violation of Federal Regulations Made Its Rigs Materially Less Safe, Creating an Undisclosed Risk of Disaster ............................................................. 9

        3. Transocean Shortchanged Rig Maintenance and Understaffed Its Rigs ........................ 9

        4. Transocean Flouted Laws Requiring It to Train Its Rig Crew On Critical Safety Tests and Well Control Procedures ......................................................................................... 10

    D. In Connection With Its Merger with GlobalSantaFe, Transocean Falsely Represented in the Proxy That It Was Materially In Compliance With the Laws Applicable to Its Drilling Business ...................................................................................................................... 11

    E. The Truth Is Revealed in the Aftermath of the *Deepwater Horizon* Disaster .................... 12

ARGUMENT ........................................................................................................................ 12

I.    Applicable Standard of Review .................................................................................... 12

    A. General Standards .......................................................................................................... 12

   B.  Plaintiffs' 14(a) Claims Assert Negligence, Do Not "Sound in Fraud" and Are Not Subject to the Heightened Pleading Standards of Fed. R. Civ. P. 9(b) ............................................. 13

II.   The Complaint Has Adequately Stated a Claim Under Section 14 of the Exchange Act and SEC Rule 14a-9 .................................................................................................................. 14

   A.  Elements and Background of a Section 14(a) Claim ................................................ 14

   B.  Plaintiffs Have Pled With Particularity That the Proxy Contained Material Misstatements and Omissions ......................................................................................................... 15

      1.  The Proxy Falsely Represented That Transocean's Drilling Operations Were Not "In Violation" of Any Applicable Laws or Regulations ....................................... 16

         i.  At the Time of the Proxy, Transocean's Official Policy Was to Disregard the BOP Maintenance Requirements Imposed By 30 C.F.R. § 250.446 .................................. 16

        ii.  At the Time of the Proxy, Transocean Routinely Violated MMS Regulations Requiring It to Take Prudent Steps to Limit the Risk of Deepwater Spills ............... 19

      2.  The Proxy Falsely Represented That Transocean's Drilling Operations Were Not "In Violation" of Any Environmental Laws ....................................................... 21

      3.  The Proxy Misleadingly Omitted True Facts Concerning Transocean's Safety Practices and Compliance with the Law ................................................................. 22

      4.  Plaintiffs Have Adequately Pled That the False and Misleading Statements and Omissions Were Material ....................................................................................... 25

   C.  Plaintiffs Have Adequately Pled That Defendants Acted Negligently ............................... 26

      1.  Negligence Is All That Is Required For a Section 14(a) Claim .................................... 26

      2.  Regardless of Whether 15 U.S.C. § 78u–4(b)(2)'s Heightened Pleading Standard Applies, Plaintiffs Have Adequately Pled Negligence ................................................. 26

   D.  The Amended Complaint Adequately Alleges Loss Causation ........................................... 29

III.   Plaintiffs Have Standing to State Claims Under Section 14 and SEC Rule 14a-9 .............. 32

IV.   Transocean Ltd. Is a Mere Continuation of Transocean Inc. ................................................. 33

   CONCLUSION ............................................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Ashcroft v. Iqbal*,
129 S.Ct. 1937 (2009) ...........................................................................................12

*Beck v. Dobrowski*,
559 F.3d 680 (7th Cir. 2009) .........................................................................26, 27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................................12

*California Public Employees' Retirement Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) ...................................................................................13

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)....................................................................................19

*Charter Twp. of Clinton Police and Fire Ret. Sys. v. KKR Fin. Holdings LLC*,
No. 08-7062, 2010 WL 4642554 (S.D.N.Y. Nov. 17, 2010)....................................14

*Dura Pharm. Inc. v. Broudo*,
544 U.S. 336 (2005)...............................................................................................30

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
343 F.3d 189 (2d Cir. 2003).....................................................................................31

*Employees' Ret. Sys. of the Govt. of the Virgin Islands v. J.P. Morgan Chase & Co.*,
No. 09-3701, 2011 WL 1796426 (S.D.N.Y. May 10, 2011) .....................................13

*Erica P. John Fund, Inc. v. Halliburton Co.*,
131 S.Ct. 2179 (2011)..............................................................................................31

*Gerstle v. Gamble-Skogmo, Inc.*,
478 F.2d 1281 (2d Cir. 1973)...................................................................................26

*Gruss v. Zwirn*,
No. 09-6441, 2011 WL 2946376 (S.D.N.Y. July 14, 2011)......................................35

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999).....................................................................................29

*In re AIG 2008 Secs. Litig.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010).......................................................................29

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010)..................................................................23, 32

*In re Bank of Am. Corp. Sec., Deriv., and Employee Ret. Income Sec. Act (ERISA) Litig.,*
757 F. Supp. 2d 260 (S.D.N.Y. 2010)........................................................................14, 15, 26

*In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.,*
763 F. Supp. 2d 423 (S.D.N.Y. 2011)......................................................................................30

*In re Citigroup Inc. Bond Litig.,*
723 F. Supp. 2d 568 (S.D.N.Y. 2010)......................................................................................14

*In re Fannie Mae 2008 Sec. Litig.,*
742 F. Supp. 2d 382 (S.D.N.Y. 2010)......................................................................................30

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
574 F.3d 29 (2d Cir. 2009)........................................................................................................31

*In re Fossil, Inc.,*
713 F. Supp. 2d 644 (N.D. Tex. 2010) .....................................................................................29

*In re JPMorgan Chase & Co. Sec. Litig.,*
MDL No. 1783, 2007 WL 4531794 (N.D. Ill. Dec. 18, 2007) ................................................29

*In re JP Morgan Chase Sec. Litig.,*
363 F.Supp.2d 595 (S.D.N.Y. 2005)........................................................................................29

*In re Marsh & McLennan Cos., Inc. Sec. Litig.,*
536 F.Supp.2d 313 (S.D.N.Y. 2007)........................................................................................12

*In re Merrill Lynch Auction Rate Securities Litig.,*
No. 09 MD 2030,  2011 WL 1330847 (S.D.N.Y. March 30, 2011) ........................................31

*In re Pfizer Inc. S'holder Deriv. Litig.,*
722 F. Supp. 2d 453 (S.D.N.Y. 2010)......................................................................................24

*In re Refco, Inc. Sec. Litig.,*
503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..............................................................................13, 14

*In re Sec. Cap. Assur. Ltd. Sec. Litig.,*
729 F. Supp. 2d 569 (S.D.N.Y. 2010)......................................................................................32

*In re Vivendi Universal, S.A. Sec. Litig.,*
605 F.Supp.2d 586 (S.D.N.Y.2009).........................................................................................30

*Iowa Pub. Employees' Ret. System v. MF Global, Ltd.,*
620 F.3d 137 (2d Cir. 2010)......................................................................................................21

*J.I. Case Co. v. Borak,*
377 U.S. 426 (1964)..................................................................................................................15

*King County, Wash. v. IKB Deutsche Industriebank AG,*
    708 F. Supp. 2d 334 (S.D.N.Y. 2010)........................................................31

*Koppel v. 4987 Corp.,*
    167 F.3d 125 (2d Cir. 1999).....................................................................23

*Krumme v. WestPoint Stevens, Inc.,*
    238 F.3d 133 (2d Cir. 2000) ....................................................................34

*Lane v. Page,*
    581 F. Supp. 2d 1094 (D.N.M. 2008) .......................................................27

*Lentell v. Merrill Lynch & Co., Inc.,*
    396 F.3d 161 (2d Cir. 2005)................................................................29, 30

*Litwin v. Blackstone Group, L.P.,*
    634 F.3d 706 (2d Cir. 2011) ....................................................................25

*Mendell v. Greenberg,*
    927 F.2d 667 (2d Cir. 1991).....................................................................15

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) ...............................................................18, 29

*Pani v. Empire Blue Cross Blue Shield,*
    152 F.3d 67 (2d Cir. 1998) ......................................................................33

*Payne v. C.I.R.,*
    No. 12473–99, 2003 WL 1620725 (U.S. Tax Ct. March 27, 2003)......................34

*Police and Fire Retirement Sys. of the City of Detroit v. Safenet, Inc.,*
    645 F.Supp.2d 210 (S.D.N.Y. 2009).....................................................13, 15

*Resnik v. Swartz,*
    303 F.3d 147 (2d Cir. 2002)......................................................................24

*S.E.C. v. Gabelli,*
    No. 10-3581, 2011 WL 3250556 (2d Cir. Aug. 1, 2011) ................................22, 25

*Seinfeld v. Gray,*
    404 F.3d 645 (2d Cir. 2005).....................................................................24

*Silverman Partners, LP v. Verox Group,*
    No. 08-3103, 2010 WL 2899438 (S.D.N.Y. July 19, 2010)............................34, 35

*Slayton v. American Exp. Co.,*
    604 F.3d 758 (2d Cir. 2010)......................................................................26

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)........................................................................15

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
    985 F.2d 1190 (2d Cir. 1993)...................................................23, 24

*Wilson v. Great Am. Indus., Inc.*,
    855 F.2d 987 (2d Cir. 1988).........................................................26

## Codes, Statutes and Regulations

15 U.S.C. § 78j(b)..........................................................................25

15 U.S.C. § 77k.............................................................................13

15 U.S.C. § 78n(a) ................................................................ *passim*

15 U.S.C. § 78t(a) ...........................................................................1

15 U.S.C. § 78u-4(b).................................................................12, 27

33 U.S.C. § 1321..............................................................................6

33 U.S.C. § 2702..............................................................................6

30 C.F.R. § 250.107................................................................5, 11, 19

30 C.F.R. § 250.300................................................................5, 11, 19

30 C.F.R. § 250.401................................................................5, 11, 19

30 C.F.R. § 250.440.................................................................6, 7, 18

30 C.F.R. § 250.446 ............................................................... *passim*

## Other Authorities

James D. Cox & Thomas Lee Hazen,
    Treatise on the Law of Corporations §22.8 (3d ed.) .....................35

## INTRODUCTION

This is a putative class action asserting claims for violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") arising out of a false and misleading joint proxy ("Proxy")[1] distributed to GlobalSantaFe Corp. ("GSF") shareholders on October 2, 2007 in connection with a merger ("Merger") between GSF and Transocean.[2]   In reliance on the Proxy, Plaintiffs – at the time GSF shareholders – voted to approve the Merger and exchange their GSF stock for Transocean stock.  Unknown to GSF shareholders, the exchange price was inflated because Transocean made false and misleading representations and warranties in the Proxy that it was in compliance with federal environmental and safety laws, regulations, and other drilling and safety standards, while omitting from its Proxy the Company's systemic violations of such laws and regulations.  Beginning on April 20, 2010 when Transocean's *Deepwater Horizon* drilling rig exploded and sank, and through the end of the Class Period, previously undisclosed information about Transocean's deficient maintenance, safety, and training practices and policies that existed at the time of the Proxy was disclosed to the market, causing the price of Transocean stock to fall and harming Plaintiffs.

The disclosures about Transocean's deficient practices and policies came from many

---

[1] The Proxy refers to SEC Form 14A and its annexes, which includes among other things the July 21, 2007 Merger Agreement.  *See* Amended Class Action Complaint, ¶1, n. 1. All references to ¶ _ herein are to the Amended Class Action Complaint ("Amended Complaint"), unless otherwise specified.

[2] Transocean entities are referred to collectively as "Transocean." As explained below, Defendants' claim that Transocean Ltd. was incorrectly named as a Defendant because Transocean Inc. issued the 2007 Proxy is without merit.  Transocean's 2008 reorganization, on which Defendants base this claim, effectively was nothing more than a name change and office relocation for tax purposes.  Transocean Ltd. continued with Transocean Inc.'s business in a seamless fashion and maintained control of all of its assets and liabilities.  Indeed, the October 9, 2008 Form 8-K describing the relocation expressly refers to Transocean Inc. and Ltd. as "we", "our" or "Transocean." These entities are the same.  It is telling that Transocean makes this its lead argument on its motion to dismiss.

sources.  In the aftermath of this disaster, the federal government, including a national commission appointed by President Obama (the "National Commission"), Congressional committees and a Joint Investigation Team formed at the direction of the U.S. Departments of the Interior and Homeland Security, investigated the causes of the *Deepwater Horizon* disaster, examining huge volumes of documentary evidence and eliciting the testimony of dozens of Transocean, BP and Halliburton employees.  These government investigations examined, among other things, Transocean's safety policies, maintenance and training procedures during the years preceding the *Deepwater Horizon* spill to determine what role these procedures played in the disaster.

The evidence developed by these investigations, and Plaintiffs' own investigation (including interviews with former Transocean employees), establishes that Transocean made false and misleading statements and omissions in its Proxy regarding its compliance with applicable laws and its safety and training programs.  Transocean expressly represented that its drilling business was in compliance with applicable federal drilling regulations and environmental laws.  But in fact, the truth was that, at the time of the Proxy, Transocean was deliberately violating these laws by:

- Failing to inspect adequately and maintain its blowout preventers ("BOP") by implementing a corporate policy ***to not*** disassemble and inspect this vital equipment every three to five years as required; [3]

- Failing to adequately staff, train and supervise maritime and drilling rig personnel, particularly with respect to emergency conditions and drilling incidents on its rigs;

---

[3]  A BOP is a large piece of equipment that sits on top of an undersea well head.  It is comprised of a series of specialized valves that can seal, control and monitor oil and gas flow.  A BOP also contains the blind shear ram that is designed to cut through drill pipe in an emergency to cut off oil flow and seal the well.

- Failing to perform required inspections and repairs for its deepwater drilling rigs, such as the *Deepwater Horizon*;

- Discouraging staff reports, or misreporting and destroying records for safety incidents on its rigs;

- Failing to implement safety systems adequate to protect the environment from deep water blowouts such as the one suffered on the *Deepwater Horizon*; and

- Creating a culture where catastrophic safety and environmental risks were routinely accepted, and environmental and other laws, regulations and industry standards were flouted to minimize operational delays and increase short-term profits.

As a result of the false and misleading statements and omissions in the Proxy, the price of Transocean stock was inflated and the integrity of the GSF shareholders' vote approving the Merger was undermined, all in violation of Section 14(a) of the Exchange Act and Rule 14a-9.

Defendants have not advanced any arguments that justify dismissal on the pleadings of Plaintiffs' claims.  Defendants' primary argument in support of dismissal – that the voluminous evidence of Transocean's practices either pre-dates or post-dates the Proxy and therefore does not support a showing of falsity – is demonstrably wrong because, as described in the Amended Complaint, the federal investigations examined evidence pertaining to Transocean's deficient and unlawful practices occurring at the time of the Proxy, as well as at later periods.

Plaintiffs have easily satisfied the standard for pleading negligence, which is all that is required under Second Circuit law to prevail on a Section 14(a) claim, and Defendants cannot show otherwise.   Moreover, Defendants' assertion that the Complaint "sounds in fraud" is a baseless attempt to foist Fed. R. Civ. P. 9(b)'s heightened pleading standards on Plaintiffs. Plaintiffs are the masters of their complaint and they have alleged that Defendants negligently – not fraudulently – made misrepresentations in the Proxy.

Defendants' attempt to impose a loss causation pleading standard requiring Plaintiffs to

disaggregate and explain all of the "intervening events" that may have contributed to Transocean stock price declines likewise fails.  Such a requirement veers far from the basic Rule 8 pleading standard that the Supreme Court and the Second Circuit apply to loss causation.  As even Defendants acknowledge, loss causation is a factual issue generally not resolved at the motion to dismiss stage.  Plaintiffs need only allege a plausible link between "corrective disclosures" and drops in the price of Transocean stock, which they have accomplished in this case by pointing to specific disclosures regarding Transocean's illegal and unsafe practices that were followed by significant declines in the price of Transocean stock.  Finally, Defendants' claim that Plaintiffs lack standing because they have not sufficiently alleged their own losses is incorrect.

For these reasons, the Court should deny Defendants' motion to dismiss in full.

## STATEMENT OF FACTS

### A.   Transocean Specialized in Offshore Oil and Gas Drilling and Had Extensive Operations in American Coastal Waters

In the 1990s, technological breakthroughs in imaging and drilling opened new business opportunities in deepwater oil drilling, including in the Gulf of Mexico.  ¶27.  In 1990, most oil and gas from the Gulf came from shallow water, but by 1998, the drilling depth averages exceeded 1,000 feet, and deepwater production in terms of barrels of oil per day surpassed that from shallow water for the first time.  ¶28.  Transocean was a major player in developing deepwater production.  *Id.*  In 1999, Transocean drilled the largest Gulf field of all time, a prospect called Thunder Horse that contained more than 1 billion barrels of recoverable reserves. *Id.*  From 2001 to 2004, industry leaders discovered an additional 11 major oil fields beneath between 4,000 and 7,000 feet of water, requiring wells reaching 30,000 feet in total depth. ¶33.

Drilling at such depths created a host of safety issues. The National Commission Report described the challenges involved with deepwater drilling in the Gulf of Mexico:

the technical challenges of ultra-deepwater drilling and production and the subsalt geology remained unique and formidable. Water depths are extreme, down to 10,000 feet. Total well depths…can go beyond 30,000 feet. Well shut-in pressures can surpass 10,000 pounds per square inch.  Bottom-hole temperatures can exceed 350 degrees Fahrenheit. Salt- and tar-zone formations can be problematic. The sandstone reservoirs are tightly packed, and ensuring hydrocarbon flow through risers and pipelines can be difficult.

¶33.  By the time of the July 23, 2007 announcement of the Merger with GlobalSantaFe, Transocean was one of the world's largest offshore oil drilling companies. ¶24.

**B.    Transocean's Deepwater Drilling in the Gulf Was Strictly Regulated By Federal Statutes and Regulations**

Commensurate with its potential to cause enormous harm to American coastal lands and waters, Transocean's deepwater drilling was heavily regulated. During the relevant time period, the Department of Interior's Minerals Management Service ("MMS") promulgated the nation's offshore operating regulations to ensure "safe operations and preservation of the environment, while balancing the Nation's needs for energy development."  ¶34.  These regulations sought to control the risk of a deepwater oil spill and required Transocean to:

- "Use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick." 30 CFR § 250.401, ¶35;

- "[P]rotect the environment as well as health, safety and property," by "[m]aintaining all equipment and work areas in a safe condition" and "us[ing] the best available and safest technology (BAST) whenever practical on all exploration, development, and production operations." 30 CFR § 250.107, ¶36;

- Refrain from "creat[ing] conditions that will pose unreasonable risk to public health, life, property, aquatic life, wildlife, recreation, navigation, commercial fishing, or other uses of the ocean."  30 CFR § 250.300, ¶37;

- "[T]ake necessary precautions to keep wells under control at all times" and "use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick." 30 CFR § 250.401, ¶38;

- "[D]esign, install, maintain, test, and use the BOP system and system components to ensure well control." 30 CFR § 250.440; and

- Conduct a major inspection of the blowout preventers on its rigs every three to five years.  30 CFR § 250.446, ¶41; 65-66.

Transocean's drilling was also regulated by the Clean Water Act, which imposes liability for discharges of oil into American waters.  ¶¶42-43; *see* 33 U.S.C. § 1321.  In addition, the Oil Pollution Act imposes clean-up costs on "each responsible party for a vessel or a facility from which oil is discharged."  ¶44; *see* 33 U.S.C. § 2702.

**C.     By January 2005, Transocean Was Systematically Violating Federal Laws and Industry Standards Designed to Reduce the Risk of Catastrophic Oil Spills**

        1.     Transocean Instituted a Company-wide Policy Flouting the Federal Requirement <u>That It Disassemble and Inspect the Blowout Preventers Aboard Its Rigs</u>

Pursuant to a corporate-wide policy implemented before the 2007 Proxy, Transocean systemically disobeyed federal regulations requiring that Transocean disassemble the BOPs aboard its rigs every three to five years in order to avoid having to take its rigs out of service for the required maintenance.  ¶¶76-78.

        i.     Blowout Preventers Are Critical Safety Equipment That Must be Properly <u>Maintained to Limit the Risk of Blowouts and Oilspills</u>

A rig's BOP is a critical piece of equipment – a stack of enormous valves that rig crews use both as a drilling tool and as an emergency safety device – that can stop a blowout from progressing or, in the event of a loss of control, seal in a well and stop the flow of oil.  ¶55.  The BOP is designed to be the final backup – a failsafe device meant to crush, shear and seal the pipe in the event disaster strikes.  *Id.*  As an MMS representative testified, the BOP "insure[s] that safe control of the well is maintained, especially in the event of intake of gas or high pressure fluids so you can maintain control of the well . . . the BOP is probably the most important factor in maintaining safety of the well and safety of everything involved, the rig and personnel."  ¶62.

    ii. Federal Law Required the Disassembly and Inspection of Blowout
      <u>Preventers Every Three to Five Years</u>

Because the BOP is the last line of defense to prevent potentially devastating environmental damage from an offshore oil spill, the U.S. government required drilling operators such as Transocean to disassemble and inspect their BOPs every three to five years.  ¶55.  The relevant federal mandate is set forth in 30 CFR § 250.446 and 30 C.F.R. § 250.440.  ¶¶65-66.  As the Chief Counsel's Report of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, (the "Chief Counsel's Report") stated, the maintenance required by these regulations is "important because it allows individual components to be examined for wear and corrosion. Any wear or corrosion identified can then be checked against the manufacturer's wear limits."  ¶67.  Inspection every three to five years was also recommended by the company that manufactured the BOPs.  ¶¶70-71.

    iii. By January 2005, Transocean Had Changed Its Official Policy So That
      <u>None of Its Blowout Preventers Received the Required Inspections</u>

As confirmed by the testimony of Transocean personnel and documents provided to the Joint Commission, Transocean implemented a corporate policy that its rigs would not receive the major inspections required by federal law every three to five years and, instead, would only be inspected if they appeared to be broken in some respect.  Transocean Subsea Superintendent Stringfellow admitted during his testimony that Transocean knowingly disregarded 30 CFR § 250.446's requirements as to the *Deepwater Horizon* and as to all of the rigs in the Gulf of Mexico.  ¶73.  Instead of following federal regulations, Transocean implemented what it termed "condition-based maintenance," under which "[t]he condition of the equipment shall define the necessary repair work, if any."  ¶¶74, 76.  Stringfellow confirmed that Transocean did not disassemble its BOPs every three to five years.  *Id*.  As charged by the United States in its

complaint against Transocean, Transocean's policy violated federal law, including 30 CFR § 250.446.  ¶72.  Similarly, the Chief Counsel's Report concluded that Transocean's condition-based maintenance "was misguided insofar as it second guessed manufacturer recommendations, API recommendations, and MMS regulations.  Moreover, the decision to forego regular disassembly and inspection may have resulted in necessary maintenance not being performed on critically important equipment."  ¶75.

The testimony of Transocean personnel, knowledgeable confidential witnesses and the maintenance records of the *Deepwater Horizon* itself confirm that Transocean had implemented its policy of disregarding federal laws by January 2005.  For example, Stringfellow admitted that in January 2005, while he was aboard the *Deepwater Horizon*, Transocean received a report from a consultant indicating that the *Deepwater Horizon*, which went into service in 2001, should come in to receive the required maintenance.  ¶77.  Transocean did not perform the required maintenance because it had already implemented its so called "conditions-based maintenance" program.  ¶77.  Indeed, the Deepwater Horizon had not been to drydock since 2001, indicating that by April 2010, many pieces of the BOP had not been certified for 9 or 10 years.  *Id.*  Further, Confidential Witness #1, who was an officer on Transocean drillships from 2001 to 2008 and who was privy to emails from Transocean management regarding its maintenance policies, observed that Transocean stopped making the required inspections in 2004.  ¶78.  At that time, the first wave of Transocean's newest, larger, rigs, the "Fifth Generation Floaters," started to come due for service.  *Id.*  The rigs were too large to be drydocked in most ports, so the inspections were deemed too costly in terms of downtime and were ended.  *Id.*[4]

---

[4] Paul Johnson, the manager of the *Deepwater Horizon*, corroborates CW1's observation that Transocean flouted safety regulations because it did not want to idle its ships and forfeit more than $500,000 a day in revenues.  *See* ¶¶80-82.

2.      Transocean's Systemic Violation of Federal Regulations Made Its Rigs Materially <u>Less Safe, Creating an Undisclosed Risk of Disaster</u>

Transocean's corporate policy to disregard costly equipment maintenance requirements, including for its BOPs, disabled essential drilling protections and greatly increased the risk of an uncontrolled and devastating spill throughout the Gulf, where the Company's deepwater fleet operated.  Thus, rather than an aberration, the *Deepwater Horizon* disaster resulted from a short-sighted and undisclosed cost-benefit gamble that turned out badly, particularly for workers on the rig, Gulf residents and the Company's investors who acquired Transocean's stock without knowledge of the risks it had taken.  As the Chief Counsel's Report stated, Transocean's "willingness to disregard regulatory obligations on a vital piece of rig machinery is deeply troubling." ¶79.  Transocean disobeyed "manufacturer recommendations, API recommendations and MMS regulations." *Id.* "Given the critical importance of the blowout preventer in maintaining well control, the Chief Counsel's team questions any maintenance regime that could undermine the mechanical integrity of the BOP." *Id.*

3.      <u>Transocean Shortchanged Rig Maintenance and Understaffed Its Rigs</u>

Transocean further increased the risk of a major spill by short-changing maintenance and refusing to hire sufficient numbers of trained engineers to manage it rigs.  As CW1 observed, Transocean ignored the concerns of rig captains who felt that their rigs were undermanned and refused to supply additional trained personnel.  ¶91. Douglas Brown, Transocean's Chief Mechanic on the *Deepwater Horizon* confirmed that Transocean was radically reducing the number of trained engineers on its rigs as early as 2003:

> I think it is important to understand how Transocean manning decisions changed over time. When we first went to work on the Deepwater Horizon, we had a fully manned engine room which consisted of six people: Chief engineer, first engineer, second engineer, third engineer, and two motormen. As the years went by, for reasons I do not understand, the flagging of the vessel changed from

Panamanian to the Marshall Islands. [By 2003,] Transocean eliminated positions so that we were only left with three people: Chief engineer, second engineer, and one motorman. Three people were left to do six people's job. While this often made it difficult to timely complete our daily preventative maintenance, we worked hard and did the best we could have.

¶94.   Such actions allowed dangerous conditions to build up on Transocean's rigs.   Not surprisingly, a maintenance audit of the *Deepwater Horizon* conducted by BP in September 2009 and sent to Transocean found serious concerns that could "lead to loss of life, serious injury, or environmental damage as a result of inadequate use and/or failure of equipment."   ¶90.

> 4.      Transocean Flouted Laws Requiring It to Train Its Rig Crew On Critical Safety
> Tests and Well Control Procedures

The safe operation of a deepwater rig requires well-trained employees who can competently use complex drilling and safety equipment.   In the words of the Chief Counsel Report, "[d]rilling is as much about people as it is about hydrocarbons and equipment . . . [Transocean] placed heavy reliance on human judgment."  ¶97.

But despite the obvious necessity of having well-trained and supported crews, the Chief Counsel's Report found that "Transocean inadequately trained [its] personnel . . . Transocean did not adequately train its rig personnel regarding kick monitoring during end-of-well, nondrilling activities, such as temporary abandonment. It also did not adequately train its crews how to respond to emergency situations. . . .   Inadequate training set employees up for failure in the face of events outside their expertise and training."  ¶98; *see also* ¶95.   Among other things, Transocean failed to train in its employees in the use of the "negative pressure" test, which was used to assess well stability.  ¶¶99-102.  Transocean failed to train its employees to detect and prevent "kicks," which were unwanted influxes of fluid or gas into the wellbore that can lead to a blowout.  ¶¶103-06.   Transocean skimped on disaster training, leaving its employees unprepared to deal with oil spills.  ¶¶107-10.  As the United States has charged, Transocean's dereliction of

its obligation to safely operate its rigs constituted "gross negligence" and violated numerous federal regulations including 30 C.F.R. §§ 250.107, 250.300 and 250.401. ¶96.

**D.    In Connection With Its Merger with GlobalSantaFe, Transocean Falsely Represented in the Proxy That It Was Materially In Compliance With the Laws Applicable to Its Drilling Business**

In July 2007, Transocean and GlobalSantaFe entered into a Merger Agreement under which two companies would merge and each GlobalSantaFe ordinary share would be exchanged for .4757 Transocean shares plus $22.46 in cash. ¶49.  Consummation of the Merger was conditioned upon, *inter alia*, certain representations and warranties made by each Company, the receipt of "fairness opinions" regarding the adequacy of the Exchange Price, and the approval of the Merger by a vote of the shareholders in each Company.  ¶3.  Accordingly, on October 2, 2007, Defendants distributed the Proxy to GlobalSanteFe shareholders in connection with the required shareholder vote.  ¶53.

As described more fully below, the Proxy falsely represented that "Neither Transocean nor any Subsidiary of Transocean is in violation of any Applicable Laws relating to the ownership or operation of any of their respective assets or businesses."  ¶143.  The Proxy Statement also falsely represented that "Transocean and each Subsidiary of Transocean has been and is in compliance with all Environmental Laws except for such matters as do not and are not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect."  ¶144.  To the contrary, however, by mid-2007, Transocean was routinely and systematically violating U.S. drilling and environmental laws and safety requirements, and taking excessive risks in order to reduce short-term maintenance costs, particularly in connection with its deepwater drilling operations.  These false and misleading statements and omissions

precluded an informed Merger vote by GSF shareholders on November 9, 2007 and artificially inflated the price of the Transocean stock exchanged for GlobalSantaFe's shares.  ¶8.

E.     **The Truth Is Revealed in the Aftermath of the *Deepwater Horizon* Disaster**

On April 20, 2010, Transocean lost control of the *Deepwater Horizon*, leading to the largest oil spill in U.S. history and the deaths of many of the crew of the rig.  In the days after the disaster, the BOP aboard the rig failed to seal the well, focusing attention on Transocean's potential role in causing or exacerbating the disaster through inadequate maintenance and safety practices.  ¶160.  In the following weeks and months, the truth regarding Transocean's derelict safety practices and rampant violations of law began to leak into the market through government investigations into the causes of the disaster and media reports.  *See e.g.* ¶159-74.  These disclosures caused significant declines in the price of Transocean stock that cannot be explained by general market conditions, or other unrelated factors.  *See id.*

## ARGUMENT

I.     **Applicable Standard of Review**

A.     **General Standards**

A complaint will survive a motion to dismiss "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In a Section 14(a) case, the complaint also must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation ... is made upon information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 536 F.Supp.2d 313, 320 (S.D.N.Y. 2007) (quoting 15 U.S.C. § 78u-4(b)(1)).

**B.      Plaintiffs' 14(a) Claims Assert Negligence, Do Not "Sound in Fraud" and Are
Not Subject to the Heightened Pleading Standards of Fed. R. Civ. P. 9(b)**

Defendants erroneously claim that Plaintiffs' Section 14(a) "sound in fraud" and should

be subject to the heightened pleading standards under Fed. R. Civ. P. 9(b).  *See* Def. Br. at 24-25.

But a complaint – such as this one – that alleges a Section 14(a) claim based on negligence

cannot sound in fraud.  *See Employees' Ret. Sys. of the Govt. of the Virgin Islands v. J.P.*

*Morgan Chase & Co.*, No. 09-3701, 2011 WL 1796426, at *8 (S.D.N.Y. May 10, 2011) ("unless

a plaintiff specifically pleads a claim of fraud, a claim under Section 11 of the Securities Act is

not subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).").[5]  In

this case, the Complaint alleges only that Defendants acted negligently.  *See* Compl. ¶¶22, 23,

186, 188, 189.   Nowhere does the Complaint assert that any of the Defendants acted with

fraudulent intent or that they intentionally issued the false and misleading Proxy with the intent

to deceive shareholders.[6]   Defendant Long, Transocean's CEO, is alleged to have signed the

Proxy, "without exercising due care," and Defendant Marshall, GlobalSantaFe's CEO, is alleged

to have signed the Proxy, "without adequately conducting the due diligence." ¶¶22, 23.

Accordingly Rule 9(b) plainly does not apply.  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611,

631-32 (S.D.N.Y. 2007) (holding that Rule 9(b) could not apply because "plaintiffs have

expressly pled negligence" and that fact was "dispositive.")

---

[5] Internal citations omitted unless otherwise noted.

[6] Defendants get no support from their cited cases, because those cases involved intentional
deception.  *See, e.g., In re JP Morgan Chase Sec. Litig.*, 363 F.Supp.2d 595, 602, 603 (S.D.N.Y.
2005) (allegations that JP Morgan Chase "knowingly colluded" with Enron to characterize loans
as revenue to obscure its financial position; JP Morgan Chase sold Enron "accounting fraud
packages"); *Police and Fire Retirement Sys. of the City of Detroit v. Safenet, Inc.*, 645 F.Supp.2d
210, 238 (S.D.N.Y. 2009) (defendants were backdating stock options "*to enrich themselves by
inflating SafeNet stock prices*.") (emphasis added); *California Public Employees' Retirement Sys.
v. Chubb Corp.*, 394 F.3d 126, 135 (3d Cir. 2004) (allegations of a fraudulent scheme to inflate
the value of Chubb's stock).

Defendants identify four paragraphs of the Complaint that they incorrectly assert are "associated with fraud."  Def. Br. at 24 (citing Compl. ¶¶54, 77, 83, 147).  These paragraphs refer to Transocean's deliberate violation of environmental and safety requirements, not allegations that the Defendants who signed the false Proxy were distributing it with fraudulent intent.  The fact that Defendants knew or should have known that Transocean was violating federal law is consistent with Plaintiffs' theory that the information was negligently excluded from the Proxy. *See Charter Twp. of Clinton Police and Fire Ret. Sys. v. KKR Fin. Holdings LLC*, No. 08-7062, 2010 WL 4642554, at *13 (S.D.N.Y. Nov. 17, 2010) ("allegation that defendants were 'aware' of the risks involved in" [the mode of financing] "is miles away from alleging fraudulent conduct."); *Refco*, 503 F. Supp. 2d at 631-32. ("Fraud, of course, implies more than falsity, and the mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent."); *In re Bank of Am. Corp. Sec., Deriv., and Employee Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 321-22 (S.D.N.Y. 2010) (rejecting application of Rule 9(b) to 14(a) claims).[7]

For these reasons, the Court should reject Defendants' baseless assertion that Fed. R. Civ. P. 9(b)'s pleading requirements apply or that Plaintiffs are required to plead scienter on the part of the Defendants.  Furthermore, even if heightened pleading standards were applicable, Plaintiffs would still not need to plead more than negligence, which is all that is required under Section 14(a).  *See BofA*, 757 F. Supp. 2d at 321.

## II.    The Complaint Has Adequately Stated a Claim Under Section 14 of the Exchange Act and SEC Rule 14a-9

### A.    Elements and Background of a Section 14(a) Claim

---

[7] Also, "mere use of statutory language is itself insufficient to render a complaint on that 'sounds in fraud.'"  *In re Citigroup Inc. Bond Litig.,* 723 F. Supp. 2d 568, 586-87 (S.D.N.Y. 2010).

"The text of Section 14(a) states that '[i]t shall be unlawful for *any person* . . . to solicit or permit the use of his name to solicit any proxy' in violation of an SEC regulation . . . Rule 14a–9, in turn, prohibits [the inclusion in a Proxy of] 'any statement' that is false or misleading as 'to any material fact' at the time that it was made." *BofA*, 757 F. Supp. 2d at 288. Fraudulent intent is not a requirement of a Section 14(a) claim. A "proxy statement should honestly, openly and candidly state all the material facts, making no concealment of the purposes for the proposals it advocates" such that Section 14(a) is satisfied "[o]nly when the proxy statement fully and fairly furnishes all the objective material facts" to allow a reasonably prudent investor "to make an informed investment decision." *Mendell v. Greenberg*, 927 F.2d 667, 670, 674 (2d Cir. 1991). The "broad remedial purpose" of Rule 14a–9 "is not merely to ensure by judicial means that the transaction, when judged by its real terms, is fair and otherwise adequate, but to ensure disclosures by corporate management in order to enable the shareholders to make an informed choice." *BofA*, 757 F. Supp. 2d at 289-90 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976)); *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964).

The elements of a claim under Section 14(a) and Rule 14a-9 are:

"(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."

*SafeNet*, 645 F. Supp. 2d at 226. "[T]here is no requirement in the Second Circuit that plaintiffs allege fraud in order to state a cause of action pursuant to Section 14(a)." *Id.* Rather, "negligence is sufficient to establish liability under Section 14(a)" because "[l]iability can be imposed for negligently drafting a proxy statement." *BofA*, 757 F. Supp. 2d at 321.

### B.   Plaintiffs Have Pled With Particularity That the Proxy Contained Material Misstatements and Omissions

1.   The Proxy Falsely Represented That Transocean's Drilling Operations Were
Not "In Violation" of Any Applicable Laws or Regulations

Transocean falsely represented in the Proxy that its drilling operations were not "in violation" of any applicable laws or in violation in any way that was "reasonably likely to have" a "material adverse effect" on Transocean, stating:

*Except for such matters as, individually or in the aggregate, do not and are not reasonably likely to have a Transocean Material Adverse Effect* and except for matters arising under Environmental Laws which are treated exclusively in Section 6.13:

(a) *Neither Transocean nor any Subsidiary of Transocean is in violation of any Applicable Laws* relating to the ownership or operation of any of their respective assets or businesses, and no claim is pending or, to the knowledge of Transocean, threatened with respect to any such matters. *No condition exists that is not disclosed in the Transocean Disclosure Letter and which does or is reasonably likely to constitute a violation of or deficiency under any Applicable Law relating to the ownership or operation of the assets or conduct of businesses of Transocean or any Subsidiary of Transocean.*

¶143.   The Proxy defined "Applicable Laws" as "any applicable law, rule, regulation, code, governmental determination, order, treaty, convention, governmental certification requirement or public limitation, U.S. or non-U.S." *Id.*   This statement was unquestionably false because, in direct contradiction of the representations in the Proxy, Transocean had instituted Company-wide policies in violation of critical safety laws and regulations to increase short-term profits.

i.   At the Time of the Proxy, Transocean's Official Policy Was to Disregard
the BOP Maintenance Requirements Imposed By 30 C.F.R. § 250.446

Transocean decided not to comply with federal regulations, particularly 30 C.F.R. § 250.446's requirement that it disassemble and inspect the BOPs aboard its rigs every three to five years.   This regulation required Transocean to "maintain [its] BOP system to ensure that the equipment functions properly" by "meet[ing] or exceed[ing] the provisions of Sections 17.10 and 18.10, Inspections, Section 17.11 and 18.11, Maintenance and Sections 17.12 and 18.12, Quality

Management, described in AP RP 53, Recommended Practices for Blowout Prevention

Equipment Systems for Drilling Wells ." ¶65.  API 18.10.3, in turn, states:

> "After every 3-5 years of service, the BOP stack, choke manifold and diverter
> components should be disassembled and inspected in accordance with the
> manufacturers guidelines.  Elastometric components should be examined for wear
> and corrosion.  Critical dimensions should be checked against the manufacturer's
> allowable wear limits."  ¶66

AP 18.10.3 further provides "A full internal and external inspection of the flexible choke and kill

lines should be performed in accordance with the equipment manufacturers' guidelines."  *Id.*

It is now a matter of public record that by January 2005 – well before the Proxy –

Transocean had instituted a policy not to perform the required maintenance.  Transocean Subsea

Superintendent Stringfellow testified that Transocean's management instituted what it termed a

"condition-based maintenance" policy under which Transocean ***did not*** disassemble and inspect

its BOPs every three to five years.  ¶¶74, 76.  Stringfellow specifically admitted that this policy

had been implemented ***by January 2005***.  ¶77.  At that time, while he was aboard the *Deepwater*

*Horizon,* Transocean disregarded a report from a consultant that the rig should come in for its

required three to five year BOP maintenance because it already had implemented its "conditions-

based maintenance" program.  *Id.*  Stringfellow also testified that by 2007, six years after the

*Deepwater Horizon* had entered service, the rig had still not been dry docked to receive the

required inspections.  *See Id.*[8]

---

[8] Defendants' blanket assertion that "the claims and testimony cited by Plaintiffs . . . refer to
alleged conditions and events at the time of and after the Macondo spill in 2010 and 2011" and
"do not address whether Transocean did or did not follow RP 53 on October 2, 2007" is flatly
contradicted by sworn testimony of Transocean's own employees before the Joint Commission.
(*See* Def. Br. at 13).  While some testimony before the Joint Commission described the specific
events of the *Deepwater Horizon* spill, other testimony – such as Stringfellow's – discussed long
existing practices and policies that had contributed to the disaster, including Transocean's non-
compliance with federal law and RP 53.  This is confirmed by the fact that the Chief Counsel's

CW1 corroborates the fact that Transocean had implemented its policy of disregarding federal regulations by January 2005.  CW1 explained that Transocean had acted in 2004 to institute a policy of disregarding 30 C.F.R. § 250.446's mandate in order to avoid the expense of dry docking its larger, Fifth Generation Floater rigs.  ¶78.[9]

In addition to violating 30 C.F.R. § 250.446, Transocean's policy of forgoing regular inspections of its BOPs also violated 30 C.F.R. § 250.440's requirement that Transocean "maintain" and "test" the "BOP system" to "ensure well control."  *See* ¶39.  In his testimony on the *Deepwater Horizon*'s blowout preventer, Stringfellow admitted that the failure to disassemble and inspect a BOP is a violation of 30 C.F.R. § 250.446.  ¶73.  The Chief Counsel's Report also concluded that Transocean had violated federal regulations, finding that Transcoean's "***willingness to disregard regulatory obligations on a vital piece of rig machinery is deeply troubling,***" that Transocean disobeyed "MMS regulations" and that, "[G]iven the critical importance of the blowout preventer in maintaining well control, the Chief Counsel's team questions any maintenance regime that would undermine the mechanical integrity of the BOP."  ¶79.  Finally, the U.S. government filed a complaint against Transocean alleging that its

---

report made findings regarding these specific subjects based in part on the testimony elicited by the Joint Commission. *See, e.g.*, ¶¶75, 79.

[9] Under Second Circuit law, CW1's observations regarding Transocean's maintenance policies should be credited because Plaintiffs have described CW1 with sufficient particularity "to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).  CW1 was an officer on Transocean rigs from 2001 to 2008 and the chief mate on two rigs in the Gulf of Mexico between 2005 and 2008.  ¶78.  As part of his job, CW1 was privy to emails from Transocean's management regarding changes to Transocean's maintenance polices.  *Id.*  CW1 recalls that Transocean's Marine Superintendent sent the captains of Transocean's ships an email communicating Transocean's new policy of ignoring the maintenance required under federal law.  *Id.*  CW1's captain provided the email to him.  *Id.*

practice of "disregarding federal regulations," including 30 C.F.R. § 250.446, was one of the causes of the *Deepwater Horizon* disaster. ¶72.[10]

> ii.    At the Time of the Proxy, Transocean Routinely Violated MMS Regulations Requiring It to Take Prudent Steps to Limit the Risk of <u>Deepwater Spills</u>

By October 2, 2007, as a result of its sustained campaign to cut costs by skimping on safety precautions, Transocean was habitually violating additional MMS regulations necessary to reduce the high risks of drilling in deep water.  As the United States has charged, Transocean engaged in a "corporate practice[]" to disregard 30 C.F.R. § 250.107's requirement that Transocean "maintain all equipment in a safe condition"; 30 C.F.R. § 250.300's requirement that Transocean "not create conditions that will pose unreasonable risk to public health, life, property, aquatic life, wildlife, recreation, navigation, commercial fishing, or other uses of the ocean," and 30 C.F.R. § 250.401's requirement that Transocean "take necessary precautions to keep wells under control at all times."  ¶¶36-38, 72, 102.  Among other things:

> • Transocean routinely failed to conduct needed maintenance on its equipment.  For example, the Chief Counsel's Report found that "records suggest that Transocean did not adequately maintain and replace" the pod batteries on its BOP, which were necessary to operate the BOP's "deadman system" that automatically closed the BOP and sealed a well in the event of an emergency.  ¶85.  For example, the crew of the *Deepwater Horizon* found that all of the batteries on the BOP were dead in November 2007. *Id.*

> • Similarly, a confidential maintenance audit conducted by BP in September 2009 found serious concerns that Transocean's lack of maintenance could "lead to loss of life, serious

---

[10] Defendants' assertion that Transocean's policy did not violate 30 C.F.R. § 250.446 because the three to five year inspection set forth in RP 53 was a mere "recommendation" is nonsense.  *See* Def. Br. at 12.  30 C.F.R. § 250.446 specifically required Transocean to "meet or exceed" the best practices set forth in RP 53, which Transocean did not do.  Moreover, in light of the fact that the Plaintiffs cite to a party admission that Transocean broke the law, a finding by the National Commission that Transocean broke the law and assertions by the U.S. government that Transocean broke the law, Plaintiffs are entitled, for purposes of this motion to dismiss, to the inference that Transocean broke the law. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

injury, or environmental damage as a result of inadequate use and/or failure of equipment." ¶90.

• Transocean cut costs by refusing to adequately staff its rigs with trained engineers. *See* ¶¶91-94. As Transocean's chief mechanic aboard the *Deepwater Horizon* testified before Congress, *by 2003*, Transocean had cut the staff engine room in half from six to three, eliminating three engineering positions. ¶94. As a result of operating with only half the staff needed, it became "difficult to timely complete [] daily preventative maintenance." The chief mechanic further described how "because of the cuts in the number of engine room personnel, we were often days, week and even months behind in completing the necessary preventative maintenance." *Id.* CW1, who was an officer on Transocean rigs from 2002 to early 2008, similarly observed emails in which the captains of Transocean's fleet expressed concern to Transocean's management that their ships were undermanned and did not have enough skilled employees. ¶91.

• The Chief Counsel's Report found "Transocean inadequately trained [its] personnel . . . Transocean did not adequately train its rig personnel regarding kick monitoring during end-of-well, nondrilling activities, such as temporary abandonment. It also did not adequately train its crews how to respond to emergency situations . . . ***Inadequate training set employees up for failure in the face of events outside their expertise and training***." ¶98. *See also* ¶¶95-110.

• Confidential Witness 2 ("CW2") a Transocean safety instructor aboard a Transocean rig from 2003 to 2005, observed that Transocean safety personnel feared losing their jobs if they were "aggressive" and attempted to prioritize safety ahead of production. ¶122. For instance, safety personnel were supposed to have "stop work authority," meaning that they should have been given free rein to stop an ongoing drilling job if safety issues were present. *Id.* However, there was a "lot of pressure" to avoid stopping drilling and the safety personnel were "beat up verbally" and were "scared to death of [losing] their jobs" if they exercised their stop work authority. *Id.*

Plaintiffs have adequately alleged that these violations were occurring as of October 2, 2007. Transocean's own employees testified that Transocean had dangerously reduced staffing on its rigs of trained personnel by 2003. ¶¶91, 94. Similarly, CW1 observed that Transocean improperly maintained its equipment between 2005 and 2007 by, for example, failing to repair fuel lines on a rig after a fire because Transocean had not appropriated enough money to purchase all necessary safety equipment. ¶¶126-27. Furthermore, Plaintiffs are entitled to reasonable inferences that, even for those corporate policies and practices described by the Chief Counsel's Report and by the confidential witnesses without identifying the specific time period

during which they occurred, that the policies and practices were in effect at time of the Proxy. As the Second Circuit has held, "[d]epending on the problem, its existence" at one point in time "may support an inference that it was present [] earlier" and plaintiffs are entitled to this reasonable inference at the motion to dismiss stage. *Iowa Pub. Employees' Ret. System v. MF Global, Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010). Here, specific dates were ascribed to much of the misconduct, and it is fair to infer that the additional wrongdoing occurred at the same times and under the supervision of the same management – *i.e.*, all of the violative practices appear to be part of a larger campaign by Transocean's corporate officers, starting in the 2003-2004 period and extending through April 2010, to cut costs through a policy of engaging in unsafe and illegal practices. See *supra* pgs 6-10. Under these circumstances and at this stage of the proceedings, it is reasonable to infer that all these practices were occurring at the time of Proxy.[11]

### 2. The Proxy Falsely Represented That Transocean's Drilling Operations Were Not "In Violation" of Any Environmental Laws

The Defendants falsely represented in the Proxy that Transocean's drilling operations were not "in violation" of any applicable laws and that the Company was not engaged in any violations that were "reasonably likely to have" a "material adverse effect" on Transocean:

> (a) ***Transocean and each Subsidiary of Transocean has been and is in compliance with all Environmental Laws*** except for such matters as do not and are not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect. ***There are no past or present facts, conditions or circumstances that interfere (or are reasonably likely to interfere in the future) with the conduct of any of their respective businesses in the manner now conducted or which interfere with continued compliance with any Environmental Law***, except for any noncompliance or interference that is not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect.

---

[11] The statements in the Proxy concerning the fairness of the Exchange Price were false in light of Transocean's widespread violations of the law.

(b) Except for such matters as do not and are not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect . . . ***there are no past or present facts, conditions or circumstances at, on or arising out of, or otherwise associated with, any current (or, to the knowledge of Transocean or its Subsidiaries, former) businesses, assets or properties of Transocean or any Subsidiary of Transocean, including but not limited to on-site or off-site disposal, release or spill of any Hazardous Materials which violate Environmental Law or are reasonably likely to give rise under any Environmental Law to (i) costs, expenses, liabilities or obligations related to any cleanup, remediation, investigation, disposal or corrective action, (ii) claims arising for personal injury, property damage or damage to natural resources, or (iii) fines, penalties or injunctive relief.***

These representations were patently false because, largely for the reasons described above, Defendants had engaged in a high risk gamble to violate federal laws and industry standards with impunity in order to increase short-term profits.   There were multiple "present facts" and "conditions and circumstances" that were "reasonably likely" to create significant liability for oil spill clean up costs under "Environmental Laws," including the Clean Water Act and the Oil Pollution Act.  *See, e.g.*, ¶¶42-44.  Moreover, because Transocean routinely flouted the law, its actions were likely to constitute "Gross Negligence" under the Clean Water Act, ¶¶42-43, such that Transocean was exposed to massive civil penalties when an oil spill occurred.  ¶43.

### 3. The Proxy Misleadingly Omitted True Facts Concerning Transocean's Safety Practices and Compliance with the Law

Transocean made numerous representations that it was in compliance with environmental and other applicable laws, that it had "extensive" training programs, and that the merger consideration was "fair." Even if these representations were not false themselves (which they were), Transocean's affirmative representations on these issues created a duty to disclose additional information that Transocean in fact was routinely flouting operating standards, under-investing in safety and maintenance, and creating dangerous conditions aboard its rigs, so that Defendants did not create a misleading impression of the risks it was assuming.  *See, e.g.*, *S.E.C. v. Gabelli*, No. 10-3581, 2011 WL 3250556, at *6 (2d Cir. Aug. 1, 2011) ("The law is well

settled, however, that so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud.")

Transocean's positive statements about its safety practices and compliance with the law put those issues "in play," triggering a duty to disclose material facts that undercut its representations:

> [W]here a defendant affirmatively characterizes management practices as "adequate," "conservative," "cautious," and the like, the subject is "in play." For example, if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations ... By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.

*In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010) (analyzing the duty to disclose in the context of Section 10(b)); *cf. Koppel v. 4987 Corp.*, 167 F.3d 125, 131 (2d Cir. 1999) ("Once the proxy statement purport[s] to disclose the factors considered [by the board of directors] . . ., there [i]s an obligation to portray them accurately.").

Indeed, addressing circumstances with an uncanny resemblance to those present in this case, the Second Circuit in *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190 (2d Cir. 1993) made clear that when a Proxy affirmatively characterizes a company's business practices, it has a duty to disclose facts undercutting those representations. In *United Paperworkers,* the plaintiff had alleged that the defendant corporation made positive statements about the company's environmental practices without disclosing the environmental issues facing the company. *Id.* at 1193-94. Although the company had made statements in its proxy depicting itself as being at the "forefront" with respect to environmental protection it did not disclose that

it was involved in extensive environmental litigation as a result of its operations.[12]  *Id.* at 1195.

The Second Circuit held that, in light of the proxy's positive characterizations, this failure to

disclose rendered the proxy misleading:

> In the present case, Paper Co. responded to the shareholder proposal in the Proxy
> Statement with a rather glowing description of the Company's environmental
> spirit, performance, and sense of responsibility.  Plainly, a reasonable shareholder
> would consider the Company's actual record important in assessing the merits of
> the Company's response to the shareholder proposal.   The response was,
> therefore, misleading absent a description of the Company's record of
> environmental derelictions or non-compliance.

*Id.* at 1198.  Beyond the actual misstatements contained in the proxy statement, the document

"conveyed an impression that was entirely false."  *Id.* at 1200.

As in *United Paperworkers*, Transocean made affirmative misstatements that created the

false impression it was operating consistently with federal regulations, environmental laws and

best practices developed by private trade groups by broadly representing in the Proxy that it was

not engaged in any material violations of Environmental Law or other Applicable Law, and that

its training and safety programs were "extensive."  *See supra* pgs. 16, 21-22.  Therefore,

Transocean had a duty to disclose that it was routinely violating applicable safety and

environmental laws in connection with its deepwater drilling operations and had significantly

increased the risk of a severe loss of well control.  Its failure to do so made the Proxy misleading.

*United Paperworkers,* 985 F.2d at 1198.[13]

---

[12] Among other things, the company stated that (1) it had already addressed environmental
matters "in an appropriate and timely manner;" (2) it was in the "forefront" with respect to
environmental protection; (3) the Board had adopted a comprehensive statement of
Environmental, Health and Safety Principles, which it described as "the most recent articulation
of the Company's longstanding commitment to the protection of the environment, which has
been an explicit Company policy for many years;" (4) "the Company's environmental conduct
code in fact is both more stringent and more industry specific" than the resolution. *Id.*  at 1194.

[13] The three decisions cited by Defendants, *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002),
*Seinfeld v. Gray*, 404 F.3d 645, 650 (2d Cir. 2005), and *In re Pfizer Inc. S'holder Deriv. Litig.*,

4.       Plaintiffs Have Adequately Pled That the False and Misleading Statements
and Omissions Were Material

A fact is material for purposes of Rule 14a-9 "if there is a substantial likelihood that a

reasonable shareholder would consider it important in deciding how to vote." *Id.*  Because the

materiality of a statement or omission is a factual matter, it should generally not be resolved at

the motion to dismiss stage and "a complaint may not properly be dismissed . . . on the ground

that the alleged misstatements or omissions are not material unless they are so obviously

unimportant to a reasonable investor that reasonable minds could not differ on the question of

their importance."  *Gabelli*, 2011 WL 3250556, at *6; *Litwin v. Blackstone Group, L.P.*, 634

F.3d 706, 717 (2d Cir. 2011).[14]  Plaintiffs plainly have satisfied this standard.   Transocean's

noncompliance with laws and regulations enacted to reduce the high stakes risks of a deepwater

spill is clearly information that a reasonable investor would consider important when voting on a

merger and approving an exchange price for his shares.  Presumably, that is why Transocean

made such extensive representations regarding these subjects in the Proxy.  Defendants

misrepresented and failed to disclose rampant and deliberate legal noncompliance that spanned

the Company, that would require hundreds of millions of dollars to rectify (*see* ¶80 and ¶29), and

that represented billions of dollars of exposure to loss if, as a consequence, one or more of its

deepwater rigs had an uncontrolled oil spill – which is exactly what occurred with the *Deepwater*

*Horizon*.  *See* ¶¶42-46.  These misstatements and omissions are far more material than those that

were sustained by the Second Circuit in *Litwin*.  *See Litwin*, 634 F.3d at 718-19 (reversing

---

722 F. Supp. 2d 453, 463-64 (S.D.N.Y. 2010), are not to the contrary because they involved
circumstances where the plaintiffs were unable to identify statements made misleading by the
omission of material facts.  *See* Def. Memo. at 32-33.  As such, they are inapt here, where
Plaintiffs have identified several forceful representations by Transocean that were misleading.
[14] *Gabelli* addressed materiality in the context of a Section 10(b) claim and *Litwin* addressed it
for a Section 11 claim.

dismissal by district court on materiality grounds where plaintiffs alleged misstatements relating to less than 5 percent of business).

### C.    Plaintiffs Have Adequately Pled That Defendants Acted Negligently

1.    Negligence Is All That Is Required For a Section 14(a) Claim

Under Second Circuit law, Plaintiffs need only plead that Defendants acted negligently:

> Under Rule 14a-9, plaintiffs need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the director defendants with an intent to deceive.  *See Gerstle v. Gamble-Skogmo, Inc.* 478 F.2d 1281, 1298-1301 (2d Cir. 1973).  Liability can be imposed for negligently drafting a proxy statement. *Id.* at 1301 n. 20.  As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the *Gerstle* negligence standard.

*Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988); *see also Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) ("Section 14(a) requires proof only that the proxy solicitation was misleading, implying at worst negligence by the issuer").. "If [the Defendants] should have been aware of deficiencies [in the Proxy] but took no steps to remedy or inquire about them . . . the negligence standard of Section 14(a) would be satisfied."  *BofA,* 757 F. Supp.2d at 324.

2.    Regardless of Whether 15 U.S.C. § 78u-4(b)(2)'s Heightened Pleading Standard Applies, Plaintiffs Have Adequately Pled Negligence

Actions brought under the Exchange Act are generally subject to the requirements of the PSLRA.  "Under the PSLRA, where proof of scienter is a required element, . . . , a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Slayton v. American Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (quoting 15 U.S.C. § 78u-4(b)(2)).

There is a split of authority regarding whether 15 U.S.C. § 78u-4(b)(2) applies to Section 14(a) claims alleging negligence.  Some courts have held that negligence, which suffices for

Section 14(a), is not a "required state of mind," *i.e.*, scienter, so that 15 U.S.C. § 78u-4(b)(2)'s pleading requirements do not apply.  For example, in an opinion authored by Judge Posner, the Seventh Circuit recently held that "[t]here is no required state of mind for a violation of section 14(a). . . The requirement in the Private Securities Litigation Reform Act of pleading a state of mind arises only in a securities case in which 'the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind.'… And negligence is not a state of mind; it is a failure, whether conscious or even unavoidable (by the particular defendant, who may be below average in his ability to exercise due care), to come up to the specified standard of care.")  *Beck,* 559 F.3d at 682; *but see Lane v. Page*, 581 F. Supp. 2d 1094, 1115-16 (D.N.M. 2008) (discussing split and noting that Tenth Circuit authority suggests that negligence is not a required state of mind).  The Court should follow Judge Posner's well-reasoned decision and hold that 15 U.S.C. § 78u-4(b)(2) does not apply to a Section 14(a) case because negligence is not a required state of mind.

Nonetheless, even if heightened pleading were required in this case, Plaintiffs have adequately pled facts that give rise to a "strong inference" of negligence.  The Amended Complaint alleges with particularity that Transocean's CEO, Long, who signed the Proxy and the Merger agreement, breached his duty of care.  The representations and warranties quoted verbatim in the Amended Complaint, with respect to the Company's compliance with environmental and safety laws and standards were prominent and detailed disclosures that obviously were significant to investors deciding whether to vote to approve the Merger and at the price offered, so that Long would have known that he needed to check their accuracy.  As several testifying and confidential witnesses confirmed, the policy decisions to disregard required maintenance on the BOP and other equipment were made at the corporate level and were

systemic.   For example, the decision to stop inspecting Transocean's BOPs throughout the deepwater fleet was made at the corporate level and memorialized in e-mails issued to captains of Transocean's vessels by the corporate office.   ¶¶76, 78.   Similarly, the decision to under-staff Transocean rigs was made at a management level.   Transocean's Marine Superintendent denied the requests of Transocean's captains for needed engineers and other staff.   ¶91.   Further, the decision to circumvent industry standards and under-staff Transocean's deepwater rigs to save costs was implemented at the corporate level when the Company determined to take advantage of the looser legal requirements of, and switch the registration of the deepwater rigs to, the Marshall Islands.   ¶94.   In addition, various reports of Transocean's violations and inadequate maintenance were completed and furnished to Transocean's management prior to the October 2007 Proxy.[15]   All of these facts were "red flags" putting Long on notice that he needed to investigate further the accuracy of the representations and warranties contained in the Proxy. Similarly, as to Marshall, Global SantaFe's CEO, he had a duty of due diligence to investigate the accuracy of material facts contained in the Proxy he signed and distributed to investors for their votes.   The prominence and obvious significance of the representations and warranties as to Transocean's legal and safety compliance contained in the Proxy clearly reflected that this was a particular area that required his attention.

---

[15] *See*, *e.g.*, ¶107 (Major Accident Hazard Risk Assessment conducted by Transocean in 2004 showed that a blowout could have dire consequences); ¶85 (internal records uncovered by the National Commission failed to properly maintain its equipment, including batteries on the BOP control pods); ¶77 (report from consultant indicating that the Deepwater Horizon had not yet received its required maintenance, which violated federal safety regulations and manufacturer recommendations); ¶138 (statements by CW3 showing Transocean's systemic disregard for training and its corporate culture that increased risks of major incidents); ¶¶78, 91, 110, 116, 123, 127, 128, 152 (statements by CW1 showing Transocean's systemic disregard for training, failure to properly inspect its equipment, and failure to report incidents in violation with federal regulations); ¶¶122, 136, 137 (statements by CW2 showing that Transocean's corporate culture increased the risk of major incidents).

Therefore, both Long and Marshall were negligent in not confirming whether Transocean had corporate policies and systemic problems that violated federal law and industry safety standards before making the lengthy representations in the Proxy touting Transocean's compliance. *See In re JPMorgan Chase & Co. Sec. Litig.*, MDL No. 1783, 2007 WL 4531794, at *8 (N.D. Ill. Dec. 18, 2007) (finding a strong inference of negligence where plaintiffs alleged that directors of company "had opportunity to monitor and inquire" regarding contrary facts). In this regard, this case is similar to *In re Fossil, Inc.*, 713 F. Supp. 2d 644, 654-55 (N.D. Tex. 2010), in which the District Court held that a strong inference of negligence was pled where plaintiffs alleged that defendants: "(1) signed and approved proxies falsely representing options were granted in accordance with shareholder-approved option plans and options were priced based on fair market value on the date of grant (among other misrepresentations); and (2) were negligent in not knowing the true omitted material facts, for each such defendant previously approved the granting of millions of alleged backdated options and/or received hundreds of thousands of alleged backdated options."[16]

### D.  The Amended Complaint Adequately Alleges Loss Causation

To plead loss causation, "a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).[17]  To allege loss causation, a plaintiff only needs to meet the standards of Rule 8 notice pleading, and "provide [the] defendant with some indication of the

---

[16] Defendants inappropriately cite to cases addressing fraud claims brought under Section 10(b) of the Exchange Act.  *See* Def. Br. at 27 (citing to *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) and *Novak*, 216 F.3d at 309).  These cases are inapt because a Section 10(b) claim requires at least recklessness, not negligence.

[17] Loss causation may be adequately pleaded by alleging either "the materialization of a concealed risk that causes a stock price decline" or "a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price." *In re AIG 2008 Secs. Litig.,* 741 F. Supp. 2d 511, 534  (S.D.N.Y. 2010).

loss and the causal connection that the plaintiff has in mind." *Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  Therefore, at the motion to dismiss stage, a "Securities Complaint need not rule out all competing theories for the drop in [a defendant's] stock price; that is an issue to be determined by the trier of fact on a fully developed record." *See In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*, 763 F. Supp. 2d 423, 507 (S.D.N.Y. 2011).

The Amended Complaint sets out a plausible causal relationship between the false and misleading Proxy and Transocean's stock price declines after April 20, 2010 as previously undisclosed information about Transocean's legal and safety deficiencies was gradually revealed to the market.[18]  The Amended Complaint alleges that in response to this information, Transocean's stock price dropped significantly.  ¶¶159-174.  Thus, Plaintiffs have adequately alleged that the misstatement or omission in the Proxy "concealed something from the market that, when disclosed, negatively affected the value of the security," which is sufficient at the pleading stage. *See Lentell*, 396 F.3d at 173; *see also In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 397 (S.D.N.Y. 2010) ("a plaintiff must only allege either: (i) facts sufficient to support an inference that it was a defendant's [misstatement]—rather than other salient factors— that proximately caused plaintiff's loss, or (ii) facts that would allow a factfinder to ascribe some rough proportion of the whole loss to" defendant's misstatement).  Defendants challenge the Complaints' loss causation allegations by pointing to other "intervening" factors that they claim may have caused the drop in Transocean's share price and arguing that Plaintiffs are required to "disaggregate" this unrelated information, (Def's Br. at 27-35), but this is precisely what the

---

[18] Partial disclosures can satisfy the loss causation requirement. See *Dura*, 544 U.S. at 342 (loss causation met where shares sold after "the relevant truth begins to leak out."); *see also In re Vivendi Universal, S.A. Sec. Litig.,* 605 F.Supp.2d 586, 599-600 (S.D.N.Y.2009) (same).

Second Circuit held plaintiffs need not do on a motion to dismiss.  *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

Defendants grudgingly concede that *Emergent Capital* contradicts their position, since it held that these types of questions must await a trial for resolution, but then stretch a statement in *Lentell* to invent an "exception" that would swallow up the rule that *Emergent Capital* announced and that *Lentell* itself embraced as having continued vitality.  *See* Def. Br. at 28.  However, later courts have rejected Defendants' construction of *Lentell*.  "*Lentell* states unequivocally that the existence of a 'market-wide phenomena caus[ing] comparable losses to other investors' only 'decreases' the prospect that the plaintiff's loss was caused by the fraud.  In other words, *Lentell* does not say that the existence of a market-wide phenomenon necessarily *eliminates* a plausible causal connection between plaintiffs' losses and defendants' alleged fraud." *King County, Wash. v. IKB Deutsche Industriebank AG,* 708 F. Supp. 2d 334, 343 (S.D.N.Y. 2010); *see also In re Merrill Lynch Auction Rate Securities Litig.*, No. 09 MD 2030, 2011 WL 1330847, at *11 (S.D.N.Y. March 30, 2011) ("Defendants next argue that Plaintiffs do not allege loss causation because they do not account for broader market phenomena that would have impaired the value of their ARS absent Defendants' conduct….The Court rejects this argument. The law does not 'impose[ ] on plaintiffs the heavy burden of pleading facts sufficient to *exclude* other non-fraud explanations.'").  The Supreme Court recently underscored this point in rejecting the premature resolution of loss causation.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2187 (2011). [19]

---

[19] *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009) cited by Defendants (Def. Memo. at 27), is inapposite because it addressed a potential conflict between class members asserting claims under the Exchange Act and the Securities Act at the *class certification* stage, not plaintiff's pleading burden.

And finally, even if it were appropriate to engage in the type of evaluation of the facts that Defendants assert *Lentell* allows, Defendants manufactured a "market-wide phenomenon" that simply does not exist and that is directly at odds with the allegations in the Amended Complaint.[20]   Defendants have submitted two charts that they claim show that Transocean's stock price tracked those of other oil industry companies.  *See* Def. Br. at 33-34.  But Defendants have failed to present a rigorous economic analysis demonstrating that Transocean's stock moved in tandem with these other oil service companies following the Company's corrective disclosures.  Even a cursory review of Defendants' charts shows that Transocean experienced a far steeper drop in its share price than its peers when the truth was revealed, which only corroborates the plausibility of Plaintiffs' loss causation allegations.[21]

## III.   Plaintiffs Have Standing to State Claims Under Section 14 and SEC Rule 14a-9

Defendants argue that Lead Plaintiffs DeKalb County Pension Fund ("DeKalb County") and the Bricklayers & Masons Local Union No. 5 Ohio Pension Fund ("Ohio Bricklayers") lack standing to assert Section 14 and SEC Rule 14a-9 claims based on the GSF-Transocean merger for two reasons: <u>first</u>, Defendants claim that DeKalb County and the Oho Bricklayers have failed to allege that they were "holders or record" on October 1, 2007 and, thus, cannot show that they were entitled to vote in the GSF-Transocean merger; and, <u>second</u>, Defendants claim that DeKalb Count and the Ohio Bricklayers have failed to allege that they continued to hold Transocean stock through the "corrective disclosures" beginning on April 20, 2010.  First, these are not

---

[20] In this regard, Defendants' reliance on *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569 (S.D.N.Y. 2010) is misplaced because the plaintiffs in that case incorporated the proposed intervening events of the housing market crises and actions by third parties into their complaint.
[21] Moreover, the "market-wide phenomenon" argument is illogical because Transocean is the cause of any "phenomenon" that followed the Macondo explosion, and Defendants' effort to seek shelter in the purported market-wide repercussions of their own wrongdoing is little more than a "convenient confusion of cause and effect."  *Ambac*, 693 F. Supp. 2d at 270.

matters that must be alleged to demonstrate standing.  Second, both of these matters *were* alleged with respect to DeKalb County.

Defendants' argument that Plaintiffs have not alleged that DeKalb County was entitled to vote in the GSF-Transocean merger fails because the Amended Complaint incorporates by reference DeKalb County's certification that was previously filed with the Court, *see* ¶¶ 21-22, which makes it clear that "DeKalb County owned 3,276 common shares in GlobalSantaFe Corporation at the time of the proxy and merger vote, and ***DeKalb County was entitled to and did vote in the merger with Transocean*."  Docket 27-1, at ¶4 (DeKalb County Certification) (emphasis added).  Furthermore, the memorandum that DeKalb County filed in support of its Motion to Appoint DeKalb County as Lead Plaintiff provides that it received 1558 Transocean shares in the merger, and then held those shares through the "corrective disclosures" on April 20, 2010, selling them on May 12, 2010 for a recoverable loss of approximately $87,237.  Docket 26, at 14.  This information is part of the record in the case, and the Court may rely on it when deciding a motion to dismiss.  *See Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d Cir. 1998) ("district court may rely on matters of public record in deciding a motion to dismiss").

As for the Ohio Bricklayers, its certification does not provide the same level of detail.  However, Plaintiffs have alleged that the false Proxy harmed GlobalSantaFe shareholders by depriving them of their right to a fully informed shareholder vote and caused them to receive inadequate consideration for their GlobalSantaFe shares.  ¶189.

## IV.   Transocean Ltd. Is a Mere Continuation of Transocean Inc.

Transocean Inc. was Transocean's holding company at the time of the merger with GSF.  Defendants argue that Transocean Ltd., the current Transocean holding company, cannot be a defendant in this case despite the fact that, by means of internal corporate reorganization (that

was intended to qualify as a tax-free "F-Reorganization" under the U.S. Internal Revenue Code)[22], it simply replaced Transocean Inc. with Transocean Ltd. as the holding company of record. *See* Def. Br. at 6.[23]  The Court should reject this argument for two reasons:

First, in violation of the Court's Individual Practices 2.B., Defendants failed to raise this hyper-technical and groundless contention as a basis for the motion to dismiss in either their letter to Plaintiffs or in a subsequent telephone conversation.   See Defendants' Letter to Plaintiffs, dated June 1, 2011 (attached as Exhibit A to Laughlin Declaration).  Had they done so, the parties could simply have stipulated to add Transocean Inc. as a party, and its joinder would have related back under Fed. R. Civ. P. 15(c)(3).  Therefore, it cannot be said that Defendants used their "best efforts" to resolve their contention informally.

Second, Defendants ignore the fact that under American law,[24] a corporation such as Transocean Ltd. that acquires the assets of another corporation becomes the successor-in-interest to that corporation in at least four different circumstances, including where the acquiring corporation is a "mere continuation" of the acquired company and where the two companies can be said to have engaged in *de facto* merger. *See Silverman Partners, LP v. Verox Group*, No. 08-

---

[22] To qualify as an "F Reorganization" under the Internal Revenue Code, the transaction must be a mere change in name or place of organization. *Payne v. C.I.R.*, No. 12473–99, 2003 WL 1620725, *9 (U.S. Tax Ct. March 27, 2003) ("Respondent also appears to concede that the transfer of the club's operation from 2618 to JKP meets the statutory requirements for an 'F' reorganization: a mere change in identity, form, or place of organization of one corporation, however effected").

[23] Defendants seek judicial notice for three SEC forms filed by Transocean in connection with the relocation in which Transocean Ltd. was created to support this argument. Def Br. at 6.  As discussed in Plaintiffs' opposition to the Request for Judicial Notice, the Court should not notice these exhibits because Defendants are raising a defense that hinges on contested facts and therefore fails the requirement under Fed. R. Evid. 201.

[24] Defendants cite to American law without discussion, signifying their apparent assent to the application of American corporate law.  *See Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) (parties' assumption that New York law controls and "is sufficient to establish choice of law.").   In addition, Defendants did not indicate their intention to argue foreign law pursuant to Fed. R. Civ. P. 44.1.

3103, 2010 WL 2899438, at **2-5 (S.D.N.Y. July 19, 2010); James D. Cox & Thomas Lee Hazen, TREATISE ON THE LAW OF CORPORATIONS §22.8 (3d ed.).   Both the "mere continuation" doctrine and the "de facto merger" doctrine apparently apply in this case, where Transocean Ltd. "acquired" Transocean Inc. by exchanging one of its shares for each outstanding share of Transocean Inc., one company merely replaced the other as the holding company and there was total continuity of stock ownership, management and business function.   *See* Defendants' Ex. 4 at 7*; Silverman*, 2010 WL 2899438, at **2-5.  Defendants have not addressed these issues, or set forth their position with any reasonable specificity.[25]

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in full.[26]

DATED:  August 5, 2011                    Respectfully submitted,

                                          By /s/ Thomas L. Laughlin
                                          Beth A. Kaswan (BK-0264)
                                          Thomas L. Laughlin (TL-8888)
                                          **SCOTT + SCOTT LLP**
                                          500 Fifth Avenue, 40th Floor
                                          New York, NY 10110
                                          Tel:      (212) 223-6444
                                          Fax:     (212) 223-6334
                                          Email:   bkaswan@scott-scott.com
                                                      tlaughlin@scott-scott.com

                                          David R. Scott (DS-8053)
                                          **SCOTT + SCOTT LLP**
                                          156 S. Main Street
                                          P.O. Box 192
                                          Colchester, CT 06415

---

[25] The Court should ignore any new arguments raised by Defendants on this subject in their reply.  *See Gruss v. Zwirn*, No. 09-6441, 2011 WL 2946376, at *24 (S.D.N.Y. July 14, 2011) ("We need not consider this argument, as it was raised for the first time on reply.").  In light of the undeveloped nature of Defendants' argument in their initial brief, it would prejudice Plaintiffs to allow Defendants to set forth new arguments on the subject.

[26] If the Court grants Defendants' motion, in whole or part, Plaintiffs respectfully request leave to amend.

Tel:      (860) 537-5537
Fax:      (860) 537-4432
Email:   drscott@scott-scott.com

Geoffrey M. Johnson
**SCOTT + SCOTT LLP**
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Tel:      (216) 229-6088
Fax:      (216) 229-6092
Email:   gjohnson@scott-scott.com

James M. Wilson, Jr. (JW-8569)
Robert W. Killorin
**CHITWOOD HARLEY HARNES LLP**
1230 Peachtree Street, NE, Suite 2300
Atlanta, GA 30309
Tel:      (404) 873-3900
Fax:      (404) 876-4476
Email:   jwilson@chitwoodlaw.com
             rkillorin@chitwoodlaw.com
             kking@chitwoodlaw.com

*Counsel for Lead Plaintiffs and*
*Co-Lead Counsel for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was filed this 5th day of August, 2011, via this Court's

CM/ECF filing system, which gives electronic notice to all parties registered to receive such

notice.

<div style="margin-left:45%;">

/s/ Thomas L. Laughlin
Thomas L. Laughlin (TL-8888)
**SCOTT + SCOTT LLP**
500 Fifth Avenue, 40th Floor
New York, NY 10110
Tel:      (212) 223-6444
Fax:     (212) 223-6334
Email:   tlaughlin@scott-scott.com

</div>