UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

BRICKLAYERS AND MASONS LOCAL
UNION NO. 5 OHIO PENSION FUND,

       Plaintiff,

   -v-                          No.  10 Civ. 7498 (LTS)(JCF)

TRANSOCEAN LTD. et al.,

       Defendants.

------------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

     Plaintiffs Bricklayers and Masons Local Union No. 5 Ohio Pension Fund

("Bricklayers") and DeKalb County Pension Fund ("DeKalb") bring this putative class action

asserting claims for violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(e), against Transocean Ltd. ("Transocean") and two

individual defendants (collectively "Defendants"), alleging that a joint proxy statement

("Proxy"), distributed to GlobalSantaFe Corp. ("GSF") shareholders on October 2, 2007, in

connection with a merger ("Merger") between offshore oil contractors GSF and Transocean,

contained false and misleading statements.[1]

     According to the Complaint, Plaintiffs – who were GSF shareholders at the time –

---

[1]    The two individual defendants, Robert Long ("Long") and Jon A. Marshall
("Marshall") (collectively "Individual Defendants"), were the CEOs of
Transocean and GSF, respectively, at the time of the Merger; both signed the
allegedly false proxy statement.  (Amended Complaint ("Compl.") ¶¶ 18-19.)  The
Section 20(a) claim is brought against Long.

voted to approve the Merger and exchange their GSF stock for Transocean stock based on false and misleading representations and warranties in the Proxy that Transocean's safety, training, inspection, and maintenance protocols were in compliance with all applicable environmental laws, and that there were no known facts or circumstances reasonably likely to give rise to liability under those laws.  On April 20, 2010, a series of mishaps – many later attributed to Transocean management and personnel errors and equipment failures – resulted in an explosion on Transocean's Gulf of Mexico oil rig, the <u>Deepwater Horizon,</u> causing the immediate deaths of eleven workers and the worst oil spill in U.S. history.[2]  The media and governmental scrutiny into Transocean's practices that followed the spill uncovered long-standing, systemic deficiencies in Transocean's safety, training, inspection and maintenance practices.  These revelations, in turn, precipitated a steep decline in Transocean's stock price.

Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Amended Complaint for failure to state a claim.  The Court has jurisdiction of this action pursuant to 28 U.S.C. §1331.  For the reasons stated below, Defendants' motion is granted in part and denied in part.

<u>BACKGROUND</u>

The following facts are taken as true for purposes of this motion practice.

I.      <u>The Merger and the Joint Proxy</u>

GSF was an offshore oil and gas drilling contractor that provided offshore drilling services to the world's leading oil and gas companies.  (<u>Id.</u> ¶ 2.)  Transocean was at the time of

---

[2]      The spill is hereinafter referred to as the "Macondo Blowout" or "Macondo Spill."

the Merger, and continues to be, one of the largest international providers of offshore contract

drilling services for oil and gas.  At the time of the Merger, Transocean owned numerous

offshore mobile drilling rigs throughout the world, including the deepwater semisubmersible

drilling rig known as the <u>Deepwater Horizon</u>.  (<u>Id</u>.)

On July 21, 2007, Defendants Long and Marshall, acting on behalf of Transocean

and GSF, respectively, entered into a tentative merger agreement (the "Merger Agreement")

pursuant to which GSF shareholders would surrender each of their shares in exchange for 0.4757

shares of Transocean stock plus a $22.46 cash payment.  (Compl. ¶¶ 3, 49.)  In the Merger

Agreement, both Transocean and GSF made "representations and warranties" about their

respective business operations.  In section 6.5 of the Merger Agreement, entitled "Compliance

with Laws; Permits," Transocean represented, among other things, that:

> Except for such matters as, individually or in the aggregate, do not and are not
> reasonably likely to have a Transocean Material Adverse Effect[3] and except for
> matters arising under Environmental Laws which are treated exclusively in
> Section 6.13:
>
> (a) *Neither Transocean nor any Subsidiary of Transocean is in violation of any
> Applicable Laws* relating to the ownership or operation of any of their respective
> assets or businesses, and no claim is pending or, to the knowledge of Transocean,
> threatened with respect to any such matters. *No condition exists that is not
> disclosed in the Transocean Disclosure Letter and which does or is reasonably
> likely to constitute a violation of or deficiency under any Applicable Law
> relating to the ownership or operation of the assets or conduct of businesses of*

---

[3]   "Material Adverse Effect" is defined, in pertinent part, with respect to "any
Person" as "any fact, circumstance, event, change, effect or occurrence that,
individually or in the aggregate, . . . has had or would be reasonably likely to have
a material adverse effect on the assets, properties, business, results of operation or
condition (financial or otherwise) of such Person and its Subsidiaries. . . ."  (<u>See</u>
Merger Agreement §10.9(c).)

*Transocean or any Subsidiary of Transocean.*

(Id. ¶ 143 (emphasis in Complaint).)  "Applicable Laws" is defined elsewhere in the Merger

Agreement as "any applicable law, rule, regulation, code, governmental determination, order,

treaty, convention, governmental certification requirement or public limitation, U.S. or non-U.S."

(Id.)  In section 6.13 of the Merger Agreement, entitled "Environmental Matters," Transocean

represented:

> (a) *Transocean and each Subsidiary of Transocean has been and is in compliance with all Environmental Laws* except for such matters as do not and are not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect.  *There are no past or present facts, conditions or circumstances that interfere (or are reasonably likely to interfere in the future) with the conduct of any of their respective businesses in the manner now conducted or which interfere with continued compliance with any Environmental Law*, except for any noncompliance or interference that is not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect.

> (b) Except for such matters as do not and are not reasonably likely to have, individually or in the aggregate, a Transocean Material Adverse Effect, no judicial or administrative proceedings or governmental investigations are pending or, to the knowledge of Transocean, threatened against Transocean or its Subsidiaries that allege the violation of or seek to impose liability pursuant to any Environmental Law, and *there are no past or present facts, conditions or circumstances at, on or arising out of, or otherwise associated with, any current (or, to the knowledge of Transocean or its Subsidiaries, former) businesses, assets or properties of Transocean* or any Subsidiary of Transocean, including but not limited to on-site or off-site disposal, release or spill of any Hazardous Materials *which violate Environmental Law or are reasonably likely to give rise under any Environmental Law to (i) costs, expenses, liabilities or obligations related to any cleanup, remediation, investigation, disposal or corrective action, (ii) claims arising for personal injury, property damage or damage to natural resources, or (iii) fines, penalties or injunctive relief.*

(Id. ¶ 144 (emphasis in Complaint).)  "Environmental Law" is defined elsewhere in the Merger

Agreement as "any Applicable Law related to human health and the environment, including the

common law." (Id.)

Included in the catalogue of environmental laws that governed Transocean's activities are: 30 C.F.R. § 250.401, which requires drilling operators to "[u]se the best available and safest drilling technology to monitor and evaluate well conditions," keep quality control personnel on-sight, ensure that personnel are adequately trained, and "[u]se and maintain equipment and materials necessary to ensure the safety and protection of personnel, equipment, natural resources, and the environment" (id. ¶ 35 (quoting 30 C.F.R. § 250.401)); 30 C.F.R. § 250.107, which requires operators to "use the best available and safest technology (BAST) whenever practical on all exploration, development, and production operations" (id. ¶ 36 (quoting 30 C.F.R. § 250.107)); 30 C.F.R. § 250.300, which requires operators to take measures to "prevent unauthorized discharge of pollutants" and avoid creating "conditions that will pose unreasonable risk" to the environment (id. ¶ 37 (quoting 30 C.F.R. § 250.300); and 30 CFR § 250.446, which requires operators to conduct a major inspection of the blowout preventer ("BOP") every three to five years.  (Id. ¶ 41.)  In addition, the Clean Water Act, 33 U.S.C. § 1321(b), and the Oil Pollution Act, 33 U.S.C. § 2702), impose civil penalties for discharges of oil and hazardous substances into the ocean, and strict liability for removal costs and damages resulting from such discharges.  (Id. ¶¶ 42-44.)

Based on the representations in the Merger Agreement, Lehman Brothers ("Lehman") and Simmons & Company ("Simmons") opined that the consideration to be paid to GSF shareholders in exchange for their stock was "fair."  (Id. ¶ 50.)

On October 2, 2007, in advance of GSF's November 9, 2007, shareholder meeting and vote on the proposed Merger, Transocean and GSF jointly disseminated the Proxy to

shareholders. (Id. ¶ 142.) The Proxy was signed by Defendants Long and Marshall. (Id. ¶ 7.) The Proxy represented that one of the "conditions" of the merger was "the accuracy of the representations and warranties of the parties set forth in the merger agreement," which was annexed to the Proxy. (Id. ¶ 53.) In addition to incorporating the Merger Agreement, the Proxy incorporated Transocean's 2006 Form 10-K, which represented that Transocean had conducted "extensive" training and safety programs. (Id. ¶ 145.) The Proxy also incorporated the Lehman and Simmons fairness opinions (id. ¶ 50), and represented that the Exchange Price – 0.4757 Transocean shares and $22.46 cash for each GSF share – was "fair." (Id. ¶ 146.)

II.  Material Misrepresentations and Omissions in the Proxy Statement

The Complaint alleges that the Proxy contained misrepresentations and omissions insofar as: (1) Transocean failed to disclose that it did not properly inspect and maintain its drilling rigs, including the BOPs, as required by law; (2) Transocean failed to disclose that its training practices were grossly deficient; and (3) Transocean failed to disclose that it had retaliated against whistleblowers and misreported or failed to report safety incidents. As a result of these misrepresentations and omissions, the exchange price was mischaracterized as "fair."

A.  Transocean's Failure to Maintain and Inspect Equipment

i.  Failure to Maintain Blowout Preventers

A BOP is a stack of valves that operates as a failsafe device designed to stop a blowout from progressing and, in the event of loss of control, seal the well and stop the flow of oil.[4] (Id. ¶ 55.) According to a Minerals Management Service ("MMS") representative, "the

---

[4]  The BOP stops oil leaks primarily through two means: the annular prevents, a donut-like rubber seal that closes around the drill pipe, and blind shear rams,

BOP is probably the most important factor in maintaining safety of the well and safety of everything involved, the rig and personnel." (Id. ¶ 62.) The BOP's maintenance is subject to strict regulation. 30 CFR §250.446 provides that an operator must "maintain [the] BOP system to ensure that the equipment functions properly" and that "BOP maintenance must meet or exceed the provisions of Sections 17.10 and 18.10 . . . described in API RP 53."[5] (Id. ¶ 65 (quoting 30 CFR §250.446).) Section 18.10.3 of API 53 provides, in turn, that:

> After every 3-5 years of service, the BOP stack, choke manifold, and diverter components should be disassembled and inspected in accordance with the manufacturer's guidelines. . . . A full internal and external inspection of the flexible choke and kill lines should be performed in accordance with the equipment manufacturers' guidelines.

(Id. ¶ 66.) Because the BOP inspection requires complete disassembly and upwards of 90 days in drydock, industry papers recommend that the maintenance be performed "during a shipyard time of a mobile offshore drilling unit (MODU) during its five-year interval inspection." (Id. ¶ 69.)

The Complaint – drawing on testimony by a Transocean Subsea Superintendent, a Deepwater Horizon rig manager, a British Petroleum ("BP") well team leader, and a Confidential Witness ("CW1") who worked as an officer on Transocean drillships from 2001 to 2008 – alleges that Transocean's management deliberately disregarded the BOP maintenance requirements in an attempt to cut costs. (Id. ¶¶ 76, 78, 81-82.) The cost of compliance was substantial: for example, Transocean rented the Deepwater Horizon to BP for $533,495 per day,

---

which consist of two metal blocks that cut the drill string and seal the well. (Id. ¶¶ 58-60.)

[5]     American Petroleum Institute ("API") is the main U.S. trade association for the oil and gas industry and is also the main body responsible for the establishment of industry standards. (Id. ¶ 65, n.7.)

but could not charge for time in excess of 24 hours that BP spent on equipment repairs. (Id. ¶ 80.) Thus, a major inspection of a BOP – which could put the rig out of commission for three months – would cost in excess of $48 million. (Id. ¶ 80.) Transocean Subsea Superintendent Stringfellow ("Stringfellow") admitted during testimony before a Joint Commission convened to investigate the Deepwater Horizon accident ("Joint Commission") that Transocean knowingly disregarded 30 CFR § 250.446's requirements as to the Deepwater Horizon and as to all of the rigs in the Gulf of Mexico. (Id. ¶ 73.) In lieu of the three-to-five year disassembly protocol, Transocean implemented what it termed "condition-based maintenance." (Id. ¶ 74.) According to the Chief Counsel's Report of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (the "Chief Counsel's Report"), Transocean's condition-based maintenance "was misguided insofar as it second guessed manufacturer recommendations, API recommendations, and MMS regulations. Moreover, the decision to forego regular disassembly and inspection may have resulted in necessary maintenance not being performed on critically important equipment." (Id. ¶ 75.) Stringfellow recounts that, while he was onboard the Deepwater Horizon in 2005, Transocean received a report from a consultant recommending that the Deepwater Horizon come in to receive required maintenance – a recommendation Transocean ignored because it had already implemented its "conditions-based maintenance" program. (Id. ¶ 77.) Because the Deepwater Horizon had not been to drydock since 2001, as of April 2010, many pieces of the BOP had not been certified for nearly a decade. (Id.) The Complaint estimates, based on Transocean's SEC Form 10-K, that, by 2007, Transocean had saved billions of dollars by improperly maintaining the BOPs on nearly its entire fleet of rigs. (Id. ¶ 83.)

Transocean also failed to maintain certain safety features on the BOP. For

example, in the event of a blowout, the BOP's blind shear rams are supposed to cut the pipe;
however, blind shear rams cannot cut through multiple pieces of drill pipe or tool joints
connecting two sections of pipe. The <u>Deepwater Horizon</u> BOP had only one blind shear ram
even though Transocean knew of the risk that a joint could obstruct the blind shear ram during an
attempted activation. (<u>Id.</u> ¶ 84.) Transocean also failed to properly maintain the batteries in the
control pods that control the BOP's "deadman switch," which automatically closes the BOP in
an emergency. (<u>Id.</u> ¶ 85.) Both Transocean and the BOP manufacturer recommend replacing
pod batteries annually and yearly battery inspections. (<u>Id.</u>) However, internal records indicate
that, as of the time of the <u>Deepwater Horizon</u> blowout, the crew had not replaced the batteries in
the two pods for one year and two and a half years, respectively. (<u>Id.</u>) Post-explosion
examinations revealed that the battery levels were low, a fact that may have contributed to the
BOP's failure. (<u>Id.</u>) According to the Chief Counsel's Report: "This appears to have been a
pattern: Company records show that rig personnel found all of the batteries [on the] <u>Deepwater</u>
<u>Horizon</u> BOP pod dead in November 2007." (<u>Id.</u>)

     ii.    <u>Failure To Conduct Drydock Inspections</u>

     Section 1.6 of the MODU Code[6] provides that a drill ship should have "a
minimum of two <u>drydock surveys</u> during any five-year period" and that "the intervals between
any two such surveys should not exceed 36 months." (<u>Id.</u> ¶¶ 114-15 (emphasis in Complaint).)
In addition to being industry standard, the five-year drydock requirement was imposed by the

---

     [6]     The MODU Code is an "international standard for mobile offshore drilling units"
designed to "ensure a level of safety for such units, and for personnel on board,
equivalent to that required" by the International Convention for Safety of Life at
Sea and the International Convention on Load Lines. (<u>Id.</u> ¶ 47, n.4.)

Marshall Islands, which was the flag state of many of Transocean's drilling ships. (Id. ¶¶ 70-71, 115.) Transocean, however, halted regular drydock surveys sometime around 2004, opting instead for "Underwater Inspection in Lieu of Dry-docking" ("UWILD") whereby Transocean dispatched divers with a video camera and scrapers to examine the hull of the drill ship. (Id. ¶ 115, 119.) The MODU Code permits operators to substitute an underwater inspection for a drydock survey if the former is "equivalent" to the latter; however, the Complaint recounts testimony by a Chief Mate who served aboard three Transocean ships that the UWILD method was a "patently inferior process." (Id. ¶ 118.) A March 2010 Lloyd's Register survey recounted crew concerns that the lack of drydock time could undermine equipment reliability. (Id. ¶ 119.)

A confidential maintenance audit, conducted by BP in September 2009 and sent to Transocean, found excessive overdue maintenance: the audit identified some 390 separate, necessary repairs – some related to the well control systems and the BOP – including many that were "high priority" that would require more than 3,500 man hours to remedy. (Id. ¶ 90.) The audit warned that these maintenance lapses could "lead to loss of life, serious injury, or environmental damage as a result of inadequate use and/or failure of equipment." (Id.)

B.    Transocean's Failure to Properly Train Personnel and Staff the Rigs

The Proxy represented that Transocean had conducted "extensive" training and safety programs. (Id. ¶ 145.) However, Transocean failed to provide its employees with the training and resources necessary to safely operate its rigs, in violation of numerous federal regulations. (Id. ¶ 95.) CW1 recounts that he was privy to complaints by Transocean captains who stated that they were undermanned and faced a shortage of skilled employees – complaints

that reached but were ignored by higher level management in Transocean.  (Id. ¶ 91.)  In lieu of

licensed engineers, who were deemed too costly, Transocean retained "MODU engineers" –

workers who lacked engineering degrees but qualified based on having spent a certain amount of

time on a rig and taking a firetraining course.  (Id. ¶ 92.)  Transocean employee Mark Hay

testified before the Joint Commission that he was given title "Subsea Engineer" with a high

school degree and a few on-the-job training courses.  (Id. ¶ 93.)  According to one of the original

crew members of the Deepwater Horizon, by 2003 "Transocean eliminated positions so that

[they] were only left with three people . . . to do six people's job. . . .  Because of the cuts in the

number of engine room personnel, we were often days, weeks, and even months behind in

completing the necessary preventive maintenance (PM) requirements."  (Id. ¶ 94.)

        According to the Chief Counsel's Report, "Transocean inadequately trained [its]

personnel . . .  regarding kick monitoring[7] during end-of-well, nondrilling activities, such as

temporary abandonment. . . . [This] set employees up for failure in the face of events outside

their expertise and training."  (Id. ¶ 98.)  The same report concluded that Transocean failed to

train its personnel to conduct and interpret the results of a negative pressure test – a test designed

to determine whether anything will leak if a well is temporarily abandoned.  (Id.)  Transocean

also failed to train its employees on how to respond to low frequency, high risk events.  For

example, in a 2004 Major Accident Hazard Risk Assessment, Transocean gave Deepwater

Horizon a 5B risk rating for reservoir blowout, meaning that there was "Low" likelihood of a

blowout occurring, but if one did occur, the event would have "Extremely Severe" consequences,

---

     [7]     A "kick" is an unwanted influx of fluid or gas into the wellbore that can result in
a blowout if the crew does not react properly.  (Id. ¶¶ 103-105.)

including "Multiple personnel injuries and/or fatalities," "Major environmental impact," and "Major structural damage and possible loss of vessel." (Id. ¶ 107.)  In its report on the Deepwater Horizon oil disaster, BP stated that "Transocean's shut-in protocols did not fully address how to respond to high flow emergency situations after well control has been lost.  Well control actions taken prior to the explosion suggest the rig crew was not sufficiently prepared to manage an escalating well control situation." (Id. ¶ 109.)  A report by a maritime and risk management organization, Lloyd's Register Group, in the weeks before the disaster determined that a lack of hands-on experience for workers and managers contributed to safety concerns and that many crew members and front-line supervisors were too readily promoted without sufficient on-the-job experience.  (Id. ¶ 113.)

These failures constituted a violation of 30 C.F.R. § 250.1501, which required Transocean to "ensure that [its] employees and contract personnel engaged in well control, deepwater well control, or production safety operations understand and can properly perform their duties." (Id. ¶ 102.)

C.    Transocean's Management Policies Created Unsafe Working Conditions

The Complaint alleges that Transocean management shifted blame to low-level employees rather than developing standards and correcting safety hazards.  A report written by Britain's Health and Safety Executive in 2009 ("HSE Report") stated that the organizational culture of Transocean is "based on blame and intolerance" and that the Company gave "little consideration" to workers' behavior which could pose serious safety hazards, like "fatigue, distraction, communication failures, or defective equipment." (Id. ¶ 111.)  That report also found

that manuals were in short supply and that there was a shortage of safety representatives.[8]   (Id.)

Confidential Witness #2 ("CW2"), who was a safety instructor aboard a Transocean rig from 2003 to 2005, states that while safety personnel are supposed to have "stop the job authority" – i.e., the ability to halt oil drilling to address safety concerns – they would be "beat up verbally" if they attempted to do so and were "scared to death of [losing] their jobs." (Id. ¶ 122.)   The HSE Report quoted a union leader and regional organizer for offshore oil who called Transocean "one of the worst offenders" in instilling safe workplace procedures on its rigs: "When an incident occurs . . . you should learn from it, but Transocean seeks to punish those people and it gets really ugly . . . . Inevitably we're going to end up with a big bang, accidents with the potential for major injuries or fatalities."  (Id. ¶ 112.)

Employees who voiced concerns about safety were ignored or subjected to retaliation.  CW2 observed Transocean repeatedly failing to correct safety hazards between 2003 and 2005.  When he voiced his safety concerns to the Offshore Installation Manager ("OIM"), he was told to "back-off" and no investigation was conducted.  (Id. ¶ 136.)  CW1 reported that, between 2005 and 2007, while he worked on two Transocean rigs stationed in the Gulf of Mexico, he observed Transocean management fail to report safety incidents and falsify other incident reports in violation of 30 C.F.R. §250.466(f), which requires that drilling records contain information on "[a]ny significant malfunction or problem."[9]  (Id. ¶¶ 115, 141.)  For example, in

---

[8]      See also id. ¶ 138 (Confidential Witness 3 ("CW3"), who worked for Transocean from 2002 to 2005, observed that Transocean frequently failed to provide rig crews with updated engineering and maintenance manuals, hampering repairs.)

[9]      Media reports confirm that only a fraction of the serious incidents aboard Transocean ships were reported to MMS.  (Id. ¶ 139.) The Chief Counsel's Report

2005, fuel lines that were made of low-grade steel and were rarely inspected broke, spilling oil into an electronic control panel and causing a fire.   Despite the seriousness of the incident, CW1 checked and could not find any evidence that it had been reported to MMS or the Coast Guard. (Id. ¶ 128.)  In mid-2007, while CW1 was aboard a rig, one of the pistons seized and blew apart, showering the engine room with shrapnel; again, CW1 could not find any evidence that the incident was reported to the MMS.  (Id.)  After an unchanged filter caught fire, the rig captain told CW1 that they would not report the incident because there had been "too many incidents" on the rig already.  (Id. ¶ 129.)  When CW1 informed the OIM of the event, he was threatened by the captain.  (Id. ¶ 131.)  After CW1 informed the OIM of his intention to report the accident and the captain's misconduct, Transocean management promised to conduct an investigation – the result of which cleared the captain of wrongdoing and downplayed the significance of the fire.  (Id. ¶¶ 131-33.)  CW1 was threatened with transfer to Nigeria, placed on medical leave, and subsequently terminated.  (Id. ¶ 134.)

III.     Disclosure and Loss Causation

        In the aftermath of the Macondo blowout, Transocean became the object of intense public scrutiny.  The resulting investigative reports, government hearings, and lawsuits aired the flawed state of Transocean's maintenance protocols, employee training, and safety procedures, causing Transocean's stock prices to plummet.

        The Complaint cites a myriad of news reports between April 27 and April 29, 2010, exposing Transocean's failure to properly maintain its rigs, train rig crews, and maintain

---

also found that the "failure to report these leaks potentially violated MMS reporting regulations."  (Id. ¶ 141.)

the "remote-control shut-off switch" used by other major oil industry companies, as well as reports describing calls by House members for an investigation. (Id. ¶¶ 160-61.) On April 29, 2010, the price of Transocean stock dropped $6.32, or 7.45%. (Id. ¶ 161.) On April 30, 2010, FBR Capital Markets downgraded Transocean because of its connection to the Deepwater Horizon oil spill disaster. (Id. ¶ 162.) The same day, Transocean stock dropped $6.19, or 7.88%. (Id. ¶ 162.) On May 5, 2010, Defendants announced in Transocean's SEC Form 10-Q that the Departments of Homeland Security and Interior, including the MMS, had begun a joint investigation into Transocean and the cause of the continuing disaster. (Id. ¶ 164.) The following day, the price of Transocean stock fell $3.06 or 4.21%. (Id. ¶ 165.) Throughout May 2010, there was a flood of negative media coverage exposing Transocean's poor safety record and its failure to respond to doubts about the BOP's integrity. (Id. ¶¶ 163-67.) On June 1, 2010, U.S. Attorney General Eric Holder announced that the DOJ was investigating whether criminal or civil charges were warranted under the Clean Water Act, the Migratory Bird Treaty Act, the Endangered Species Act and the Oil Pollution Act as well as criminal statutes. (Id. ¶ 168.) That announcement caused Transocean's stock to decline 11.85%. (Id. ¶ 169.) On July 19, 2010, Stephen Bertone, Transocean's Chief Engineer aboard the Deepwater Horizon, provided testimony to the Joint Commission regarding a September 2009 rig safety audit performed by BP, which identified 390 preventative maintenance tasks that Transocean had failed to perform. (Id. ¶ 170.) That day, Transocean's stock dropped 7.68%. (Id. ¶ 170.) On July 21, 2010, the New York Times published an article entitled "Workers on Doomed Rig Voiced Concern About Safety," detailing two separate confidential March 2010 internal reports, according to which:

- Many Transocean workers were concerned about safety practices and feared

reprisals if they reported mistakes or other problems;

- Transocean workers said that company plans were not carried out properly and that they "often saw unsafe behaviors on the rig";

- Some workers also voiced concerns about poor equipment reliability, "which they believed was a result of drilling priorities taking precedence over planned maintenance";

- "At nine years old, Deepwater Horizon has never been in dry dock," one worker told investigators. "We can only work around so much";

- "Run it, break it, fix it," another worker said. "That's how they work";

- Many key components — including the blowout preventer rams and failsafe valves — had not been fully inspected since 2000, even though guidelines require inspection of the preventer every three to five years;

- At least 26 components and systems on the rig were in "bad" or "poor" condition;

- Workers felt that Transocean management, in Houston, would engage in reprisals if safety hazards were reported;

- "Many workers" reported "fake data" regarding safety incidents.

(Id. ¶ 171.) As a result of the New York Times article, the Company's share price declined

another $1.25, to close at $47.75 on July 21, 2010. (Id. ¶ 172.) An article shortly thereafter

revealed that the "deadman's switch" aboard the Deepwater Horizon was inoperable. (Id.) Each

revelation precipitated a decline in Transocean's stock. As a result of the disclosure of

previously misrepresented and concealed facts concerning Transocean's practices, Transocean's

common stock price declined from $92.03 per share on April 20, 2010, to $45.26 at the close of

trading on July 23, 2010. (Id. ¶ 173.)

IV.     The Present Action

On September 30, 2010, Bricklayers filed suit, asserting claims under Section

14(a) and Section 20(a) of the Exchange Act.  On January 7, 2011, Bricklayers and DeKalb were appointed joint Lead Plaintiffs (docket entry no. 36) and, on April 7, 2011, Bricklayers and DeKalb filed their Amended Complaint, asserting claims "on behalf of all former GSF shareholders, and their successors in interest, who exchanged their shares in the Merger and suffered harm as a result." (Id. ¶ 175.)

Defendants now move to dismiss the Amended Complaint for (1) lack of standing under Section 14(a); (2) failure to plead actionable misrepresentations and omissions in the Proxy; (3) failure to plead loss causation; (4) failure to plead claims against Individual Defendants; and (5) improperly listing Transocean Ltd. as a Defendant.

DISCUSSION

I.    <u>Standing</u>

Defendants assert that Plaintiffs lack standing to bring suit under Section 14(a) for two reasons.  First, they argue that because Plaintiffs did not plead that they were "holders of record" as of October 1, 2007 – the applicable record date – Plaintiffs have failed to show that they were entitled to vote on the merger.  Second, Defendants argue that because Plaintiffs failed to plead that they continued to own the stock after April 20, 2010 – the date on which the corrective disclosures began – Plaintiffs cannot show a cognizable injury.

"It is generally accepted that only shareholders who were entitled to vote on a transaction have standing under section 14(a) to challenge the proxy materials issued by a corporation regarding that transaction."  <u>DCML LLC v. Dana Bus. Sys. PLC</u>, No. 08 Civ. 5829(SAS), 2008 WL 5069528, at *2 (S.D.N.Y. Nov. 26, 2008); <u>see also United Paperworkers</u>

Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1197-98 (2d Cir. 1993) ("The SEC . . .

promulgated Rule 14a-9 with the goal of preserving for all shareholders who are entitled to vote

. . . the right to make decisions based on information that is not false or misleading.") (emphasis

added)).  Moreover, to have standing under Article III, a plaintiff must allege a personal injury.

Allen v. Wright, 468 U.S. 737, 751 (1984).  In Dura Pharm., Inc. v. Broudo, the Supreme Court

recognized that "if . . . the purchaser sells the shares quickly before the relevant truth begins to

leak out, the misrepresentation will not have led to any loss" and that, in such circumstances, a

plaintiff cannot plead injury.  544 U.S. 336, 342 (2005).

Plaintiff DeKalb has proffered facts sufficient to show that it has both statutory

and constitutional standing to bring suit.  The DeKalb County Certification, which was

incorporated by reference in the Complaint (Compl. ¶ 21), states that "DeKalb County was

entitled to and did vote in the merger with Transocean."  (Ex. A, attached to Declaration of

James M. Wilson, Jr.)  Moreover, while not pled in the Complaint, DeKalb represented in its

memorandum in support of its motion to be appointed Lead Plaintiff that it sold its Transocean

shares on May 12, 2010, at a loss.  (See Memo. of Law at 8, docket entry no. 26.)  Accordingly,

the Court finds that DeKalb has standing.

However, Bricklayers has failed to proffer any facts showing that it was eligible to

vote or that it retained its Transocean shares after the corrective disclosures began.  Accordingly,

the motion to dismiss for lack of standing is granted without prejudice with respect to

Bricklayers.  Plaintiffs will be granted leave to file a Second Amended Complaint proffering

facts that demonstrate Bricklayers' standing to bring a claim.

II.     Governing Legal Standards

     A.     Rule 12(b)(6) Motion to Dismiss

          On a motion to dismiss a complaint pursuant to Federal Rule of Civil Procedure

12(b)(6),  the Court "accept[s] as true all factual statements alleged in the complaint and draw[s]

reasonable inferences in favor of the non-moving party." McCarthy v. Dun & Bradstreet Corp.,

482 F.3d 184, 191 (2d Cir. 2007).  The movant bears the burden of demonstrating that the

complaint fails to state a claim upon which relief may be granted. Lerner v. Fleet Bank, N.A.,

318 F.3d 113, 128 (2d Cir. 2003).  To survive a Rule 12(b)(6) motion, a complaint must "plead

enough facts to state a claim that is plausible on its face." Ruotolo v. City of New York, 514

F.3d 184, 188 (2d Cir. 2008) (internal quotation marks omitted) (citing Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  "Where a

complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the

line between possibility and plausibility of entitlement to relief." Id. (internal quotations and

citations omitted).

          In determining a Rule 12(b)(6) motion to dismiss, the Court may consider the

complaint, any exhibit attached to the complaint, materials incorporated in the complaint by

reference, and documents that, "although not incorporated by reference, are 'integral' to the

complaint." Schwartzbaum v. Emigrant Mortgage Co., No. 09 Civ. 3848, 2010 WL 2484116, at

*3 (S.D.N.Y. June 16, 2010).  A document is integral to the complaint if the complaint "relies

heavily upon its terms and effect." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir.

2002) (internal quotations omitted).  If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, controls, and the court need not accept the allegations in the complaint as true.  Barnum v. Millbrook Care Ltd. Partnership, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994).[10]

B.   Section 14(a) and Rule 14a-9

Section 14(a) of the Exchange Act bars "the dissemination of proxy statements 'in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" Schiller v. Tower Semiconductor, Ltd., 449 F.3d 286, 290 (2d Cir. 2006) (quoting 15 U.S.C. § 78n(a)).  SEC Rule 14a-9, in turn, prohibits both the inclusion of "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact," and the omission of "any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a) (West 2010).

To state a claim under Section 14(a), a plaintiff must allege that: "(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  Police and Fire

---

[10]      Defendants have tendered voluminous additional material in support of their motion, and the parties dispute the extent to which this material may properly be considered in connection with this motion.  The Court need not resolve the parties' dispute about the propriety of considering Defendants' exhibits because, even if they are considered, the Complaint still survives the motion to dismiss, except as to Bricklayers' standing and the assertion of claims against Transocean Ltd.

Retirement System of City of Detroit v. SafeNet, Inc., 645 F. Supp. 2d 210, 226 (S.D.N.Y. 2009)

(internal quotations omitted).  A fact in a proxy is material "if there is a substantial likelihood

that a reasonable shareholder would consider it important in deciding how to vote."  Resnik v.

Swartz, 303 F.3d 147, 151 (2d Cir. 2002) (quoting Virginia Bankshares, Inc. v. Sandberg, 501

U.S. 1083, 1090 (1991)).  To succeed on a material omission claim, "the plaintiff must show that

there was a substantial likelihood that the disclosure of the omitted fact would have been viewed

by the reasonable investor as having significantly altered the total mix of information made

available."  United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1198 (2d Cir.

1993) (internal quotations omitted).  While "[i]t is not sufficient to allege that the investor might

have considered the misrepresentation or omission important . . . it is not necessary to assert that

the investor would have acted differently if an accurate disclosure was made."  Ganino v.

Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000).  The "broad remedial purpose" of Rule

14a-9 "is not merely to ensure by judicial means that the transaction, when judged by its real

terms, is fair and otherwise adequate, but to ensure disclosures by corporate management in

order to enable the shareholders to make an informed choice."  In re Bank of Am. Corp. Secs.

757 F. Supp. 2d 260, 289-290 (S.D.N.Y. 2010) (quoting TSC Indus., Inc. v. Northway, Inc., 426

U.S. 438, 448 (1976)).  "In view of the prophylactic purpose of the Rule and the fact that the

content of the proxy statement is within management's control," doubts as to the materiality of

misstated or omitted information are to "be resolved in favor of those the statute is designed to

protect."  TSC Indus., 426 U.S. at 448.

   The materiality determination "requires delicate assessments of the inferences a

'reasonable shareholder' would draw from a given set of facts and the significance of those

inferences to him, and these assessments are peculiarly ones for the trier of fact."  Id. at 450.

Thus, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Ganino v. Citizens Utilities Co., 228 F. 3d 154, 162 (2d Cir. 2000) (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)).

      C.     Heightened Pleading Standard

         The parties agree that Plaintiffs' claims are subject to the requirement, imposed by the Private Securities Litigation Reform Act ("PSLRA"), that the Complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C.A. § 78u–4(b)(1) (West 2010). However, the parties disagree as to whether the heightened pleading standards of Fed. R. Civ. P. 9(b) and 15 U.S.C.A. § 78u-4(b)(2) apply.

         Rule 9(b) of the Federal Rules of Civil Procedure requires that all allegations of fraud be "stated with particularity." Fed. R. Civ. P. 9(b).  To meet Rule 9(b)'s heightened pleading standard, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

         Plaintiffs argue that Rule 9(b) is inapplicable because the Complaint describes Defendants' conduct as negligent, not fraudulent.  (See, e.g., Compl. ¶¶ 186, 188-89.)  A plaintiff may state a Section 14(a) claim by pleading negligence.  Wilson v. Great American Industries,

Inc., 855 F.2d 987, 995 (2d Cir. 1988).  However, when a plaintiff's factual assertions in a

Section 14(a) claim are premised on fraudulent conduct, "they are subject to heightened pleading

requirements, . . . even if they disclaim reliance on a fraud theory."  In re JP Morgan Chase Sec.

Litig., 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) (citing Rombach, 355 F.3d at 176).  Here, "the

wording and imputations of the complaint" – at least as they relate to Transocean – "are

classically associated with fraud."  Rombach, 355 F.3d at 172.  Plaintiffs allege that the

statements in the Proxy concerning Transocean's compliance with Environmental Laws and

"safety and training" were "knowingly" false, because Transocean was "routinely and

systematically violating U.S. environmental laws and safety requirements," and had a "policy of

disobeying federal safety regulations" and "knowingly flout[ing] federal law" to "increase short-

term profits" and "boost earnings."  (Compl. ¶¶ 54, 77, 83, 147.)  Accordingly, the Court finds

that Plaintiffs' claims against Transocean are subject to the heightened pleading standards of

Rule 9(b).  See, e.g., Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc., 645 F. Supp. 2d 210, 238

(S.D.N.Y. 2009).  Having reviewed the Complaint thoroughly, the Court concludes that

Plaintiffs' fraud-type allegations are sufficient to meet the Rule 9(b) standard.

 The more difficult question is whether Plaintiffs' claims are governed by the

additional pleading requirement of the PSLRA.  Section 78u-4(b)(2) provides that:

> In any private action arising under this chapter in which the plaintiff may recover
> money damages only on proof that the defendant acted with a particular state of
> mind, the complaint shall, with respect to each act or omission alleged to violate
> this chapter, state with particularity facts giving rise to a strong inference that the
> defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2) (West 2010).  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S.

308, 321-24 (2007) (recognizing that § 78u-4(b)(2) "unequivocally raised the bar for pleading

scienter" beyond what was required under Rule 9(b)).  Unlike Rule 9(b), which applies to "all averments of fraud," Rombach, 355 F.3d at 171,[11] Section 78u-4(b)(2) is limited to instances where the defendant's "particular state of mind" is a necessary element of the claim.  Because a Section 14(a) claim can be stated under a theory of negligence, the applicability of this provision depends on whether negligence is a "state of mind."  The Second Circuit has not opined on the matter, and what authority exists is divergent.  Compare Bond Opportunity Fund v. Unilab Corp., 99 Civ. 11074(JSM), 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003) (holding that "Plaintiffs must plead with particularity facts that give rise to a strong inference of negligence") with Beck v. Dobrowski, 559 F.3d 680, 682 (7th Cir. 2009) (finding that § 78u-4(b)(2) does not apply to Section 14(a) claims because "negligence is not a state of mind; it is a failure, whether conscious or even unavoidable (by the particular defendant, who may be below average in his ability to exercise due care), to come up to the specified standard of care"); see also Page Keeton et al., Prosser and Keeton on the Law of Torts § 31, p. 169 (5th ed. 1984) ("negligence is conduct, and not a state of mind").  The Court finds the reasoning in Beck more persuasive and concludes that § 78u-4(b)(2) is inapplicable to Plaintiffs' claims.[12]

III.    Whether Plaintiffs Have Alleged Plausibly That The Proxy Contained Material
        Misrepresentations and Omissions

---

[11]     Since Rombach, Rule 9(b) has undergone a stylistic amendment: instead of "averments of fraud" the Rule uses the phrase "in alleging fraud."  Fed. R. Civ. P. 9(b) (West 2010).

[12]     The Court notes, however, that even if Section 78u-4(b)(2) did apply, Plaintiffs' claims would survive the motion to dismiss.  A "strong inference" is one that is "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference."  Tellabs, 551 U.S. at 314.  Plaintiffs' allegations of negligence are sufficient to satisfy this standard.

Plaintiffs' allegations identify three categories of purported misrepresentations and omissions: (1) statements about Transocean's compliance with and potential liabilities under "Environmental Laws"; (2) the statement that Transocean conducted "'extensive' training and safety programs"; and (3) the statement that the "Exchange Price" was "fair." Defendants argue that Plaintiffs have failed to identify material misrepresentations or omissions in any of the categories.

> A.   Statements Regarding Compliance With, And Potential Liabilities Under, Environmental Laws

Defendants argue that Plaintiffs have failed to plead a misrepresentation or omission concerning Transocean's compliance with environmental laws because Plaintiffs cannot identify specific laws and regulations that Defendants were breaching at the time the Proxy was issued. See Bond Opp. Fund, 2003 WL 21058251, at *10 (quoting In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002)) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events."). More specifically, Defendants argue that the Complaint's references to testimony and reports from 2003, 2005, 2009, and 2010 fail to allege plausibly that Transocean was out of compliance in October 2007.

This argument is flawed on two levels. First, the Proxy did not merely represent that Transocean was "in compliance with all Environmental Laws" – it broadly represented that there were no known "past or present facts, conditions or circumstances . . . [which] are reasonably likely to give rise under any Environmental Law to (i) costs, expenses, liabilities or obligations related to any cleanup, remediation, investigation, disposal or corrective action, (ii) claims arising for personal injury, property damage or damage to natural resources, or (iii) fines,

penalties or injunctive relief." (Compl. ¶ 144.)  Given the breadth of this representation, Plaintiffs need not plead that Transocean was in violation of any specific environmental law or regulation at the time of the Merger.   Rather, Plaintiffs may state a Section 14 claim by pleading facts indicating that Transocean's undisclosed safety, training, and inspection deficiencies constituted, at the time of the Merger, "past or present facts, conditions or circumstances" that were "reasonably likely to give rise under any Environmental Law" to costs and liabilities.

Second, Defendants vastly overstate the level of specificity required to allege plausibly that Transocean was violating environmental law or exposing itself to a high risk of liability in October 2007.  Plaintiffs have proffered specific allegations that Transocean operated under non-compliant and substandard maintenance and staffing policies in the years prior to and after the issuance of the Proxy.  In light of the similarity of the problems described by reports and witnesses with respect to practices before and after the date of the Proxy – and given that all facts in the Complaint are taken as true and all reasonable inferences are drawn in Plaintiffs' favor at this stage – it is reasonable to infer that the practices were in place at the time of the Proxy. See, e.g., Iowa Public Employees' Retirement System v. MF Global, Ltd., 620 F.3d 137, 143, n.13 (2d Cir. 2010) ("Depending on the problem, its existence in February 2008 may support an inference that it was present six months earlier.  This is sufficient to raise [the plaintiffs'] right to relief above the speculative level.").  Therefore, the Plaintiffs have met their pleading burden, including their burden under Rule 9(b).

1.     BOP Allegations

Defendants argue that the Complaint fails to identify a material misrepresentation or omission with respect to Transocean's maintenance and inspection of the BOP for two

reasons.  First, Defendants contend that API RP 53's direction that the BOP be disassembled every three to five years is only a recommendation, not a legal requirement;[13] thus, failing to abide by it cannot constitute a violation of "any Environmental Law."  Second, Defendants argue that the Complaint does not plead facts that definitively show that Transocean was violating API RP 53 as of October 2007.  Neither argument has merit.

Defendants' first contention ignores the unambiguous language of 30 C.F.R. § 250.446.  That regulation does not merely incorporate API RP 53 by reference – rather, it explicitly requires that "BOP maintenance and inspections . . . meet or exceed" the specified provisions of API RP 53, including the three-to-five-year disassembly directive.  The "meet or exceed" language elevates API RP 53 from mere recommendation to regulatory command.  (See also Compl. ¶¶ 73, 75 (conclusion by Transocean Subsea Superintendent and Chief Counsel's Report that Transocean's BOP maintenance practices were out of compliance with federal regulations).)

Defendants' second contention is likewise unavailing.  The Complaint recounts testimony from Transocean Subsea Superintendent Stringfellow that Transocean's management had instituted its "condition-based maintenance" policy – which replaced the three-to-five-year disassembly and inspection regime – by January 2005, more than two and a half years before the merger vote.  (Compl. ¶¶ 74, 76, 77).  The Complaint also recounts statements by CW1 – a senior officer with seven years of experience aboard Transocean drillships – that, by 2007,

---

[13]      Defendants' papers quote the BOP "manufacturer's guidelines," which state: "API RP 53 is not considered to be an industry standard.  It is a Recommended Practice and, as such, it's intended to be a guideline, providing advice for operations and maintenance of Well Control and Drilling Equipment."  (Defs Memo. at 12.)

Transocean management had abandoned the regulatory requirement that it conduct a major inspection of its BOPs every three to five years.  (Id. ¶ 78.)

> 2.      Failure to Conduct Drydock Surveys

Defendants similarly argue that Plaintiffs have failed to identify a material misrepresentation or omission regarding Transocean's failure to conduct drydock surveys because (1) the failure to conduct the surveys did not violate an Environmental Law or "applicable law," and (2) the Complaint does not plead facts explicitly showing that Transocean had ceased conducting drydock surveys by October 2007.  Both arguments fail.

The Proxy represented that Transocean was in compliance with all "applicable laws," defined as "any applicable law, rule, regulation, code, governmental determination, order, treaty, convention, governmental certification requirement or public limitation, U.S. or non-U.S." (Compl. ¶ 143 (emphasis added).)  The drydocking requirement was imposed by the Marshall Islands, which was the flag state of many of Transocean's drilling ships.  (Id. ¶ 115).  As such, it qualifies as an "applicable law."

Defendants argue that the Marshall Islands drilling standards permit underwater inspections in lieu of drydocking; however, those standards provide that underwater inspections are only permitted "when conditions provide an equivalent examination."  (See Republic of Marshall Islands, Mobile Offshore Drilling Unit Standards at 12, attached as Ex. 42 to Defs' Memo.)  The Complaint recounts statements by numerous Transocean employees – some of whom were employed at the time of the Merger – who detail the inadequacy of Transocean's underwater inspections.  (See, e.g., Compl. ¶ 119 (CW1 explaining that the UWILD process was "patently inferior"); id. ¶ 119 (Lloyd's Register 2010 survey detailing rig crews' concern that the

lack of drydock time could generally undermine equipment reliability)); see also id. ¶ 78 (testimony of CW1 that Transocean had ceased drydocking by 2004).) This suffices to support two claims: first, that Transocean misrepresented its compliance with an applicable standard, and second, that Transocean failed to fulfill its duty to disclose that it had put into place an inadequate, alternative inspection regime.

B.    Statements Concerning Transocean's Training and Safety Programs

Defendants argue that Plaintiffs have failed to plead a material misrepresentation or omission with respect to Transocean's training and safety programs.[14] Defendants contend that Plaintiffs cannot predicate a misrepresentation claim on Transocean's representation that it "conducted 'extensive' training and safety programs" because (1) Plaintiffs have not pled facts showing that the statement is literally false – i.e., that Transocean's safety and programs were not, to use the dictionary definition, "large in extent and range or amount" (Defs Memo. at 19 (quoting American Heritage Dictionary (4th ed. 2006)); and (2) the representation is non-actionable "puffery."[15] Both arguments are without merit.

---

[14]    Defendants also contend that "most of" Plaintiffs' allegations are based on testimony and reports issued after the Macondo Spill in April 2010, which do not demonstrate that Transocean's staffing and training practices in October 2007 were deficient. As above, this argument is without merit: in addition to the post-Macondo Spill statements – which are, by themselves, sufficient to support an inference that Transocean's training and safety practices were deficient at the time of the Merger – the Complaint relies on statements by individuals who worked on Transocean rigs prior to the merger. (See Compl. ¶¶ 9, 126-27.)

[15]    Defendants also argue, to no avail, that the Complaint fails to identify a violation of any environmental or "applicable law." The Complaint alleges that Transocean violated regulations mandating the reporting of equipment malfunctions (Compl. ¶ 141 (citing 30 C.F.R. §250.466(f)), as well as federal regulations requiring operators to "[m]aintain[] all equipment and work areas in a safe condition." (Id. ¶ 36 (quoting 30 C.F.R. §§ 250.107); id. ¶¶ 96, 102.)

The Second Circuit recently re-affirmed that "half-truths" – statements that are "literally true" but "create a materially misleading impression" – may support a securities claim. S.E.C. v. Gabelli, 653 F.3d 49, 57 (2d Cir. 2011). In Gabelli, a mutual fund executive had issued a Memorandum that stated that "for more than two years, [market timers] have been identified and restricted or banned from making further trades," but that efforts had not "completely eliminated all [market] timers." While the mutual fund had stopped most of its investors from engaging in market timing, the fund failed to disclose that it had made a secret exception for a single investor. The Circuit found that the complaint "plausibly alleged that a reasonable investor reading the Memorandum would conclude" – incorrectly – "that the [defendant] had attempted in good faith to reduce or eliminate . . . market timing across the board." Id. Likewise, the Complaint plausibly alleges facts indicating that a reasonable investor would assume that Transocean's safety and training measures were not only "large in extent and range or amount," but adequate, when, in fact, the measures were insufficient to address applicable legal requirements and created a high risk of legal exposure. (See, e.g., Compl. ¶ 92 (failure to staff rigs with qualified engineers); id. ¶ 98 (Chief Counsel's Report's finding that Transocean inadequately trained [its] personnel); id. ¶¶ 111-12 (HSE Report's conclusion that Transocean gave "little consideration" to workers' behavior which could pose serious safety hazards, like "fatigue, distraction, communication failures, or defective equipment," that safety manuals were in short supply, and that Transocean understaffed safety personnel); id. ¶¶ 128-41 (detailing Transocean's failure to report safety incidents).)

Defendants' second contention fails for a similar reason. Puffery is defined as "an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would

not rely on it, thereby rendering it immaterial as a matter of law." <u>ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 206 (2d Cir. 2009). Quintessential examples of puffery include statements that a company "sets the standard for integrity," <u>id.</u>, or "general announcements that [a defendant] was optimistic about its earnings and expected to perform well." <u>San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co., Inc.</u>, 75 F.3d 801, 811 (2d Cir. 1996) (internal punctuation omitted).  In deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution. As explained above, materiality determinations entail delicate, fact-intensive assessments that are more properly left to the jury.  The only circumstance in which a Court may deem a statement immaterial as a matter of law is when it is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." <u>Ganino</u>, 228 F.3d at 162.  In an industry as dangerous as deepwater drilling, it is to be expected that investors will be greatly concerned about an operator's safety and training efforts.  The Court cannot say, as a matter of law, that Transocean's representation that such efforts were extensive was "obviously unimportant" to GSF shareholders.

      C.      <u>Statement That the Exchange Price Was "Fair"</u>

      Plaintiffs allege that, as a result of the misrepresentations and omissions concerning Transocean's safety, training, and inspection practices, the Proxy's representation that the Exchange Price was "fair" was also materially false.  (Compl. ¶ 50.)  "Plaintiffs who charge that a . . . fairness opinion . . . is materially misleading, must allege 'with particularity' 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false." <u>Bond Opp. Fund</u>, 2003 WL 21058251 at *5 (quoting <u>Va. Bankshares v. Sandberg</u>, 501 U.S.

1083, 1093-98 (1991)).  Defendants argue that the Complaint fails to allege facts showing that

they did not subjectively believe that the fairness opinion was accurate.  Defendants further argue

that the Complaint fails to proffer facts showing that price was unfair in 2007.  Neither argument

has merit.

Plaintiffs have alleged "provable facts" that support a strong inference that

Defendants did not believe the fairness opinion that they incorporated into the Proxy.  When

Lehman and Simmons concluded that the Exchange Price was fair, they relied on representations

in the Merger Agreement that Defendants allegedly knew were false and misleading.  Had

Lehman and Simmons known about Transocean's allegedly problematic safety, training, and

maintenance practices, it is highly unlikely that they would have given the exchange price their

imprimatur.  Plaintiffs allege that Defendants knew the true facts when the Proxy was issued.

The Complaint is thus sufficient to support plausibly the inference that Defendants were not

subjectively of the opinion that the exchange price was fair.  Thus, the Complaint has met its

burden of pleading objective and subjective falsity with respect to the fairness opinion.

VI.     Loss Causation

Under the PSRLA, a plaintiff must plead loss causation – i.e., a "causal link

between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."

Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003);

15 U.S.C. § 78u-4(b)(4).  Defendants argue that Plaintiffs have failed to plead loss causation

because the Complaint does not "plausibly distinguish between price declines caused by alleged

disclosures of the allegedly deficient Transocean practices and declines caused by the 'tangle of

[other] factors' that negatively affected Transocean's stock price."  (Defs Memo. at 28 (quoting

Dura, 544 U.S. at 343).)  According to Defendants, the "tangle of other factors" includes (1) the

stock decline in the oil-drilling industry as a whole; (2) investigations and hearings, prompted by

the Macondo Spill, into Transocean's practices; (3) lawsuits prompted by the Macondo Spill; (4)

a Transocean subsidiary's designation as a "responsible party" under the Oil Pollution Act as a

result of the Macondo Spill; (5) a stock analyst's downgrading of Transocean because of its

connection to the Macondo Spill; and (6) the moratorium on deepwater drilling, prompted by the

Macondo Spill.   Defendants' arguments are unavailing.

     "Loss causation may be adequately pleaded by alleging either a corrective

disclosure of a previously undisclosed truth that causes a decline in the stock price or the

materialization of a concealed risk that causes a stock price decline." In re American Intern.

Group, Inc., 2008 Securities Litigation, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010).  With respect

to the latter, "where some or all of the risk is concealed by the defendant's misrepresentation or

omission, courts have found loss causation sufficiently pled." Nathel v. Siegal, 592 F. Supp. 2d

452, 467 (S.D.N.Y.2008).  The pleading of loss causation – even for securities fraud claims - is

governed by Rule 8 notice pleading standards under which Plaintiffs must plead "a short and

plain statement of the claim showing that the pleader is entitled to relief." In re Bear Stearns

Companies, Inc. Securities, Derivative, and ERISA Litigation, 763 F. Supp. 2d 423, 506-07

(S.D.N.Y. 2011) (quoting In re Tower Auto. Sec. Litig., 483 F. Supp. 2d 327, 348 (S.D.N.Y.

2007)).  A complaint need only provide the defendant with "some indication of the loss and the

causal connection that the plaintiff has in mind." Id. (quoting Dura Pharms., Inc., 544 U.S. at

347).  Contrary to Defendants' contention, a plaintiff is not "required to allege the precise loss

attributable to [the fraud or misrepresentation/omission]." Lentell v. Merrill Lynch & Co., 396

F.3d 161 (2d Cir. 2005). Whether a loss "was caused by an intervening event . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." Emergent Capital, 343 F.3d at 197.[16]

Here, the Complaint pleads loss causation under both the corrective disclosure and the materialization of risk theories. First, it meticulously links each corrective disclosure about Transocean's drilling practices with a corresponding decline in Transocean's stock. Second, the Complaint pleads facts indicating that the Macondo Spill was caused in part by Transocean's poor maintenance and safety practices – in other words that, far from being part of the "tangle of other facts," the Macondo Spill was a manifestation of the very risks that were allegedly improperly concealed from shareholders in the Proxy. (See Compl. ¶¶ 12-14, 88-90, 108-109, 160, 174.)[17]

## V.    Claims Against Individual Defendants

The Complaint alleges that GSF CEO Marshall and Transocean CEO Long signed the Proxy "without adequately conducting due diligence to assure that the statements in the Proxy

---

[16]    The exception to this general rule was set forth in Lentell v. Merrill Lynch & Co., in which the Second Circuit held that in cases where "substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosure alleged to conceal the very same risk a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud – rather than other salient factors – that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment." 396 F.3d 161, 177 (2d Cir. 2005). This exception is inapplicable here.

[17]    The Court also finds it significant that Defendants' own chart comparing Transocean's stock prices against industry competitors shows that Transocean's stock suffered the most precipitous decline of any deepwater drilling company, belying Defendants' argument that Transocean's stock decline was simply a manifestation of a market-wide downturn.  (Ex. 3 attached to Defs' Memo.)

. . . were true and not misleading." (Compl. ¶¶ 23, 186.)  The Complaint also alleges that both

Individual Defendants "were aware of and/or had access to the true facts." (Id. ¶ 190.)

Defendants argue that the claims against the Individual Defendants are insufficient because these

conclusory allegations are not accompanied by facts sufficient to show scienter, nor facts that

give rise to a "strong inference of negligence." (Defs. Memo. at 26 (quoting Bond Opp. Fund,

2003 WL 21058251, at *4)).  The Complaint identifies numerous reports and complaints,

received by Transocean's management, that detailed the deficiencies in Transocean's safety,

training, and inspection protocols.  As such, the Complaint's allegations are sufficient to meet the

requirements of Rule 9(b).

VI.    Claims Against Transocean Ltd.

       According to documents attached to the motion to dismiss, after the October

2007, Merger between GSF and Transocean Inc., the merged company became a direct, wholly-

owned subsidiary of Transocean Ltd. as a result of a 2008 re-organization.  (Exs. 4 & 5, attached

to Defs Memo.)  Defendants argue that the Complaint should be dismissed as to Defendant

Transocean Ltd. because it is a separate legal entity that was not involved in the Proxy or Merger.

       Plaintiffs concede that Transocean Inc. is now a direct, wholly-owned subsidiary

of Transocean Ltd. and that, generally, "a parent corporation . . . is not liable for the acts of its

subsidiaries." United States v. Bestfoods, 524 U.S. 51, 61 (1998).  However, Plaintiffs argue

that Transocean Ltd. may still be held liable under the "de facto merger" doctrine and the "mere

continuation" doctrine.  The de facto merger exception applies "when the transaction between

the purchasing and selling companies is in substance, if not in form, a merger." New York v.

National Service Industries, Inc., 460 F.3d 201, 205 (2d Cir. 2006).  The mere continuation

exception applies where "it is not simply the business of the original corporation which continues, but the corporate entity itself and there is a common identity of directors, stockholders, and the existence of only one corporation at the completion of the transfer." Colon v. Multi–Pak Corp., 477 F. Supp. 2d 620, 626-27 (S.D.N.Y. 2007) (internal quotations omitted).

Plaintiffs have failed to proffer any factual support for either theory of liability in the Complaint and make only a cryptic reference to an "F-Reorganization" and the Internal Revenue Service Code in their opposition papers.   Accordingly, the Court will dismiss all claims against Transocean Ltd. and grant Plaintiff leave to amend the Complaint to add Transocean Inc. or plead facts in support of its de facto merger and mere continuation theories.

### CONCLUSION

Defendants' motion to dismiss the Amended Complaint is granted without prejudice as to all claims brought by Bricklayers and as to Transocean Ltd.  Plaintiffs are granted leave to file a Second Amended Complaint by April 16, 2012, adding Transocean Inc. as a Defendant or pleading facts in support of their claim against Transocean Ltd., as well as facts supporting Bricklayers' standing to bring a claim.  The motion to dismiss is denied in all other respects.

This memorandum opinion and order resolves docket entry no. 41.

SO ORDERED.

Dated: New York, New York
       March 30, 2012

_____
LAURA TAYLOR SWAIN
United States District Judge